Ex Parte Reverend Keith TUCCI.

Ex Parte Randall TERRY.

Ex Parte Patrick MAHONEY.

Ex Parte Wendy WRIGHT.

Ex Parte Flip BENHAM.

Ex Parte Joseph SLOVENIC.

Ex Parte Bob JEWITT.

Nos. D–2809, D–2819, D–2820, D–2821,
D–2822, D–2823, D–2824.

Supreme Court of Texas.

June 30, 1993.

Edward Gillett, Houston, Stuart J. Roth, Mobile, AL, Jay Alan Sekulow, Decatur, GA, James M. Henderson, Sr., Mark N. Troobnick, Washington, DC, John G. Stephanovich, Virginia Beach, VA, for relators.

Rock W.A. Owens, Arthur E. Murphy, Edna H. Palermo, Karen B. Jewell, Katherine A. Ellis, Kathy D. Patrick, Mike Driscoll, Terence L. O'Rourke, Craig Smyser, Neal S. Manne, Houston, for respondent.

## OPINION

DOGGETT, Justice.

We consider the scope of our state constitutional guarantee of freedom of expression. Keith Tucci, Randall Terry, Joseph Slovenic, Patrick Mahoney, Wendy Wright, Flip Benham, and Robert Jewitt were convicted of civil contempt for public protests in which each of them disregarded a provision of a temporary restraining order. As relators, they bring this original habeas corpus proceeding asserting that they have been confined for expression which is protected under article I, section 8 of the Texas Constitution.

## I.

The importance attached to freedom of expression in our state's jurisprudence is reflected in the longstanding rule that one imprisoned for disregarding a court order restraining speech may challenge the underlying restraint as void through a habeas proceeding such as this. Texas courts have repeatedly granted habeas relief to release those confined for disregarding an unconstitutional restriction on varying types of expression. *See Ex parte Henry*, 147 Tex. 315, 215 S.W.2d 588 (1948) (peaceful picketing); *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75 (1920) ("vilifying, abusing or using opprobrious epithets"); *Ex parte McCormick*, 129 Tex.Crim. 457, 88 S.W.2d 104 (1935) (gag order); *Ex parte Foster*, 44 Tex.Crim. 423, 71 S.W. 593 (1903) (gag order).[1] As we concluded in *Ex Parte Henry*:

> One cannot be punished for contempt for violating an order which a court has no authority to make.
> 215 S.W.2d at 597.[2]

Underlying our state law is the principle that speech delayed often translates into speech denied.[3] The Texas approach represents the converse of the federal collateral bar rule, which was relied upon in *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), to bar the release of Dr. Martin Luther King, Jr. and others from the Birmingham jail for disregarding unconstitutional restrictions upon their civil rights marches. Citizens must not "be muffled pending outcome of . . . proceedings" to dissolve an injunction, since

> [t]he ability to exercise protected protest at a time when such exercise would be effective must be as protected as the beliefs themselves.... It is a flagrant denial of constitutional guarantees to balance away this principle in the name of "respect for judicial process." To preach "respect" in this context is to deny the right to speak at all.

388 U.S. at 349, 87 S.Ct. at 1847 (Brennan, J., dissenting). Nor is Texas alone in recognizing the unduly restrictive nature of a collateral bar rule. *See, e.g., In re Berry*, 68 Cal.2d 137, 65 Cal.Rptr. 273, 280, 436 P.2d 273, 280 (1968) (en banc); *Wood v. Goodson*, 253 Ark. 196, 485 S.W.2d 213, 217 (1972); *State ex. rel. Superior Court v. Sperry*, 79 Wash.2d 69, 483 P.2d 608, 611 *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 418 P.2d 594, 596 (1966).[4]

---

1. Conversely, in *Ex parte Pierce*, 342 S.W.2d 424 (Tex.), *cert. denied*, 366 U.S. 928, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961), we appropriately denied habeas relief after determining that the underlying order was constitutional.

2. While claiming that Texas' repudiation of the collateral bar rule has nothing to do with affording special protection for speech, Chief Justice Phillips relies exclusively upon cases in which this court permitted collateral review of court orders restricting freedom of expression. 859 S.W.2d at 37 (Phillips, C.J., concurring). I certainly do agree, however, that this court's review in a habeas proceeding is not limited to whether the underlying order unconstitutionally infringes upon that particular right; an order unconstitutional on any grounds is not enforceable by contempt.

3. *See* Note, *Defiance of Unlawful Authority*, 83 Harv.L.Rev. 626, 635 (1970) (noting that the collateral bar rule may stifle freedom of expression).

4. Relying solely on the collateral bar rule to decide this case, the dissent, in a series of contradictions, suggests that, in appropriate cases, constitutional challenges may be permitted by those jailed for exercising their right of free expression, while at the same time making clear that an appropriate case will never arise. One exception that "may apply" occurs when an order is "transparently invalid," 859 S.W.2d at 65 (Hecht, J., dissenting), a term the dissent employs yet refuses to define. This exception, allegedly "may account for several of the Texas free speech cases," though we are not told which ones. *Id.* at 69. This exception apparently protects some forms of speech but not others such as demonstration by Relators in Houston. Perhaps forgetting that this case involves the right of free expression, the dissent announces that "Relators' circumstances are similar to those we described ... over a half century ago," in a case involving *attempted collection of a cigarette tax. Id.* at 70 (citing *Ex parte Kimberlin*, 126 Tex. 60, 86 S.W.2d 717 (1935)).

A second exception seemingly recognized by the dissent would permit collateral review in cases involving civil, as opposed to criminal, contempt. *Id.* at 68. Here, Relators were jailed until they purged themselves of contempt by swearing future compliance with the trial

## II.

Fearful that former President George Bush would weaken the Republican Party's opposition to a woman's constitutional right to choose whether to have an abortion, Relators initiated "Operation G.O.P." to express vehemently their anti-choice views during the 1992 Republican National Convention in Houston. To attract maximum attention, Relators scheduled their protests at local family planning clinics. Concerned that they and their clients would be caught up in the intra-Republican crossfire, these clinics, joined by others, obtained temporary restraining orders to protect clinic access. Nevertheless, Relators gave various speeches—one imploring President Bush to appoint additional anti-choice judges and others condemning abortions—within a judicially prohibited area of "one-hundred (100) feet" from "either side of or in front of any doorway entrance or exit, parking lot, parking lot entrance or exit, driveway, or driveway entrance or exit" of a clinic.

Each Relator was fined $500 and committed to the Harris County jail for six months or for a lesser time if purged of contempt by paying the fine and announcing in open court a willingness to abide by the restraining orders. All seven sought habeas relief, asserting that the contempt judgment by which they were incarcerated was based upon a void, unconstitutional temporary restraining order. After the court of appeals denied relief, this court ordered Relators released upon bond.

## III.

In support of the temporary restraining orders, it was asserted that clinic demonstrations posed an immediate and irreparable threat to the ability of women to seek counseling at the clinics and, if desired, to obtain abortion-related services without intimidation, threats of violence, harassment or physical obstruction. A woman's right to terminate a pregnancy is constitutionally protected. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). We have found merit in the reasoning of this decision in recognizing our own independent right of privacy under the Texas Constitution in *Texas State Employees Union v. Texas Dep't of Mental Health and Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987) (citing *Roe*); *see also Diamond Shamrock Ref. and Mktg. Co. v. Mendez*, 844 S.W.2d 198, 203 (Hightower, J., concurring) (emphasizing the imperative. nature of the right to privacy under the

court's order. Even though this case involves civil contempt, the dissenting justices nonetheless refuse to review the constitutionality of the underlying order.

Yet these purported exceptions are only a mirage, since even "transparently invalid" orders or unconstitutional ones forming the basis for civil contempt must be appealed prior to their violation. The dissent would require an attempt to appeal the underlying order restricting speech no matter how limited the time available. *Id.* at 70 n. 26 (relying on *In re Providence Journal Co.,* 820 F.2d 1354 (1st Cir.1987) (en banc) (requiring attempt to appeal, even when time available is a matter of hours)). The dissent would deny Relators relief because they "made no effort to seek review by appeal." 859 S.W.2d at 70. Relators are thus faulted for failing to pursue a remedy not available under Texas law, which prohibits an appeal of a temporary restraining order.

The dissent also suggests a possible exception to the collateral bar rule when an appeal of an order restricting expression cannot be timely prosecuted. But determination of how much time must be spent pursuing an appeal prior to speaking out in violation of a court order necessarily places courts in the position of evaluating the importance of the timing of the speech. Judges, then, would be elevated to censors required to examine the content of the speech to determine whether or not the message could wait a week, two weeks, a month or years until an appeal is prosecuted. If Relators could not have obtained a ruling on an appealable temporary injunction and subsequent emergency appeal until the second day of the Republican convention, would their rights be adequately protected? What if no ruling were possible until the very last day? Would the dissent require silence in the meantime?

Of course, what the dissent is truly demanding are not exceptions, but strict enforcement of the collateral bar rule, which is supposedly essential to the ability of "trial courts to enforce orders in volatile situations." *Id.* at 69. Our decision today, however, in no way lessens the power of a trial court to render an order in accord with the Texas constitutional standard and to enforce that order through the power of contempt. Contrary to the dissent, I cannot see how justice is served by leaving imprisoned those found to have violated an order shown to be unconstitutional.

Texas Constitution); Amy Johnson, *Abortion, Personhood, and Privacy in Texas*, 68 Tex.L.Rev. 1521 (1990). Without unimpaired access to appropriate counseling and medical facilities, a woman's constitutional guarantee of choice would be no choice at all.

Additionally, the clinics and intervenor businesses[5] claimed injury would result from trespasses, blocked access and the intimidation of patients, staff and customers. This court has recognized that "[c]onstitutional protection of the rights of free speech and assembly does not license ... obstruction of public ways or of entrances to and exits from places of business." *Ex Parte Pierce*, 342 S.W.2d at 427.

Uncontroverted evidence offered in support of the temporary restraining orders established that the threat of injury posed by Operation G.O.P. to the women plaintiffs' right of access to the clinics and to the ability of clinics and businesses to operate was both imminent and irreparable.

## IV.

The trial court issued two temporary restraining orders containing a number of provisions clearly directed to protecting against the specific injuries alleged by the women, clinics and businesses. Access was assured by injunctive relief that barred:

> [t]respassing on, physically invading, entering without consent, damaging, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any part of the Planned Parenthood facility ..., including the entrances and exits, the parking lots ..., and any of the clinic's or parking lots' entrances and driveways.[6]

To ensure access to the facilities in question, the trial judge further enjoined "obstructing or interfering in any way with the entrance or exit of pedestrian or vehicle

traffic to or from this one block of Berry Street." Additionally, the temporary restraining orders contained four independent provisions to guard against intimidation and harassment that prohibited:

> Demonstrating within twenty-five (25) feet of any person seeking access to or leaving the clinic, its parking lots, or intervenors' businesses or parking lots, or in any way impeding such person's entrance to or exit from the clinic, parking lots or businesses;

> Physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, or crowding persons entering or leaving, working at, or using any services at Planned Parenthood's above-referenced facility or at the intervenors' businesses;

> Harassing, intimidating or physically abusing any doctor, health care professional, or other staff member, employee or volunteer who assists in the provision of services at the Planned Parenthood facility; and

> *Making any sound or noise (whether by mechanical loudspeaker, sound amplification device or otherwise) that is so loud that it disturbs, injures, or endangers the health or safety of any patient or staff person of the ... facility.*[7]

The contempt convictions were not, however, based on violations of these provisions drawn to protect against specific injuries. Rather, confinement of relators was premised solely on their having disregarded portions of the temporary restraining orders that barred:

> Demonstrating within one-hundred (100) feet from either side of or in front of any doorway entrance or exit, parking lot, parking lot entrance or exit, driveway, or driveway entrance or exit at [any of the] clinics[s] or parking lots.

---

5. Adkins Architectural Antiques and Brian G. Martinez D.D.S., two businesses adjoining the Planned Parenthood Clinic on Berry Street, joined the clinic's request for a restraining order.

6. Similarly, the temporary restraining order applicable to the other clinics barred "[t]respassing on, sitting in, blocking, impeding or ob-

structing access to, ingress into or egress from any part of any of the buildings, the clinics' parking lots and any of the clinics' or parking lots' entrances and driveways."

7. Near identical provisions were included in the order applicable to the other clinics.

Relators thus do not attack any of the other provisions of the restraining orders but challenge only the one-hundred foot limitation as unconstitutional.

## V.

In reviewing the validity of the particular one-hundred foot limitation in these orders, we must look first to our Texas Constitution. *See Davenport v. Garcia*, 834 S.W.2d 4, 12 (Tex.1992). With its broad command that " '[e]very person shall be at liberty to speak ... opinions on any subject,' [8] article one, section eight ... provides greater rights of free expression than its federal equivalent." *Id.* at 10. "[I]ts language demonstrates Texas' strong and longstanding commitment to free speech." *Id.* at 7.

Relying upon this fundamental state guarantee, our courts have repeatedly rejected both legislative and judicial attempts to restrict expression. The earliest writings are those of our sister court, the Texas Court of Criminal Appeals. In granting habeas relief to an arrested news dealer, that court declared violative of article I, section 8 an ordinance of the City of Seguin forbidding the sale of a particular Chicago newspaper:

> The power to suppress one concedes the power to suppress all.... The doctrine of the constitution must prevail in this state, which clothes the citizen with liberty to speak, write, or publish his opinion on any and all subjects.

*Ex parte Neill*, 32 Tex.Crim. 275, 22 S.W. 923, 924 (1893). In *Ex parte Foster*, 44 Tex.Crim. 423, 71 S.W. 593 (1903), the same constitutional guarantee precluded a judicial attempt to suppress publication of testimony in a murder trial by the editor of the Houston Chronicle. *See also Ex parte McCormick*, 129 Tex.Crim. 457, 88 S.W.2d 104 (1935). In striking down a Disloyalty Act adopted during World War I, the court

similarly emphasized that "the use of [particular] language per se [cannot be made] a felony ... without offending against [this] provision of the Bill of Rights." *Ex parte Meckel*, 87 Tex.Crim. 120, 220 S.W. 81, 84 (1920).

In our civil jurisprudence, the "constitutional guaranty of liberty of speech" was accorded early respect, precluding an injunction to restrain publication of a libel. *Mitchell v. Grand Lodge Free & Accepted Masons*, 56 Tex.Civ.App. 306, 121 S.W. 178, 179 (Dallas 1909, no writ). Our court's first use of section eight to safeguard speech came in *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (1920), where habeas relief was accorded to one held in contempt for violating an injunction by making "slanderous epithets to the female telephone operators" during a labor dispute. In thereafter refusing to enjoin publication of an alleged libelous article, the court in *Strange v. Biggers*, 252 S.W. 826 (Tex.Civ. App.—Dallas 1923, no writ), declared that

> freedom of speech will necessarily end when supervision by a court of equity of the expressions and sentiments of the individual is allowed to begin.

*See also Pirmantgen v. Feminelli*, 745 S.W.2d 576, 579 (Tex.App.—Corpus Christi 1988, no writ) (holding unconstitutional injunction barring dissemination of allegedly libelous letter).

Consistent with this jurisprudence and the history of our state constitution, this court announced in *Davenport* that restrictions must be targeted at the effect of expression rather than at the expression itself. There, "an imminent and irreparable harm to the judicial process [that] deprive[s] litigants of a just resolution of their dispute" was determined to be the effect of expression to which a judicial order could be directed. 834 S.W.2d at 10. Second, we emphasized the need to ensure

---

**8.** Tex. Const. art. I, § 8, provides in full that: Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments of libels, the jury shall have the rights to determine the law and the facts, under the direction of the court, as in other cases.

that any limitation "represents the least restrictive means to prevent that harm[ful effect.]" *Id.*

■ That same standard controls here. Freedom of expression may not be restricted solely on grounds that its exercise will have the effect of producing imminent and irreparable harm. Restraints may be imposed only if the injunctive relief granted encompasses the least restrictive means of protecting against the alleged harmful effect. In resolving both whether the alleged effect was imminent and irreparable and whether the temporary injunctive relief granted here was the least restrictive means to prevent that harm, we look to the injury asserted, the relief requested, and the underlying evidence.

## IV.

■ Encompassed within this large "speech-free" zone around each of the clinics was not just clinic property and the area immediately in front of entrances and exits of the clinics and their parking lots, but public streets and sidewalks as well. This restriction had the effect of closing to protestors during the Republican Convention the entire city block on which the Planned Parenthood clinic was located, and displacing them across several of Houston's busiest streets. The one-hundred foot limitation similarly barred protests during this critical time on public streets and sidewalks near the other clinics.

The one-hundred foot speech-free zone provision of the temporary restraining order here bears a striking resemblance to that at issue in *Ex Parte Henry* prohibiting strikers from picketing "on, across, at or near or within 100 feet of the railroad tracks" being used to transport freight into their employer's plant. 215 S.W.2d at 590. In voiding that injunction, this court concluded that

> So long as the pickets did not physically obstruct the spur tracks and thereby nullify or seriously impair the right of the railways to use the street, they had the same right to use the streets as the railways had.

*Id.* at 597. Unless such a restriction is proved to be the least restrictive means of guarding against an irreparable and imminent injury, it is an impermissible infringement on our state constitutional right of free expression. While the one-hundred foot limitation here, simply by the mere fact of distance, might have had the general effect of preserving clinic access and protecting patients, staff and customers against intimidation and harassment, it was not proved at the trial court hearing that this large zone was the least restrictive means for guarding against these injuries. Although a map of the Planned Parenthood facility was referred to at the hearing on the restraining orders, it was not admitted into evidence. As to the other clinics, no evidence was offered regarding their location and physical facilities. It was recognized at the hearing that these varied widely, from free-standing buildings on heavily travelled city streets to smaller facilities in high-rise offices.

Those opposing the one-hundred foot speech free zone argued to the trial court that it was not tailored to the circumstances of each individual clinic. Rather than offering specific evidence justifying a particular distance for each clinic, those seeking the restraint urged a uniform restriction for "administrative convenience." As our sister court has noted, "the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen." *Ex parte McCormick,* 88 S.W.2d at 107. Nor was it shown that the other provisions of the temporary restraining orders provided inadequate protection. In fact, the parties seeking injunctive relief were not even in agreement as to the necessity of the one-hundred foot limitation; the State of Texas maintained that a thirty-foot zone was adequate to protect against any threatened injury.

Given the potential harmful impact of Relator's demonstrations on the fundamental constitutional right of privacy of women desiring access to these clinics, her decision to grant emergency relief is understandable. However, our state constitution re-

quires that we enforce its stringent preference for freedom of expression even for those who advocate interference with other constitutional rights. Without specific findings supported by evidence that the 100–foot speech-free zone was the least restrictive means to ensure unimpeded access to clinics and guard against intimidation and harassment, we hold that this limitation in the restraining orders violates article I, section 8 of the Texas Constitution.

Throughout the nation, peaceful antiabortion picketing has given way to increasing incidents of violence, vandalism and trespass, as well as blockading of clinic entrances denying women their right to seek reproductive health services, including abortions.[9] Effective injunctive relief is available to protect against these harms. There may well be situations in which prohibiting demonstration within a limited area is essential to protecting a woman's right to choose whether to have an abortion.[10] Here, though, the limited record before the trial judge at the hearings on temporary restraining orders did not support a one-hundred foot ban on speech. We should not be understood as saying the trial judge could not, following a more complete evidentiary hearing on permanent injunction, impose restrictions around the Houston clinics, either using a limited geographical ban on activity or restricting the number of protestors. Every such restriction must, however, be justified by a proper evidentiary showing that such measures are essential to preserve the right of clinic access, and that each satisfies fully the

standard we have required under the Texas Constitution.

A least restrictive means requirement ensures that, when a variety of methods are available to prevent harm, our constitution commands the use of that approach which is least intrusive as to individual liberties. The West Virginia Supreme Court has similarly recognized that its "state constitutional free speech provisions would certainly compel" the use of a "less restrictive alternatives" analysis. *West Virginia Citizens Action Group, Inc. v. Daley,* 174 W.Va. 299, 324 S.E.2d 713, 725 (1984). Nor does this requirement differ significantly from the appropriate interpretation of the meaning of "narrowly tailored" under the better reasoned federal jurisprudence. *See, e.g., Project 80's, Inc. v. City of Pocatello,* 876 F.2d 711 (9th Cir.1989); *Pursley v. City of Fayetteville,* 820 F.2d 951 (8th Cir.1987); *City of Wateska v. Illinois Public Action Council,* 796 F.2d 1547 (7th Cir.1986), *aff'd mem.,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987); *Wisconsin Action Coalition v. City of Kenosha,* 767 F.2d 1248 (7th Cir.1985); *Association of Community Org. for Reform Now v. City of Frontenac,* 714 F.2d 813 (8th Cir.1983).

The eventual, unfortunate repudiation of this protective standard by the United States Supreme Court in *Ward v. Rock Against Racism,* 491 U.S. 781, 798–99, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989), has justifiably met with criticism.[11] By now merely requiring that the means chosen "promotes a substantial government interest that would be achieved *less effec-*

9. *See, e.g.,* David A. Grimes, Jacqueline D. Forrest, Alice L. Kirkman & Barbara Radford, *An Epidemic of Antiabortion Violence in the United States,* 165 Am.J. of Obstetrics and Gynecology 1263 (1991); *Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, —— ———, & n. 10, 113 S.Ct. 753, 780–81 & n. 10, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting) (detailing incidents of violence, vandalism and blockading by Operation Rescue).

10. Although not reviewed under our state constitutional standard, prohibitions encompassing more limited areas have been upheld elsewhere as a means of assuring clinic access. *See Portland Feminist Women's Health Ctr. v. Advocates for Life,* 859 F.2d 681, 684 (9th Cir.1988) (12–

foot rectangular zone in front of clinic); *Thompson v. Police Dept. of New York,* 145 Misc.2d 417, 546 N.Y.S.2d 945, 947 (N.Y.Sup. 1989) (8 by 15 foot zone in front of clinic entrance).

11. *See, e.g.,* Paul A. Blechner, *First Amendment: Supreme Court Rejection of the Least Restrictive Alternative Test,* 1990 Ann.Surv.Am.L. 331 (1991); Gregory L. Lippetz, *The Day the Music Died:* Ward v. Rock Against Racism, 25 U.S.F. L.Rev. 627 (1991); Carney R. Sherigan, *A Sign of the Times: The United States Supreme Court Effectively Abolishes the Narrowly Tailored Requirement for Time, Place and Manner Restrictions,* 25 Loyola L.A. L.Rev. 453 (1992).

*tively"* otherwise, *id.* at 799, 109 S.Ct. at 2758 (emphasis supplied), that Court tolerates rather substantial adverse effects on speech if masked as directed to some purported goal other than suppression. This lesser standard dilutes constitutional speech protections and assures that there will be "trampl[ing] on the rights of others" [12]: those who express unpopular views.

Unless alternative methods of protecting against harm are considered, courts cannot evaluate whether the means selected are narrowly directed to that objective. *See id.* at 806, 109 S.Ct. at 2762 (Marshall, J., dissenting). As explained by the commentator upon whom Justice Gonzalez relies, 859 S.W.2d at 59–60 (Gonzalez, J., concurring), consideration of less restrictive alternatives "is relevant to deciding whether government has in fact left too little opportunity for communicative activity, whether for speakers or for listeners." Laurence H. Tribe, American Constitutional Law § 12–23 (2d ed. 1988).

To provide speech the full protection guaranteed by article I, section 8, our evaluation of restrictions must consider whether the method of preventing harm constitutes the least restrictive means.[13] In con-

curring in today's judgment, despite their protestations to the contrary, Justice Gonzalez and Chief Justice Phillips [14] do, in fact, evaluate lesser intrusive means of preventing harm in determining whether the 100–foot speech-free zone may be upheld. Both note, as do I, the other less restrictive provisions of the trial court's temporary order which appear designed to protect the right of clinic access.[15] It is preferable, however, not just to employ a least restrictive means analysis here, but to reaffirm it clearly as an essential element of our jurisprudence. This ensures more consistent judicial consideration that cannot waver depending on a judge's personal approval or disapproval of the message that has been restricted.

Today our court continues to favor the growth and enhancement of freedom not its constraint. The fact that vigorous debate of public issues in our society may produce speech considered obnoxious or offensive by some is a necessary cost of that freedom.[16] Our Constitution calls on this court to maintain a commitment to expression that is strong and uncompromising for friend and foe alike.

Accordingly, Relators remain discharged.

---

**12.** *See* 859 S.W.2d at 62 (Gonzalez, J., concurring).

**13.** The only authority upon which Justice Gonzalez relies for requiring proof that the competing interest is truly compelling, *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987), in fact reaches a result opposite to the one he endorses today. There, the Washington Supreme Court upheld a geographical ban on speech similar to the one we consider, even though other more specific provisions of the injunction were designed to protect clinic access. *See* 721 P.2d at 918 (Anderson, J., dissenting in part).

**14.** Since most of his lengthy writing has so little to do with today's decision and so much to do with his fretting over *Davenport,* Chief Justice Phillips' concurrence is addressed in an appendix.

**15.** While the concurring justices join in today's judgment, they do so in a manner that is directed more by labels than analysis. They resolve the issue presented by classifying the suppres-

sion of expression as "indirect" rather than "direct," 859 S.W.2d at 59–60 (Gonzalez, J., concurring), or as a partial rather than a "total" ban, *id.* at 27 (Phillips, C.J., concurring), or as a mere "place" restriction rather than a true "prior restraint." *Id.* Within the 100 foot areas, a "direct" and "total" ban was imposed to "restrain" speech "prior" to its exercise. Chief Justice Phillips provides no basis for distinguishing between the 100–foot speech free zone we consider today as simply a place restriction, as opposed to a 500–foot limitation, or one set at the number of feet encompassed within the Seguin city limits in 1893. *See id.* at 27 (conceding latter, at issue in *Ex Parte Neill,* 32 Tex.Crim. 275, 22 S.W. 923 (1893), is a "prior restraint"). Judicial inquiry is more appropriately focused on whether the restriction, however labelled, is directed solely to the harmful effects of speech and whether its proper objective is accomplished in the least restrictive manner.

**16.** In the words of Justice Holmes, genuine freedom of expression requires "not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer,* 279 U.S. 644, 655, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929) (Holmes, J., dissenting).

Concurring opinion by PHILLIPS, C.J., joined by CORNYN, J.

Concurring opinion by GONZALEZ, J.

Dissenting opinion by HECHT, J., joined by ENOCH, J.

## APPENDIX I

### Response to Concurrence of Chief Justice Phillips

Today at least five members of this Court continue to subscribe to the broad conception of individual liberty guaranteed under our state constitution and embodied in *Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992, orig. proceeding). While requiring a mere nine paragraphs to explain his own rationale for agreeing with the judgment entered today, Chief Justice Phillips writes at length about a guarantee of the Texas Constitution that he then chooses to ignore completely, since he is personally unable "to articulate its meaning with confidence." 859 S.W.2d at 33. Instead, he prefers to resolve this case solely on federal constitutional grounds which are "more familiar" to him. *Id.*

Rejecting the views of both this plurality and Justice Gonzalez regarding the import of *Davenport* for the instant case, his expansive writing addresses issues that even he concedes "would be folly to attempt to resolve here." *Id.* at 16 n. 1. His search for "astonishing errors" in *Davenport, id.* at 28, is, itself, rather astonishing. In his zeal to dissent from each and every underpinning of that decision, Chief Justice Phillips goes to the extreme of questioning support for the court's observations that

"[f]rom the outset of this state's history, freedom of expression was a priority." *id.* at —— (quoting *Davenport*, 834 S.W.2d at 7), and that

> The authoritarianism and unresponsiveness of Mexico to [certain] attempts to exercise and establish protection of free speech were a contributing factor to Texas' revolution and independence.

*Id.*

Refusing to acknowledge the early commitment of Texans to freedom embodied in their Proposed Constitution for the State of Texas (1833), *see id.*, Chief Justice Phillips disregards experiences that shaped their concerns including Mexican appropriation of printing presses brought to Texas,[17] a mandated printer's oath "not to disturb the peace,"[18] instructions by the Commandant at Bexar to "prevent the enemies of order from circulating reports"[19] and attempted military censorship of newspaper comment on "odious and noisy questions" about the conduct of governmental affairs.[20]

Indeed, our Texas Declaration of Independence emphasizing that the Mexican government had removed "even the semblance of freedom," complained that the expression of the citizenry in the form of "petitions and remonstrances" had not only been disregarded but that spokesmen like Stephen F. Austin had been "thrown into dungeons." Austin, himself, had previously called for "an inviolable guarantee of liberty of speech."[21] He contended that

> A free press was the battery, pen and ink the small arms, and sound principles the balls and shells with which well disseminated and united public opinion [could]

17. *See* Eugene C. Barker, *Notes on Early Texas Newspapers 1819–1836,* 21 Sw.Hist.Q. 127, 128 (1918).

18. *Id.* at 130 (describing printers' oath).

19. Letter from Colonel Domingo de Ugartechea [Commandant at Bexar] to the Principal Commandancy of Coahuila and Texas, dated July 15, 1835, 1 Papers of the Texas Revolution 245 (John Jenkins, ed. 1973).

20. Letter from General Martin Perfecto de Cos to the Editors of the *Mercurio de Matamoros* dated March 31, 1835, 1 Papers of the Texas

Revolution 50 (John Jenkins, ed. 1973), to which these early journalists appropriately expressed outrage, indicating that their writing about "'odious questions' [was] indispensable [for] calling the attention of the Government" and noting the eagerness of the people for a response to the "remonstrance [that] had been made to the Government." *See* Letter from the Editors of *Mercurio de Matamoros* to General Martin Perfecto de Cos, Commandant General of the Eastern Internal States, dated April 13, 1835, *id.* 65, 66.

21. See Eugene C. Barker, The Life of Stephen F. Austin 72 (2d ed. 1949).

beat down aristocratic privilege and abuse.[22]

When such efforts proved unavailing, and as a basis for "exhort[ing] every citizen to march as soon as possible" so that Texas "be freed from military despots before it is closed," he also, as Chairman of a Committee of Safety, in a Circular to the public protested that the Mexican government had "suppressed, by military influence, the expression of public opinion."[23]

This history is, of course, ignored in today's attack on the court's prior writing in *Davenport,* as is the call for a "full, clear, and comprehensive bill of rights" in the earlier Declaration of Independence, made at Goliad on December 20, 1835.[24] This call was answered shortly thereafter in 1836 with the adoption of the Declaration of Rights in the Constitution of the Republic of Texas. It is the freedom of expression guarantee of Section 4 of this Declaration to which the court in *Davenport* referred in concluding that

> Rather than a restriction on governmental interference with speech such as that provided by the First Amendment of the United States Constitution, Texans chose from the beginning to assure the liberties for which they were struggling with a specific guarantee of an affirmative right to speak.

834 S.W.2d at 7–8.

**22.** *Id.* at 342.

**23.** Circular from Committee of safety of the jurisdiction of Austin, October 3, 1835, 1 Papers 19 (Jenkins).

**24.** Nor was that call isolated. Austin had summoned Texans to "express our opinions on the present state of things, and to represent our situation to the government." Speech of Colonel Austin delivered September 8, 1835, 1 Papers 423, 427 (Jenkins). They were doing just that. In Nacogdoches with an "exchange [of] their ideas freely and fearlessly," they sought "the preservation of human rights" and opposed "symptoms of tyranny dangerous to liberty." Nacogdoches Meeting, August 15, 1835. *Id.* at 343–44. At the same time their neighbors sought newspaper publication of Resolutions adopted at San Jacinto insisting that "there are certain, essential, sacred and imprescriptible rights which must be guaranteed to every citizen." *See id.* at 317–21.

**25.** Ransom Hogan, *Rampant Individualism in the Republic of Texas,* 44 Sw.Hist.Q. 454, 456–57

But Chief Justice Phillips will have none of this. There is nothing unique about Texas, he insists. In defiance of the historical record, he insists that there is simply insufficient repetition by the Texans of the revolutionary era in asserting their concerns about liberty and claims an interest in this vital subject must be confined to one man, Stephen F. Austin, long revered as the father of Texas. 859 S.W.2d at 30. Any fair analysis of our history justifies our reading of it in *Davenport;* the desire for freedom of expression was hardly limited to one man or one document. So devoid of historical support is Chief Justice Phillips that he must cite to an article whose very title contradicts his opinion and speaks to what is special about this state— *Rampant Individualism in the Republic of Texas.*[25] In fact, that study heralds

> a widespread passion for freedom of speech, which the motto of the Matagorda *Colorado Herald* further exemplified: "Give me liberty to know, to utter, and to argue freely, above all liberties."[26]

He prefers to denigrate the work of the Texas drafters of that same era on the unusual grounds that they must have considered the constitutional experience of others and because the strong language they chose in 1836 did not attract the enthusiasm of one historian a century later.[27]

(1941). Because these early Texans "were irascible" and "enjoyed fighting" often sparked by "[u]nbridled talk," *id,* Chief Justice Phillips amazingly concludes that these people, who so prized freedom and individualism, lacked "tolerance" of expression.

**26.** *Id.*

**27.** *See* 859 S.W.2d at 29 (quoting Rupert N. Richardson, *Framing the Constitution of the Republic of Texas,* 31 Sw.Hist.Q. 191, 213 (1928)). This same commentator offers no support for Chief Justice Phillips' contention that Pennsylvania was the keystone state for the Texas freedom of expression provision. Speaking of our first charter, he writes that "[i]t does not appear that any one state constitution was followed." *Id.* at 209. Commenting more specifically on the Declaration of Rights, he concludes

> It appears that the framers of this article had before them a copy of the Constitution of the United States and that of several of the southern and western states, and that they gathered

Certainly Texans did not live wholly isolated from the rest of the world and human experience in 1836, 1845,[28] or 1876,[29] nor do they now.[30] Of course, there are others here and abroad who have made enormous contributions to freedom. The question resolved by the court in *Davenport* and addressed once again today is whether the Texas judiciary will contribute to that effort with independent decisionmaking or serve only to parrot the thinking of an omniscient federal judiciary on every civil liberties question.

Not content to disparage only the first clause of article I, section 8 on which *Davenport* centered, Chief Justice Phillips extends his criticism to the second as well:

[A]nd no law shall ever be passed curtailing a liberty of speech, or of the press.

Though aware that such wording was not commonly employed elsewhere at the time of its original adoption in Texas, Chief Justice Phillips immediately assumes that our Texas founders were simply penning platitudes rather than constitutional guarantees. 859 S.W.2d at 22–23. He refuses to accord any significance to this clause, first incorporated by Texans in 1836, because of

differing amendments rejected at the Pennsylvania Constitutional Convention of 1790 [31] and the Texas Reconstruction Convention of 1868. As to the latter, it is difficult to see how the rejection of an amendment offered by a delegate "who voted with the Radical Republicans" to strike this clause constitutes "at least circumstantial evidence" of anything.

Passing quickly over the particular wording of that part of article I, section 8 applicable here and in *Davenport*, Chief Justice Phillips instead dissects another largely uninterpreted clause. 859 S.W.2d at 23. In order to dilute our state constitutional free speech guarantee, this concurrence focuses almost exclusively on constitutional language dealing with libel actions. *See, e.g., id.* at 28 (deriding as a "curious conclusion" *Davenport's* reference to Texas' early commitment to freedom of speech, since the constitution also "in common with most American state constitutions, expressly recognized criminal libel prosecutions"); *id.* at 25 (condemning the Court's "characterizing" of the 1875 Convention with regard to resolutions containing a truth defense in libel actions).[32] The law of defamation is

---

from each whatever gems of political philosophy struck their fancy.
*Id.*

**28.** Indeed, as indicated by another source upon whom Chief Justice Phillips relies:

although delegates to the Constitutional Convention of 1845 mentioned from time to time the provisions existing in constitutions elsewhere, they were ready to agree with Rusk that "We can reflect for ourselves and are capable of forming a Constitution for ourselves."

Frederic L. Paxson, *The Constitution of Texas, 1845*, 18 Sw.Hist.Q. 386, 388 (1915).

**29.** *Davenport* acknowledged that our current charter was "molded after reflection on the constitutions of other states [but should not] veer in meaning each time the United States Supreme Court issue[s] a new decision." 834 S.W.2d at 16 (quoting James C. Harrington, The Texas Bill of Rights 41 (1987)).

**30.** *See Dow Chem. Co. v. Alfaro,* 786 S.W.2d 674, 680 (Tex.1990) (Doggett, J., concurring) ("Never have we been required to forfeit our membership in the human race in order to maintain our proud heritage as citizens of Texas.").

**31.** Chief Justice Phillips relies not just on Pennsylvania's rejection of wording similar to that

incorporated in the second clause of section 8, 859 S.W.2d at 22, to prove the meaningless nature of the Texas free speech guarantee, but also on its *acceptance* of wording similar to that of the first clause of section 8. *Id.* at 20. Not acknowledging this inconsistency, he insists that what "was unquestionably a triumph for conservative commercial interests and their allies" in Pennsylvania in 1790 be controlling law in Texas in 1993. *Id.* at 21.

**32.** In properly noting that "a proposal to replace the existing free expression provision with alternative language more similar to that of the First Amendment of the United States Constitution was explicitly rejected" in the 1876 Constitution, this Court in *Davenport,* 834 S.W.2d at 8, referenced defeat of a resolution by delegate Brady in favor of "including an affirmative grant of the liberty to speak and publish." *Id.* at n. 13. The court did not address the impact of the Convention's handling of another clause, not at issue in *Davenport,* dealing with libel actions and incorporated in the same rejected resolution.

Nor is there any evidence to suggest that the same convention's substituting the word "person" for "citizen" in article I, section 8 was some mere "printer's error." 859 S.W.2d at 30. Texas was not alone in broadening its protection to

now declared the superior lens through which the Texas commitment to freedom of expression must be viewed. Not only did this Court in *Davenport* fail to appreciate the marvels of this wonderful looking glass, but Chief Justice Phillips also notes the similar failings of those other state courts that have "deemed their free expression clauses broader than the corresponding federal guarantee." *Id.* at n. 24.

While irrelevant to any of the parties before us, a review of the Texas law of libel is absolutely essential to the concurrence; without it, an argument could never be made that "proponents of free expression died hard"[33] in Texas nor the quite extraordinary assertion that

> [by] 1876, Texas, at least from a constitutional standpoint, was no longer on the cutting edge of free expression; it was not even in the mainstream.

859 S.W.2d at 25. Such claims hardly comport with the reality of nineteenth century Texas in which the ordinary newspaper editor has been described as disposed to discuss public men and public measures with the utmost freedom, to denounce without restraint what he believed to be wrong, and to advocate with vigor and fervor what he conceived to be right.[34]

Only during the period of reconstruction that followed the Civil War and immediately preceded the 1876 Convention was the Texas editor

> confronted by the unaccustomed fact that the frank expression of his opinions as to public policy and the acts of those in authority was liable to be construed as treason.[35]

Interestingly, Chief Justice Phillips's primary expert on our state's history of freedom of expression is the occupying Union General during Reconstruction, who advances the quite preposterous claim that such freedom "ha[d] never existed in Texas," 859 S.W.2d at 31 (quoting General J.J. Reynolds, November 4, 1868). This wholly unsupported assertion contrasts with the decision of even the delegates to the Reconstruction Convention of 1868[36] to reject conformity of our Texas Bill of Rights with the Federal Bill of Rights[37].

---

every "person." *See The Kentucky Bill of Rights: A Bicentennial Celebration*, 80 Ky.L.J. 1, 41 (1990–91) (noting substitution of "person" in the freedom of expression provision of section 8 of the Kentucky Constitution of 1891 for "citizen" in that of 1792, art. XII, § 7).

**33.** 859 S.W.2d at 25 (quoting Frederic L. Paxson, *The Constitution of Texas, 1845*, 18 Sw. Hist.Q. 386, 395 (1915)) (quoting W. Weeks, ed., Debates of the Texas Convention 303 (Houston 1846)). Indeed, those debates reflect that the delegates chose a compromise whereby public figures were accorded less protection than private citizens.

By the contemporary standards of the day, this appears to have not been significantly different from what even some newspapers advocated. For example, editor Godwin Brown Cotton announced in the August 21, 1830 issue of *The Texas Gazette*, published at Sam Felipe de Austin, that "our press shall never be made the vehicle of accusations against the private character of any individual whatever." But, according to a later commentator,

> public men, for public acts, [Cotton] says, are responsible and may be investigated in the press, but not so with private cases.

*See* Eugene C. Barker, *Notes on Early Texas Newspapers 1819–1836*, 21 Sw.Hist.Q. 127, 131–32 (1918).

**34.** A.C. Gray, *A History of the Texas Press*, in 2 A Comprehensive History of Texas, 1685–1897 368, 395 (Dudley G. Wooten, ed. 1989).

**35.** *Id.* Indeed, the one specific example given of a nineteenth century prosecution for seditious libel was during this period:

> The [editor of the Houston] Age charged that one of the officers of the State government was "the champion thief of America." He was indicted by a Republican grand jury, charged with criminal libel, and gave bond in the sum of five thousand dollars for his appearance to answer. He republished the charge, insisted that it was true, and challenged the State to a trial; but the case was postponed from term to term and finally dropped.

*Id.* at 403–04.

**36.** *See Quinlan v. Houston & T.C. Ry. Co.*, 89 Tex. 356, 34 S.W. 738, 744 (1896) (explaining that, pursuant to a proclamation of U.S. President Andrew Johnson, this convention met to restore the Constitution of 1845 and disavow the 1861 Secession Convention); *see also Grigsby v. Peak*, 57 Tex. 142, 145, 150–51 (1882).

**37.** The delegates voted to retain Sections 3–21 of the Bill of Rights of the 1845 Constitution and rejected a committee recommendation that would have substituted a demand for federal conformity:

We are told that our Texas guarantee of freedom of expression is but a poor copy of an earlier Pennsylvania Constitution. 859 S.W.2d at 21 (citing Pa. Const. art. IX, § 7 (1790) as "the paradigm for the Texas guarantees"). Even were it true that our forbears simply copied identical language from the federal constitution or that of another state, that does not mean that they accepted the identical meaning attached by that other forum, either then or now. But in this particular instance, what we are not told is that the Pennsylvania courts have regularly interpreted this language as "independently protect[ing]" expression, *William Goldman Theaters, Inc. v. Dana*, 405 Pa. 83, 173 A.2d 59 (1961), and as "even more protective of speech than the federal Constitution." *Franklin Chalfont Assoc. v. Kalikow*, 392 Pa.Super. 452, 573 A.2d 550, 556 (1990); *see also Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981). Nor are they alone. Almost a century ago wording similar to that contained in article I, section 8 was described as "terse and vigorous" and "broader" than the comparable federal provision with which it "varies" and as "giv[ing] [citizens] greater liberty in the exercise of the right granted." *Dailey v. Superior Court*, 112 Cal. 94, 44 P. 458, 459 (1896). The highest court of another state to whose constitutional language on freedom of expression Chief Justice Phillips refers has reached the same conclusion. *See O'Neill v. Oakgrove Construction, Inc.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 4–6, 523 N.E.2d 277, 280–82 (1988). Indeed, what he demands today is not so much the imposition of Pennsylvania constitutional language but the minority approach to interpreting that language, which that very state has rejected.[38]

The consternation expressed in today's concurrence is hardly limited to *Davenport;* what really seems to upset Chief Justice Phillips is a decade of important related jurisprudence. Both this court and our sister court, the Court of Criminal Appeals have recognized the independent vitality of our Texas Constitution rather than relying exclusively on the federal judiciary. *See, e.g., LeCroy v. Hanlon*, 713 S.W.2d 335, 338–39 (Tex.1986); *In re Baby McLean*, 725 S.W.2d 696, 698 (Tex.1987); *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983); *Heitman v. State*, 815 S.W.2d 681, 690 (Tex.Crim.App.1991). He repudiates the rationale of all of these opinions.

Additionally Chief Justice Phillips declares these rulings of our highest Texas courts "simply wrong" in describing a federal constitutional floor for individual liberties, which the states may equal or exceed with a ceiling—a greater level of protection. 859 S.W.2d at 32. When both federal and state constitutional claims are raised, a state court may not, under the supremacy clause, U.S. Const. art. VI, cl. 2, afford less protection to individual rights than that guaranteed by our national Bill of Rights. In that sense, the prior writings of this court are fully accurate regarding a "federal safety net"—a floor for our liberties and a potentially higher state ceiling. It is also true that an independent state judiciary may interpret its fundamental law as affording less protection than our federal charter. Chief Justice Phillips prefers the latter. In his view not only does our state charter fail to offer a more expansive ceiling for broader freedoms but it fails even to offer a floor.

Chief Justice Phillips insists that the poor wording selected by the Texas frontiersmen provides even less protection than those guarantees found elsewhere, 859 S.W.2d at 31; apparently our State Constitution offers only superfluous subflooring for individual rights. In essence his position is that anything not already written about the scope of freedom of expression

---

The inhibitions of power enunciated in articles from one to eight inclusive, and thirteen, of the amendments to the Constitution of the United States, deny to the States, as well as to the General Government, the exercise of the powers therein reserved to the people, and shall never be exercised by the government of this State.
1 Journal of the Reconstruction Convention of 1868 235, 662 (1870).

**38.** *See Goldman Theaters*, 173 A.2d at 69, 72 (Eagen, J., dissenting).

can best be obtained from Washington.[39] The possibility that state jurists have the capacity for thoughtful, independent consideration of even identical constitutional language [40] is not even a conceivable possibility. Fortunately our court continues to reject this view. Rather we agree that our own constitutional guarantees must be

truly independent of the rising and falling tides of federal case law both in method and in specifics. State courts cannot abdicate their responsibility for these independent guarantees, at least not unless the people of the state themselves choose to abandon them and entrust their rights entirely to federal law.

*State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1323 (1983). Lost in the discussion of the law of Blackstone, of defamation and the federal courts, Chief Justice Phillips forgets that "[h]istorical analysis is only a starting point" for understanding our Constitution; "[i]n no way must our understanding of its guarantees be frozen in the past." *Davenport,* 834 S.W.2d at 19. Our Texas Constitution is not a collection of meaningless paper promises, mere surplusage to the federal guarantees. Rather we as jurists are summoned to give effect to its terms whenever liberty is threatened.

A state court that dares to give such independent meaning to the fundamental governing law adopted by its citizens assures only "five justices' ephemeral notion of the greater good," 859 S.W.2d at 32. A federal court only "do[es] good" and must be copied. A state court that assures greater liberty rights for its citizens must necessarily be in the "grab bag" business of "result oriented pronouncements;" a federal court only gets the right result with the right reasoning. *Id.* This is the essence of the view urged with such vehemence by Chief Justice Phillips in an attack not limited to the five jurists with whom he differs today, but aimed more generally at the disavowal of prior Texas rulings upholding state constitutionalism as well as those other state courts that have "deemed their free expression clauses 'broader' than the corresponding federal guarantee." *Id.* at 32 n. 34; *see also supra* text accompanying n. 22. Chief Justice Phillips is more than willing to find fault with attempts to recognize our state constitution as a separate, firm basis for our liberties, but wholly reluctant to assist in a "principled articulation" *and application* of its terms. *Id.* at 32. To him, only the possibility that our state judiciary may interpret our state charter as affording *less* protection than the federal affords any hope "of principled state constitutional development." *Id.* at 32 n. 34 (offering a rare line of praise for my opinion because of its acknowledgement that a state constitution could conceivably offer less protection).

The concurrence naturally derides as a "false construct," *Id.* at 33, the sound rea-

---

**39.** In his demand for a wholly subservient role for Texas jurisprudence and his strained interpretation of the liberty guarantees contained in the Texas Constitution, Chief Justice Phillips overlooks the reality of federal jurisprudence. The vital meaning of constitutional language not uncommonly lies dormant. As the U.S. Supreme Court, in an opinion authored by Chief Justice Vinson, observed:

no important case involving free speech [initially guaranteed in 1791] was decided by this Court prior to *Schenck v. United States,* 249 US 47 [39 S.Ct. 247, 63 L.Ed. 470] (1919). *Dennis v. United States,* 341 U.S. 494, 503, 71 S.Ct. 857, 864, 95 L.Ed. 1137 (1951).

Similarly, more than half a century elapsed after enactment of the Fourteenth Amendment before its application of First Amendment guarantees to the states was acknowledged in *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed.

1138 (1925). As recently as *Prudential Ins. Co. v. Cheek,* 259 U.S. 530, 538, 42 S.Ct. 516, 520, 66 L.Ed. 1044 (1922), the United States Supreme Court continued to declare that "the Constitution of the United States imposes upon the States no obligation to confer upon those within their jurisdiction ... the right of free speech...."

**40.** *See* Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law,* 1 Emerging Issues in State Const.Law 17, 19 (1988) ("that [some state constitutional provisions] are duplicated in the federal Constitution cannot mean that they are simply to be cloned to their federal counterparts"); *see, e.g., Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548, 555 (1985) (reaching conclusion contrary to United States Supreme Court based on differences concerning application of similar state and federal constitutional provisions).

sons relied upon by this court in *Davenport*, 834 S.W.2d at 17–19, to justify looking first to our state constitution.[41] His broadside is further extended to a most accurate summary of the facts here while failing to identify a single, specific shortcoming in that recitation. 859 S.W.2d at 33–36 Chief Justice Phillips then concludes by copying not only the reasoning but the buzzwords of his sole "commentator" on "result-oriented pronouncements"—Justice Hecht's concurrence in *Davenport*[42]—of which only a more verbose replay has been provided today. *Id.* at 37. A new claim that our constitution has been treated as "a handy grab bag"[43] and old charges of "case-by-case activism" and "unseemly chauvinism," *id.*,[44]—charges directed at the just pride that this court has taken in our unique Texas heritage, our Texas Constitution, and our Texas jurisprudence—have been answered fully in *Davenport:*

> In interpreting our constitution, this state's courts should be neither unduly active nor deferential; rather, they should be independent and thoughtful in considering the unique values, customs, and traditions of our citizens....

> While reflecting local concerns and assuring local accountability, reliance by this court on our own constitution allows Texas to have a meaningful voice in developing this nation's jurisprudence....

> As a state court, sitting in Texas, our expertise is in Texas law, our judges are Texas citizens and members of the Texas Bar, and our concerns are Texas concerns. If we simply apply federal law in all cases, why have a Texas Supreme Court?....

> ... [C]onsistent with the very diversity that supplies strength to our union, we build from experience in Texas and elsewhere to enhance individual liberty....

> ... [W]e accept today ... the responsibility to conduct a thoughtful, complete, and independent search for a sound understanding of our most fundamental state law.

834 S.W.2d at 18, 19, 20, 22, 23. Hopefully an eventual willingness of all members of this Court to accept this responsibility will produce considerably "more substantial" efforts in the future. 859 S.W.2d at 37. All that remains "flawed" today is not the "methodological framework" of *Davenport, id.*, but the unwillingness of four justices on this court to honor and protect it.

---

**41.** To support his reliance solely on federal law to decide claims made by Texas citizens under the Texas Constitution, Chief Justice Phillips disregards the overwhelming majority of commentators that approve efforts of state judiciaries to contribute to constitutional scholarship. *See, e.g.,* Peter J. Galie, *State Supreme Courts, Judicial Federalism and the Other Constitutions,* 71 Judicature 100, 100 n. 10 (1987) (of approximately three hundred articles, "all but a handful are favorable"); Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law,* 1 Emerging Issues in St. Const.L. 17, 17 (1988); William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.U.L.Rev. 535 (1986); Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 Tex.L.Rev. 977 (1985); Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts,* 18 Ga.L.Rev. 165 (1984); Hans A. Linde, *First Things First: Rediscovering the State's Bills of Rights,* 9 U.Balt.L.Rev. 379, 383 (1980).

**42.** Justice Hecht in turn agrees with Chief Justice Phillips that the particular expression at issue here is protected by the First Amendment despite his announcement that this court has no jurisdiction to make that determination. 859 S.W.2d at 65 (Hecht, J., concurring)

**43.** Typical of the concurrence's misuse of authority, this phrase is pulled from Ronald R.K. Collins, *Reliance on State Constitutions—Away from a Reactionary Approach,* 9 Hastings Const. L.Q. 1, 2 (1981). In fact Professor Collins, whose writings were relied upon in *Davenport,* criticizes the very view expressed by the concurrence. The entire thrust of the cited Collins article is that, instead of simply reacting to isolated federal decisions of which they disapprove, "state courts should look first to their own laws, and in that regard downplay their concern about 'the ebb and flow of opinions on the Potomac.'" *Id.* at 18. This is the same interpretative method adopted by this court in *Davenport,* but to which the concurrence continues to object.

**44.** *Compare Davenport,* 834 S.W.2d at 41 (Hecht, J., concurring).

PHILLIPS, Chief Justice, concurring.

The decisions of five justices in two opinions are based on the fundamentally flawed premise that the Free Expression Clause of the Texas Constitution, TEX. CONST. art. I, § 8, is in some relevant way "broader" or more protective of free expression than the First Amendment to the United States Constitution. Because of this alleged greater breadth, a majority of the Court strikes down the trial court's order.

I disagree that our clause is "broader" than its federal counterpart in any sense that affects this case. In fact, I am not certain that the order of the trial court below violates the Texas Constitution in any respect. Only because I conclude that the order violates the guarantees of the First Amendment do I join in the Court's judgment discharging the Relators. Accordingly, I write separately.

## I.

### A.

The comparative breadth construct to which the Court adheres can mean very different things to different beholders. Here, it does not dissuade Justice Gonzalez from recognizing the fundamental dichotomy between direct and indirect governmental regulation, long a starting point in most state and federal analyses of free speech. It does lead him, however, to require a higher countervailing interest to justify in restricting speech than do the federal courts or most state courts. In contrast,

the doctrine leads the plurality to erect a test that, as Justice Gonzalez explains, virtually eviscerates the notion of protecting any competing interests or rights that are harmed by speech. Both writings, however, purport to rely on *Davenport v. Garcia*, 834 S.W.2d 4 (1992), in which this Court first adopted the comparative breadth construct.

One obvious reason for such divergent results is that comparative breadth is not a one-dimensional concept. In the free expression context, for example, a constitutional provision may be "broad" or "narrow" on at least six axes, including: 1) the types of expression deemed protected, 2) the range of potential infringers against which the provision is operable, 3) the range of potential persons and entities who may invoke the protection, 4) the type of permissible restrictions and sanctions on free expression, 5) the degree of importance necessary for a competing interest or right to restrict free expression, and 6) how narrowly the infringement on free expression must be tailored to accommodate that competing interest or right. Thus, to pronounce one free expression clause as broader than another is, standing alone, of little help.

As to any axes along which breadth may appropriately be measured in this case, I maintain that the Texas Free Expression Clause is not "broader" than the corresponding guarantee of the First Amendment.[1] A closer examination of our provi-

---

1. In *Davenport*, the Court suggested that our speech guarantee is not merely "a restriction on governmental interference with speech such as that provided by the First Amendment of the United States Constitution," but rather "a specific guarantee of an affirmative right to speak," 834 S.W.2d at 8, as it was not like "the First Amendment, ... framed purely as a negative restriction on enactment of laws...." *Id.* at 8 n. 13. As the case at bar, like *Davenport*, involves an alleged government infringement of speech, the issue of whether our provision also governs the behavior of private actors or entities is not presented here. A number of states have held that their free expression guarantees protect expression not only against government restriction, but also against private enforcement of property rights. *See Bock v. Westminster Mall*, 819 P.2d 55, 60 (Colo.1991); *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 153

Cal.Rptr. 854, 859–61, 592 P.2d 341, 346–48 (1979), *aff'd on other grounds*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *State v. Schmid*, 84 N.J. 535, 423 A.2d 615, 626, 630 (1980), *cert. dism'd sub nom, Princeton University v. Schmid*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); *see also Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382, 1390–91 (1982); *but see Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co.*, 512 Pa. 23, 515 A.2d 1331, 1334–36 (1986); *Meyer v. McDonald*, 112 Or.App. 321, 828 P.2d 1054, 1055 (1992). An even larger number, however, have rejected such a notion. *See, e.g., Cologne v. Westfarms Assoc.*, 192 Conn. 48, 469 A.2d 1201, 1207–10 (1984); *Citizens for Ethical Govt. v. Gwinnett Place Assoc.*, 260 Ga. 245, 392 S.E.2d 8, 10 (1990); *State v. Lacey*, 465 N.W.2d 537–39, 540 (Iowa 1991); *Woodland v.*

sion demonstrates why I reject the Court's conclusion, and why I find it necessary only to reach Relators' First Amendment claims.

## B.

Article I, Section 8 reads as follows:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publications of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8.

It seems obvious that no provision which expressly recognizes criminal libel prosecutions can be read as approaching Justice Black's absolutist vision of free expression. The unadorned text, however, does not reveal whether this guarantee should properly be read as any "broader" in protecting Relators' free expression rights than the prevailing understanding of the First Amendment.[2] To make such a determination, we must search for the import of terms like "liberty," "speak, write or publish," "subject," "responsible," "abuse," "law," and "curtailing," as they relate to the provision as a whole. Only after we make an independent determination of our

---

*Michigan Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337, 344–48 (1985); *SHAD Alliance v. Smith Haven Mall,* 66 N.Y.2d 496, 498 N.Y.S.2d 99, 102–05, 488 N.E.2d 1211, 1214–17 (1985); *State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981); *Jacobs v. Major,* 139 Wis.2d 492, 407 N.W.2d 832, 839–48 (1987); *see also Johnson v. Tait,* 774 P.2d 185, 190 (Alaska 1989); *Fiesta Mall Venture v. Mecham Recall Committee,* 159 Ariz. 371, 767 P.2d 719, 723 (Ct.App.1988); *Southcenter Joint Venture v. National Democratic Policy Comm.,* 113 Wash.2d 413, 780 P.2d 1282, 1285–92 (1989).

The issue of whether state constitutional provisions impose greater restrictions against private deprivations of free expression than the First Amendment has also engaged spirited scholarly debate, not only across the nation, *see, e.g.,* Curtis J. Berger, *Pruneyard Revisited: Political Activity on Private Lands,* 66 N.Y.U.L.Rev. 633 (1991); Alan E. Brownstein & Stephen M. Hankins, *Pruning Pruneyard: Limiting Free Speech Rights Under State Constitutions on the Property of Private Medical Clinics Providing Abortion Services,* 24 U.C. Davis L.Rev. 1073 (1991); William Burnett Harvey, *Private Restraint of Expressive Freedom: A Post–Pruneyard Assessment,* 69 B.U.L.Rev. 929 (1989); Elizabeth Hardy, Note, *Post–Pruneyard Access to Michigan Shopping Centers: The "Malling" of Constitutional Rights,* 30 Wayne L.Rev. 93 (1983); *Developments in the Law: The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324, 1401–02 (1982), but in Texas as well. *See, e.g.,* James C. Harrington, *Free Speech, Press, and Assembly Liberties Under the Texas Bill of Rights,* 68 Tex. L.Rev. 1435 (1990); Joseph H. Hart, *Free Speech on Private Property—When Fundamental Rights Collide,* 68 Tex.L.Rev. 1469 (1990); Matthew W. Paul & Jeffrey L. Van Horn, Heitman v. State: *The Question Left Unanswered,* 23 St. Mary's L.J. 929 (1992); Note, *Still as Strangers: Nonemployee Union Organizers on Private Commercial Property,* 62 Tex.L.Rev. 111 (1983).

It would be folly to attempt to resolve this complex issue under the inapposite facts before us. I do note, however, that no state has ever held that all private relationships are potentially governed by constitutional principles. As Professor Tribe has observed:

[B]y exempting private action from the reach of the Constitution's prohibitions, it stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices, such as choices of the persons with whom they will associate. Such freedom is basic under any conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands.

Laurence Tribe, American Constitutional Law § 18–2, at 1691 (2d ed. 1988), earlier edition quoted in part in *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337, 347 (1985); *see also Western Pennsylvania Socialist Workers,* 515 A.2d at 1335.

The plurality criticizes my mention of this aspect of *Davenport,* 859 S.W.2d at 10, yet subsequently quotes this language verbatim. *See id.* at 10. If *Davenport* really suggests that all private infringements of speech are constitutional violations, then it truly is a landmark, or perhaps a landmine, in Anglo–American jurisprudence. *See Diamond Shamrock v. Mendez,* 844 S.W.2d 198, 217 n. 11 (Tex.1992) (Doggett, J., dissenting).

**2.** I simply disagree with Justice Gonzalez's long-held and oft-repeated view that our guarantee is "more broadly worded" than the First Amendment, so that a literal application requires heightened protection. 859 S.W.2d at 63 n. 7 (Gonzalez, J., concurring).

guarantee's meaning should we attempt to compare its reach with another guarantee.

To interpret any provision of the Texas Constitution, we start with our recent pronouncement in *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989):

> In construing [a section of the Texas Constitution], we consider "the intent of the people who adopted it." [citations omitted] In determining that intent, "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of the inquiry." [citation omitted] However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time. [citation omitted] [3]

In applying this standard to Article I, Section 8, I thus look to the literal text, to the general historical context from which it arose, to the sources from which our framers derived it, to their deliberations in choosing it, to the understanding of the voters in adopting it, to its development in the judicial opinions of this and other states, and to its need to serve an evolving and expanding society. *See* TEX. CONST. art. I, § 29 ("... we declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate....."). I also look to the entire provision and the relationship between its component parts, not, as do the plurality and concurrence, merely to the first clause of the first half of the first sentence. After all, the whole guarantee, although separated into two adjoining sections in prior Texas Constitutions, was combined by the framers of the current Constitution into a single section, presumably for a reason.

Finally, I consider also the experience of other jurisdictions, many of whom share similar free expression guarantees. Closely corresponding provisions existed in thirteen of the 25 American states at the time of our 1836 Independence Convention, including every state which had joined the Union after 1791. By our 1875 Convention, 26 of the 36 other states had such a clause, as do 36 of the 49 other states today.[4] I am convinced that our language reflects not an attempt to glorify "all that is unique to Texas," *Davenport*, 834 S.W.2d at 22, but a conscious desire to examine "the action of the other States" and "profit by their example and experience." DEBATES OF THE TEXAS CONVENTION OF 1845 at 89 (William F. Weeks, reporter) (1846) (remarks of Delegate Isaac Van Zandt of Harrison County).[5]

---

**3.** A somewhat different articulation, set forth in the concurring opinion in *Davenport* and slightly modified by me, suggests that we "ordinarily look to such things as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intentions of the framers [and ratifiers], the application in prior judicial decisions, the relation of the provision to [other parts of the constitution and] the law as a whole, the understanding of other branches of government, the law in other jurisdictions, state and federal, constitutional and legal theory, and fundamental values including justice and social policy." *Davenport*, 834 S.W.2d at 30 (Hecht, J., concurring, with my additions noted). Both this and the *Edgewood* formulation, which it "closely parallels," *Davenport*, 834 S.W.2d at 22, are useful constructs for constitutional analysis.

**4.** *See* Appendix.

**5.** Although *Davenport* acknowledges that "we may also look to helpful precedent from sister states" as "we build from experience in Texas and elsewhere to enhance individual liberty," 834 S.W.2d at 20, 22, in fact its interpretative analysis wholly ignores the rest of the Anglo-American experience. The opinion never acknowledges that our Texas free expression provision resembles *any* other jurisdiction, much less nearly three-quarters of the American states. It cites no other state constitution, convention journal, convention debate, legislative provision or judicial decision in analyzing the Texas Constitution. While the Court expressly invited "other states [to] rely on unique Texas law developed independently by the legislature and judiciary of this state," *id.* at 18, it returned the favor only to this extent: "We do not say that the Texas guarantee of free expression inevitably varies in all particulars from the federal, or that of New York or California." *Id.* at 22.

With these general principles in mind, I turn to the words of our guarantee to determine "the evils intended to be remedied and the good to be accomplished." *Edgewood*, 777 S.W.2d at 394.

## II.

### A.

Article I, Section 8, begins as follows:

*Every person shall be at liberty to speak, write, and publish his opinions on any subject, being responsible for the abuse of that privilege....*

By its plain terms, this portion of the guarantee both grants and limits the freedom of expression, for one may later be called to account for exercising the "privilege" of the "liberty" of expression. The language derives from the eighteenth century right at English common law to publish books and pamphlets without prior government approval. *See generally* FREDERICK SEATON SIEBERT, FREEDOM OF THE PRESS IN ENGLAND 1476–1776: THE RISE AND DECLINE OF GOVERNMENT CONTROLS (1952); Philip Hamburger, *The Development of the Law of Seditious Libel and the Control of the Press*, 37 STAN.L.REV. 661 (1985). This English "liberty of the press," while no doubt advanced in its time, was a far cry from modern notions of free expression. *See* JONATHAN EMORD, FREEDOM, TECHNOLOGY, AND THE FIRST AMENDMENT (1991). It was truly a situation of "let the publisher beware," for the mere absence of censors afforded no protection against a myriad of common law and statutory mechanisms by which an expression could be sanctioned *after* publication. As Blackstone explained:

[W]here blasphemous, immoral, treasonable, schismatical, seditious, or scandalous libels are punished by English law ... the *liberty of the press*, properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matters when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity.... Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating or making public of bad sentiments, destructive of the ends of society, is the crime which society corrects.

4 WILLIAM BLACKSTONE, COMMENTARIES 151–52 (emphasis in original). Some of these very words were enshrined in the speech and press guarantees of the Pennsylvania Constitution of 1790.[6] What "Blackstone thus recognized as the law of England came to be ... an established constitutional right in Pennsylvania as to both speech and press." *William Goldman Theatres, Inc. v. Dana*, 405 Pa. 83, 173 A.2d 59, 62 (1961), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). This language eventually spread to most other American states,[7] and has been included in all the constitutions of Texas.[8]

Under the Blackstonian view, disfavored expression, once uttered or published, could be punished not only by private civil ac-

---

Fortunately, today's plurality opinion and appendix and Justice Gonzalez's concurring opinion do allude to the provisions of other states and the opinions interpreting them. While I agree with Justice Gonzalez that the plurality's unique view of prior restraint has not been voiced elsewhere, I also concede that I disagree with several opinions interpreting corresponding guarantees. Unlike the plurality opinion, however, I do try to explain the rationale for my differences.

6. *See* Appendix.

7. *See* Appendix.

8. *See* Appendix. *See also* Article 16 of the General Provisions of the proposed Constitution of 1833, Article I, Section 5 of the proposed West Texas Constitution of 1868, and Article I, Section 8 of the proposed Constitution of 1974.

tions, but also, if written, by criminal libel actions for criticisms of individuals or entities ("private libel"), of the government or its officials ("seditious libel"), of the church ("blasphemous libel"), or of the "laws or nature" or "public morality" ("obscene libel"). *See* THOMAS COOPER, TREATISE ON THE LAW OF LIBEL AND THE LIBERTY OF THE PRESS 58–61 (1822); *see also* FRANCIS L. HOLT, THE LAW OF LIBEL 51 (1812); BLACKSTONE, 4 COMMENTARIES at 151. Although libel defendants theoretically enjoyed the benefits of trial by jury, the courts largely nullified this protection by deciding the most crucial issues of the case. COOPER, TREATISE ON THE LAW OF LIBEL AND THE LIBERTY OF THE PRESS 95; GEORGE W. COOKE, TREATISE ON THE LAW OF DEFAMATION 31 (1846). About all that the jury could ever decide was whether the defendant did in fact disseminate the writing ("publication"), the sense in which the words in question should be read ("innuendo"), or whether the writing was "of and concerning" the victim ("colloquium"). In criminal actions, moreover, truth was not a defense, because all utterances damaging to one's reputation, particularly those which were accurate, were considered to have the tendency to create animosities and to disturb the public peace by provoking violent retaliation. BLACKSTONE, 4 COMMENTARIES at 150. Thus, the general rule became "the greater the truth, the greater the libel." *See* W. BLAKE ODGERS, ODGERS ON LIBEL AND SLANDER 340 (1881).

During the many constitutional conventions convened in Texas in the nineteenth century, debate centered not on whether to abandon this basic common law structure, but on whether or how to modify it. The real questions were what defenses to criminal libel prosecutions should be enshrined and what issues should be reserved for the jury in such actions. As for the "liberty to speak, write, or publish," its meaning as a restriction only against prior restraint was well understood. As one framer explained: "[T]he government which fails to protect character from unjust and unprovoked aspersion, is as imperfect as one that fails to protect life. The one is as dear as the other, and ought as much to be placed under the protecting shadow of the law."

1845 DEBATES at 93 (Remarks of Delegate Volney E. Howard of Bexar County). Expression was thus a conditional right, whose exercise in no way excused responsibility.

One could dismiss our forbears' use of Blackstonian language as an historical anomaly, except that the English common law formulation was but one extant tradition of free expression. Even in eighteenth century England, many of Blackstone's contemporaries argued that the liberties of speech and press should be defined much more broadly. Grounding their views in the earlier work of philosophers like Milton, Locke, and Spinoza, the radical Whigs argued that society and government actually benefitted, rather than suffered, from vigorous debate. Trenchard and Gordon, who published *Cato's Letters* in the LONDON JOURNAL from 1720 to 1723, argued for a broad right to express oneself without fear of consequences. *See* Essay No. 15, *On Freedom of Speech; That the Same is Indispensable from Publick Liberty* (Feb. 4, 1720), *in* JONATHAN TRENCHARD AND THOMAS GORDON, CATO'S LETTERS 100 (L. Levy ed. 1971); *see generally* William T. Mayton, *Seditious Libel and the Lost Guarantee of a Freedom of Expression*, 84 COLUM.L.REV. 91 (1984).

The radical Whig view enjoyed broad support in colonial America, where an especially vigorous press regularly defied the law by criticizing their local royal governments. *See, e.g.,* ARTHUR M. SCHLESINGER, PRELUDE TO INDEPENDENCE: THE NEWSPAPER WAR ON BRITAIN 1764–76 (1958); David A. Anderson, *The Origins of the Press Clause*, 30 U.C.L.A. L.REV. 455, 512–13 (1983). Many historians even believe that, by the commencement of the Revolution, the American notion of speech and press liberty was closer to Cato's than Blackstone's. They point to the *Address to the Inhabitants of the Province of Quebec*, where the Continental Congress in 1774 expounded on free expression as one of the "fundamental rights of the colonists":

The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the ad-

vancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiment on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officials are shamed into more honorable and just means of conducting affairs.

1 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 at 108 (1968). Moreover, nine of the thirteen original states adopted Revolutionary constitutions with some free press guarantee,[9] and none used the crabbed terms of the English common law. Many scholars have suggested that this more expansive approach was also embodied in the First Amendment to the United States Constitution, which was sent to the states by Congress in 1789 and became effective two years later.[10]

By contrast, there is little doubt about the intent and effect of the free speech provision of the 1790 Pennsylvania Constitution, the paradigm for the Texas guarantee. The entire 1790 Constitution was unquestionably a triumph for conservative commercial interests and their allies and a defeat for radical Whigs and their allies, who championed the Constitution of 1776. *See* ROSALIND L. BRANNINES, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 9–20 (1960); ROBERT L. BRUNHOUSE, THE COUNTER-REVOLUTION IN PENNSYLVANIA, 1776–1790 (1942). The free expression clause was no exception to that trend. *See* Anderson, 30 U.C.L.A.L.REV. at 490 n. 211.

Even those who claimed that the First Amendment placed stringent restrictions on the federal government recognized the states' greater authority to regulate expression. As President Jefferson explained to Abigail Adams in 1804:

Nor does the opinion of the unconstitutionality and consequent nullity of [the Sedition Act of 1798] remove all restraint from the overwhelming torrent of slander which is confounding all vice and virtue, all truth and falsehood in the US. The power to do that is fully possessed by the several state legislatures. It was reserved to them, and was denied to the general government, by the constitution according to our construction of it. While we deny that Congress have a right to controul [sic] the freedom of the press, we have ever asserted the right of the states, and their exclusive right, to do so.... In general the state laws appear to have made the presses responsible for slander as far as is consistent with their useful freedom.

Letter, Thomas Jefferson to Abigail Adams, September 11, 1804, in 1 THE ADAMS-JEFFERSON LETTERS 279 (Lester J. Cappon ed., 1959).

Texas courts have traditionally adhered to this limited view of the state's free expression guarantee. As was explained in *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75 (1920):

The purpose of this provision is to preserve what we call "liberty of speech" and the "freedom of the press," and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of that privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint ... Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates.

220 S.W. at 76. Thus, prior restraint is always prohibited, assuming the expression

9. *See* Appendix. Only the Pennsylvania Constitution expressly protected speech, however. PA. CONST., DECLARATION OF RIGHTS, § XII (1776). *See also* VT. CONST. ch. I, § XIV (1777).

10. *See, e.g.,* LUCAS A. POWE, JR., THE FOURTH ESTATE AND THE CONSTITUTION: FREEDOM OF THE PRESS IN AMERICA 22–50 (1991); David Rabban, *The Original Meaning of the Free Speech Clause of the First Amendment, in* 6 THE UNITED STATES CONSTITU-

TION at 36 (R. Simmons, ed., 1789); Anderson, 30 U.C.L.A. L.REV. at 523–33; Thomas I. Emerson, *Colonial Intentions and Current Realities of the First Amendment,* 125 U.PA.L.REV. 737, 738–45 (1977); David Rabban, *The Ahistorical Historian: Leonard Levy on Freedom of Expression in Early American History,* 37 STAN.L.REV. 795, 801–06 (1985); *but see* LEONARD W. LEVY, EMERGENCE OF A FREE PRESS 173–219 (1985).

does not rise to the level of "conduct,"[11] but the government can require accountability for expressions, once made, that constitute "abuse" of the privilege of free expression. As the Court in *Davenport* reiterated: "[U]nder our broader guarantee, it has been and remains the preference of this Court to sanction a speaker after, rather than before, the speech occurs." *Davenport*, 834 S.W.2d at 9.

### B.

The Texas Free Expression Clause provides an additional guarantee in the second clause of the first sentence:

> [A]nd no law shall ever be passed curtailing the liberty of speech, or of the press.

This provision, which has also been included in every adopted Texas Constitution,[12] enjoys far less general acceptance in other American jurisdictions. Only four states had similar language in 1836, and only 16 other states had it when the Constitution of 1876 was framed. Even today, fewer than half the states afford such protection in their constitutions.[13]

As with the first clause, the delegates to the various Texas constitutional conventions expended little effort in framing this language. In all probability, the text was borrowed, directly or indirectly, from the First Amendment to the United States Constitution. *Cf. SHAD Alliance*, 498 N.Y.S.2d at 101, 488 N.E.2d at 1213, and authorities cited therein. What the framers and ratifiers originally intended to protect by these words is less certain.

Both the Connecticut and Wisconsin supreme courts, for example, have recently concluded that similar language in their constitutions serves only to modify or supplement a more general right of free expression articulated in the "liberty and responsibility" clause. In *Cologne v. Westfarms Assoc.*, the Connecticut Supreme Court looked to contemporary newspaper reports of the 1818 constitutional convention to conclude that the framers viewed the clause as:

> appl[ying] only to the passage of *laws* restraining freedom of speech or press and ... not by its terms afford[ing] protection ... against restrictions upon the exercise of those rights which government officials may impose whether or not sanctioned by law.

469 A.2d at 1209 (emphasis added). Even under a more modern conception of "law," the Wisconsin Supreme Court in *Jacobs v. Major*, explained:

> The two independent clauses ... are related to each other with [the liberty and responsibility formulation] expressing the right to free speech *and* the second stating the entity, the state, against whom the right is shielded.

407 N.W.2d at 837.

Furthermore, the available history suggests that this language was not viewed by many framers as particularly protective of free speech. The framers of the Wisconsin Constitution of 1846, for example, rejected as too indefinite a proposed provision modelled on the First Amendment protections of free speech, petition, and assembly. *See Jacobs v. Major*, 407 N.W.2d at 849 (Abrahamson, J., concurring and dissenting); STATE HISTORICAL SOCIETY OF WISCONSIN, THE CONVENTION OF 1846 at 365 (Milo M. Quaite ed., 1919). At the Pennsylvania Convention of 1790, Delegate Henry Miller, who consistently voted against expanding the liberty of expression, wanted to substitute language similar to this clause ("no law

---

**11.** As *Tucker* explained:

  Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may properly be restrained.

220 S.W. at 76. *See also Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983); *Dallas Gen. Drivers, Warehousemen and Helpers*

*v. Wamix, Inc.*, 295 S.W.2d 873, 875 (Tex.1956); *Hawks v. Yancey*, 265 S.W. 233, 239 (Tex.Civ. App.—Dallas 1924, no writ) (injunction upheld against persistent harassment where "words and speech became verbal acts" which "constituted conduct"); *cf. Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931).

**12.** *See* Appendix.

**13.** *See* Appendix.

shall ever be passed abridging the freedom of speech or of the press") for the detailed Pennsylvania guarantee. MINUTES OF THE CONVENTION OF THE COMMONWEALTH OF PENNSYLVANIA 383 (1790); *see id.* at 166, 174. At the Texas Constitutional Convention of 1845, Delegate Lemuel D. Evans of Fannin County, always a vigorous advocate of free expression rights,[14] moved unsuccessfully to strike the entire clause. 1845 DEBATES at 73. Similarly, at the Reconstruction Convention of 1868, Delegate R.K. Smith of Galveston County, who voted with the Radical Republicans to replace most of the Texas bill of rights with the exact language of the federal bill of rights,[15] also moved unsuccessfully to strike this clause. 1 JOURNAL OF THE RECONSTRUCTION CONVENTION OF 1868 at 663 (1870). That Miller favored such language, while Evans and Smith opposed it, is circumstantial evidence of the relative importance placed on these words in the eighteenth and nineteenth centuries.

Furthermore, it must be remembered that, whatever its original purpose, during the time our constitutions were framed the free expression guarantees of the First Amendment were generally applied only to forbid prior restraints. *See, e.g., Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907); THEOPHILUS PARSONS, THE POLITICAL, PERSONAL, AND PROPERTY RIGHTS OF A CITIZEN OF THE UNITED STATES 169 (1874), *quoted in*, EMORD, FREEDOM at 87–90; JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 993, at 703–04 (1833). For all practical purposes, therefore, the state and federal guarantees were regarded as the same.

*See Ex parte Tucker*, 220 S.W. at 76 ("The experience of the English nation and some of the American colonies under the tyranny of [licensing] systems is the reason [the ban on prior restraints] is one common to the Constitutions of the American States, and for its incorporation, in like words, in the First Amendment to the Federal Constitution"). While the federal experience demonstrates the elasticity of these elegant words, no Texas case has yet suggested that the second clause imparts protection greater than either the "liberty and responsibility" clause or the First Amendment, or that it modifies the state's ability to impose punishment for expressions deemed an "abuse." *See id.*

### C.

The next clause of Article I, Section 8 provides as follows:

*In prosecutions for the publications of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence.*

Ironically, because the United States Supreme Court now apparently interprets the First Amendment to prohibit criminal sanctions for any true statement, *see Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *see also Gertz v. Welch*, 418 U.S. 323, 346–48, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974); *Farnsworth v. Tribune Co.*, 43 Ill.2d 286, 253 N.E.2d 408, 411–12 (1969); *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626, 629,

---

**14.** Later in the Convention, Evans proposed the most expansive free expression clause ever considered in Texas:

No citizen shall ever be punished for speaking, writing, printing, publishing, or circulating his opinions, on any subject, either by civil suit or indictment; unless malice be proven or implied.

JOURNAL OF THE CONVENTION OF 1845 at 75 (1845); 1845 DEBATES at 95. This proposal was defeated by the delegates. *1845 Debates* at 95.

**15.** At the First Session of the Reconstruction Convention, the Committee of General Provisions recommended that Section 3 of the Bill of Rights read as follows:

The inhibitions of power enunciated in articles from one to eight inclusive, and thirteen, of the amendments to the Constitution of the United States, deny to the States, as well as to the General Government, the exercise of the powers therein reserved to the people, and shall never be exercised by the government of this State.

1 JOURNAL OF THE RECONSTRUCTION CONVENTION OF 1868 at 235 (1870). The delegates, however, voted to substitute Sections 3–21 of the Bill of Rights of the 1845 Constitution for the proposed Section 3, *id.* at 662, and eventually retained the existing language of the free expression guarantee without change. *Id.* at 663.

632 (1972), the provisions of the third clause fail to resonate with modern concepts of free expression. But our framers "accepted the concept that a republican form of government can be politically libeled and that the offender should be criminally prosecuted." LEVY, EMERGENCE OF A FREE PRESS at 212 (discussing Pennsylvania Constitution of 1790). To them, in fact, this language was the key provision in deciding how much constitutional protection to accord free expression. Thus, we must examine the history and development of this clause to understand the underlying intent of the entire guarantee.

By departing from the common law rule that even true statements could be punishable if they tended to incite or offend, the framers and ratifiers made an implicit policy determination that the value of some types of utterances would outweigh any harm they might cause to government stability or personal reputation. What interests were sufficiently important to require a truth defense generated more discussion and more motions than did the framing of all other components of our free expression clause combined.

When our constitutions were written, three distinct formulations regarding evidence of truth in libel trials existed. The first, originating in the Pennsylvania Constitution of 1790, restricted the admissibility of truth solely to a few narrow categories of statements related to public and governmental affairs.[16] The second, appearing first in the New York Constitution of 1821, was more open-ended, providing a complete defense to when the speaker acted "with good motives and justifiable ends."[17] The third, appearing first in the Mississippi Constitution of 1817, simply permitted evidence of truth in all libel prosecutions.[18]

By 1836, ten states had adopted the Pennsylvania model and three the New York model, but only two followed the Mississippi model, which had even been abandoned in that state.[19] Yet the Constitution of the Republic of Texas adopted language almost identical to the original Mississippi clause:

*In all prosecutions for libels, the truth may be given in evidence.*

TEX. CONST., DEC. OF RIGHTS § 5 (1836). It was, for its time, a markedly liberal pronouncement.

When Texas, in compliance with the joint resolution of Congress for annexation, 5 STAT. 797, adopted and ratified its first state constitution, the framers rejected the earlier formulation in favor of a Pennsylvania-type clause:

In prosecutions for the publications of papers investigating the conduct of officers, or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence.

TEX. CONST. art. I, § 6 (1845). This decision reflected the framers' rejection of a broad commitment to a vigorous, untrammeled press. "What good can be subserved, what benefit arise," asked Delegate James Love of Galveston County, from the public discussion of "every little indiscretion which may occur in the community?" The press had "no business whatever to enter into private character; let them confine their strictures and remarks to the public officers of the government." 1845 DEBATES at 76. Delegate James S. Mayfield of Fayette County agreed, asking: "In what manner is the cause of freedom and liberty throughout the world to be promoted by allowing an editor to publish truths, even with regard to the relations of private

---

**16.** In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. PA. CONST. art. IX, § 7 (1790).

**17.** In all prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was

published with good motives and justifiable ends, the party shall be acquitted. N.Y. CONST. art. VII, § 8 (1821).

**18.** In all prosecutions or indictments for libels, the truth may be given in evidence. MISS. CONST. art. I, § 8 (1817).

**19.** *See* Appendix.

life?" *Id.* at 81. Delegate Isaac Van Zandt of Harrison County observed:

> I would not diminish the liberty of the press: I would have it as free as the winds of heaven; I would put no clog upon it. But let this liberty be employed with discretion. You give every one the right to bear arms for his own defence: but does it follow that he has the right to slay his neighbor in all cases?

*Id.* at 90. Although the delegates were closely divided, eventually the more restrictive view prevailed. As one historian concluded: "The movement for complete liberty died hard, but in the end it gained only a clause added to the original section [as reported by the General Provisions Committee], "or where the matter published is proper for public information." Frederic L. Paxson, *The Constitution of Texas, 1845*, 18 Sw. HIST. Q. 386, 395 (1915).

Virtually no changes were made in this language in the next three constitutions.[20] However, a vigorous effort was again made to expand the scope of the truth defense at the 1875 Convention. The Bill of Rights Committee initially offered a broader clause, but during debate the delegates narrowed the language. JOURNAL OF THE CONSTITUTIONAL CONVENTION 338–39 (1875). Eventually, on the motion of Delegate John H. Reagan of Anderson County, the familiar language of the 1845 Constitution was reinstituted by the framers. *See id.* at 339; GALVESTON DAILY NEWS, October 13, 1875, at 1; HOUSTON DAILY TELEGRAPH, October 13, 1875, at 1.

Thus, by 1876, the Texas Constitution was hardly on the cutting edge of free expression; it was not even in the mainstream. Only six other state constitutions still provided for such a circumscribed truth defense, while nineteen used either the New York or Mississippi models.[21] Even Pennsylvania, which originated the Texas approach in 1790, had abandoned it for a more liberal standard,[22] as had Great Britain, where Lord Campbell's Act of 1843 had made truth with good motives a defense in a prosecution for criminal libel. *See* 6 & 7 Vict. c. 96 (1843); LEVY, EMERGENCE OF A FREE PRESS at 212.

**D.**

The final clause of Article I, Section 8 provides:

> *And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.*

This clause expands the common law role of fact finders in criminal libel prosecutions, ensuring them the right to render a general verdict in the same manner as they do in other criminal cases. That is to say, the clause permits a jury to decide guilt or innocence by applying the relevant legal standards to its view of the evidence, resolving each of the subsidiary issues legally necessary to reach its verdict: whether the material is libellous, whether the defendant published it, and the sense in which the material should be read.[23] Some states

---

**20.** *See* Appendix.

**21.** *See* Appendix.

**22.** *See* Appendix.

**23.** While the general guarantee protects against the kind of judicial usurpation that occurred at common law, the concluding phrase, "under the direction of the court, as in other cases," was probably intended to curb jury discretion and power. As Professor Friedman explains:

> There was a maxim of law that the jury was judge both of law and of fact in criminal cases. The idea was particularly strong in the first, Revolutionary generation, when memories of royal justice were fresh.... But the rule came under savage attack from some judges and other authorities. There was fear

that the rule, if taken seriously, would destroy the "chances of uniformity of adjudication." It also threatened the *power* of judges. By the [mid-nineteenth century], many states, by statute or decision, had repudiated the doctrine.

LAWRENCE FRIEDMAN, A HISTORY OF AMERICAN LAW 284–85 (1985) (emphasis in original). Thus, in opposing the deletion of this clause at the 1845 Convention, Delegate James Armstrong of Jefferson County argued: "If gentlemen want everything tried by a jury without a court, let them make such a general provision in the proper place." 1845 DEBATES at 87. Our courts have read this provision to mean only that juries "take the law from the court, and are required to be governed thereby." *McArthur v. State*, 41 Tex.Crim. 635, 57 S.W. 847, 849 (1900); *see also Squires v. State*, 39 Tex.Crim. 96, 45 S.W. 147, 151 (1898).

trace similar constitutional provisions directly to the Fox Libel Act, 32 Geo. III. ch. 60 (1792), *see, e.g., Gray v. Mossman*, 91 Conn. 430, 99 A. 1062, 1066–67 (1917); *Oakes v. State*, 98 Miss. 80, 54 So. 79, 82 (1910); *McWilliams v. Workers' Printing Co.*, 188 Mo.App. 504, 174 S.W. 464, 467 (1915), while others have suggested that the provision was inspired by the Peter Zenger trial of 1735. *See* RODNEY A. SMOLLA, FREE SPEECH IN AN OPEN SOCIETY at 29–30 (1992); LEVY, EMERGENCE OF A FREE PRESS at 212. Today, nineteen other states incorporate a parallel guarantee in their free expression clause.[24]

### III.

### A.

What is one to make of all this? Many of the framers' deliberations now seem obscure, and, as we have seen, the provisions most important to them have been effectively superseded by the evolving guarantees of the First Amendment. Yet in applying these antique words to contemporary situations, we must remain faithful to the essential purposes of the framers and ratifiers. Several conclusions stand out.

First, the broad, majestic guarantees of the first two clauses were combined with the precise, technical provisions of the last two. Any fair reading of our free expression guarantee must consider the provision as a whole, not merely the first portion thereof.[25] In addition to the truth defense clause, our Constitution characterizes expression as a "privilege" in the first clause,[26] and qualifies the jury's role as "under the direction of the court, as in other cases" in the fourth clause.[27] Third, there was little desire to sanction the actions of those who would "discuss and scan every private act of our lives," 1845 DEBATES at 81 (remarks of Delegate Mayfield), "utter calumnies against [women]," *id.* at 73 (remarks of Delegate Van Zandt), publicize "every little indiscretion which may occur in the community," *id.* at 76 (remarks of Delegate Love), or "drag [a woman] before the public gaze [and] publish to the world every peccadillo or misdeed in her history," *id.* at 81 (remarks of Delegate Mayfield). While speech could not be censored in *advance, protection* would *not* be afforded for those who invaded the "private relations of private citizens." *Id.* at 70 (remarks of Delegate Van Zandt).

### B.

To apply what we have learned to the facts at hand, we must first determine whether the trial court's orders constitute prior restraints on speech. If they do, they are unconstitutional, as there is no assertion that the expression here constituted "conduct" or "threatened conduct." *Ex parte Tucker*, 220 S.W. at 76. After all,

It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could ut-

---

24. *See* Appendix.

25. In failing to consider how one part of the guarantee might inform the meaning of another, the plurality and Justice Gonzalez both err. This partial approach seems to me the principal reason why some other jurisdictions have also, after little consideration, deemed their free expression clauses "broader" in some respect than the corresponding federal guarantee. *See, e.g., Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 773 P.2d 455, 459 (1989); *In re Hearings Concerning Canon 35,* 132 Colo. 591, 296 P.2d 465, 466–67 (1956); *O'Neill v. Oakgrove Constr, Inc.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277, 280 n. 3 (1988); *see also State v. Coe,* 101 Wash.2d 364, 679 P.2d 353, 359–60 (1984).

26. No American state used the term "privilege" in a corresponding provision in 1836, and only two other states use it today. By contrast, twenty-two states use the term "right," fifteen use "liberty," and one uses "freedom." *See* Appendix. Although no decisions have discussed this distinction, one could argue that "privilege" is more restrictive than the terms used elsewhere.

27. Only four states qualify the jury's role as being both "under the direction of the court" and "as in other cases." Nine states omit the phrase "as in other cases," one leaves out only "under the direction of the court," and five reject both limiting phrases in corresponding provisions. *See* Appendix.

ter them. . . . Liberty of speech will end when such control begins.

*Id.*

In the present order, however, the trial court was not acting as a censor either as to the content of Relators' expression or as to the identity of persons allowed to speak. Instead, the challenged portions of the injunctive relief regulated only where Relators might stand while demonstrating. While some restriction of time, place and manner may be so spatially extensive as to constitute a prohibition against a speaker or his or her message, not every limitation rises to this level. Hence, a citywide ban on the sale of a newspaper would be barred by Article I, Section 8, *see Ex parte Neill,* 32 Tex.Crim. 275, 22 S.W. 923, 923–24 (1893) (striking down local ordinance that declared Chicago newspaper a nuisance and prohibited its sale within city limits); *cf. Organization for a Better Austin v. O'Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (injunction barring leafletting anywhere in city was prior restraint), but a restriction of a few feet on abusive or damaging speech surely should not. Such a limited restriction would enable the speakers to deliver their message to whom they want, but in a manner that accords some weight to the rights of others. Striking such a balance between competing interests is at the heart of free exercise jurisprudence, both under the federal and Texas guarantees. *See State v. Garcia,* 823 S.W.2d 793, 797–98 (Tex.App.—San Antonio 1992, writ denied) (applying time, place, and manner analysis to Article I, Section 8 claim); *Lindsay v. Papageorgiou,* 751 S.W.2d 544, 549–50 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (same). As Professor Cox has observed: "Freedom of expression, despite its primacy, can never be absolute. . . . Some balancing is inescapable. The ultimate question is always, where has—and should—the balance be struck?" Archibald Cox, Freedom of Expression 4 (1980).

This is especially true under state constitutional guarantees like ours, where a balancing of interests is inherent in the notion of "abuse." Speech is "abused" when the legally cognizable benefits arising from un-fettered expression are outweighed by the legally cognizable costs to competing and conflicting interests. Thus, in *Bering v. SHARE,* the Washington Supreme Court held that abortion clinic protesters "abused" their speech rights "by blocking ingress and egress and by engaging in coercive and disorderly picketing," which in turn "impede[d] access to health care, and . . . impinge[d] upon women's constitutional right to make and effectuate the abortion decision." 106 Wash.2d 212, 721 P.2d at 918, 931 (1986), *cert. dism'd,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).

This is precisely the type of balance, long required of courts, which the plurality opinion today rejects. But such fact-specific inquiry, far from mere "labeling," is at the core of what courts must do when competing rights and interests collide. For precisely the reasons articulated by Justice Gonzalez, I conclude that 100–foot bans on demonstrators who seek to confront women and call public attention to their choice decision to seek abortion services are not prior restraints. They instead merely regulate the location of expression, and their validity must be tested under our Constitution by whether the expression constitutes an "abuse" for which the speakers have been held "responsible."

### C.

How does the plurality justify abandoning a balancing process to impose a near absolute protection for speech? It offers three basic justifications. All fail.

### 1.

First, the plurality looks not to authorities involving time, place and manner restrictions, but to cases reviewing essentially total bans on expression. It applies the test of *Davenport,* which clearly involved a prior restraint, to the facts of this case, announcing:

Freedom of expression may not be restricted solely on grounds that its exercise will have the effect of providing imminent and irreparable harm. Restraints may be imposed only if the in-

junctive relief encompasses the least restrictive means of protecting against the alleged harmful effect.

859 S.W.2d at 6. The plurality also cites other prior restraint cases, including *Ex parte Tucker; Ex parte McCormick,* 129 Tex.Crim. 457, 88 S.W.2d 104, 106–07 (1935) ("gag order" on media coverage of trial); *Ex parte Foster,* 44 Tex.Crim. 423, 71 S.W. 593, 594–95 (1903) (same); *Ex parte Neill; Pirmantgen v. Feminelli,* 745 S.W.2d 576, 579 (Tex.App.—Corpus Christi 1988, no writ) (injunction against libel); *Strang v. Biggers,* 252 S.W. 826 (Tex.Civ.App.—Dallas 1923, no writ); and *Mitchell v. Grand Lodge Free & Accepted Masons,* 56 Tex. Civ.App. 306, 121 S.W. 178, 179 (Dallas 1909, no writ).[28] The plurality points to no other jurisdiction currently failing to recognize a distinction between prior restraint and legitimate regulation of speech, and I find none. This extraordinary result could create much harm, and much mischief, if adopted by this Court as a universal principle.

### 2.

Second, the plurality purports to rely on the "jurisprudence and ... history" of our state free speech clause as expressed by this Court in *Davenport,* 859 S.W.2d at 5. A detailed exploration of the Court's rationale in that case reveals the fallacy of this reliance.

In *Davenport,* the Court first claimed to conduct a "careful and detailed analysis of the development and interpretation of article one, section eight ... to give effect to what is indelibly written into our state constitution." 834 S.W.2d at 21. In concluding that Texas has always selected an "expansive freedom of expression clause ... to ensure broad liberty of speech," *id.* at 8, the Court committed a number of astonishing errors.

For instance, the Court claimed that the language of the proposed constitution of 1833[29] "incorporated the strong desire of Texans to speak without fear of governmental repression." *Id.* at 7. This is a curious conclusion regarding a provision

---

**28.** The sole case relied upon by the plurality that is arguably not a prior restraint decision might be *Ex parte Meckel,* 87 Tex.Crim. 120, 220 S.W. 81 (1920), in which the Court of Criminal Appeals struck down on free speech grounds the World War I-era Disloyalty Act, which prohibited a variety of utterances critical of the United States and its armed forces. This case, however, hardly supports the total primacy of free expression that the plurality advances. The court actually upheld the Act in its initial opinion, concluding that the Act was aimed at preventing *breaches of the peace* and did not punish speech merely as an end in itself. *See id.* at 81–82. This reasoning, while consistent both with the historic rationale for seditious libel and other criminal libel statutes, seems even less protective of free speech than was the First Amendment jurisprudence of that era. *See Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (issue when analyzing seditious speech restriction was whether words "are used in circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent"). On rehearing, however, the court determined that the statute was *not* aimed at preventing breaches of the peace because it appeared to authorize prosecutions for uttering proscribed language to persons who were *not* citizens of the United States. The utterance of language critical of the United States or its armed forces, the court implied,

would not tend to provoke a violent response from non-citizens. *See Ex Parte Meckel,* 220 S.W. at 84. Instead, the purpose of the statute was "to denounce as a felony the use of the disloyal language described," *id.,* as an end in itself.

The only case cited by the plurality even remotely on point factually, *Ex parte Henry,* 147 Tex. 315, 215 S.W.2d 588 (Tex.1948), is, despite the plurality's intimations to the contrary, solely a First Amendment case. *See id.* at 594.

**29.** In April, 1833, a Convention at San Felipe drafted a proposed state constitution as part of an effort to secure separate statehood from Coahuila. Article 16 of the General Provisions of that constitution provided:

> The free communication of thoughts and opinions, is one of the inviolable rights of man; and every person may freely speak, write, print, and publish, on any subject, being responsible for the abuse of that liberty; but in prosecutions for the publication of papers investigating the official conduct of men in public capacity, the truth thereof may be given in evidence, as well as in personal actions of slander; and in all indictments for libles [sic], the jury shall have the right to determine the law and the facts, under the direction of the court as in other cases.

Office of the New Orleans Commercial Bulletin, Constitution or Form of Government of the State of Texas (1833).

that, in common with most contemporary American state constitutions, expressly recognized criminal libel prosecutions.[30]

Next, the Court intimated that the 1836 Constitution demonstrated special emphasis on speech, since that document "in general closely tracked the wording of the United States Constitution, differing language was chosen to protect speech." 834 S.W.2d at 7. In fact, "[t]he constitution of the Republic of Texas is a composite structure of portions of the constitutions of the United States and of several of the state constitutions in effect at that time." Rupert N. Richardson, *Framing the Constitution of the Republic of Texas*, 31 Sw. Hist.Q. 191, 209 (1928). Only a few phrases of the Declaration of Rights were substantially the same as the American Bill of Rights. In short, "[t]he Declaration of Rights contains nothing new and consists

substantially of what one can find attached to the constitution of almost any state." *Id.* at 213; *see also* J.E. Ericson, *Origins of the Texas Bill of Rights*, 62 Sw.Hist.Q. 457, 457, 465–66 (1959).

In discussing the framing of both the 1845 and 1876 Constitutions, the Court wholly ignored the scope of the truth defense, characterized by one delegate as "the battle ... of freedom against tyranny." 1845 Debates at 77 (remarks of Delegate Francis Moore of Harris County). Rather, it mentioned only two preliminary, unimportant decisions from each of these conventions, all of which were essentially irrelevant to the final product.[31]

Finally, the Court attached immense significance to the framers' substitution of "person" for "citizen" in the opening phrase of Article I, Section 8. This "care-

---

**30.** Most of the 1833 Constitution was an amalgamation of the Tennessee, Missouri, and Louisiana constitutions *see* Joseph W. McKnight, *Stephen Austin's Legalistic Concerns*, 89 Sw. Hist.Q. 239, 265 (1986). In particular, the first twenty-one general provisions were taken almost verbatim from twenty-one of the first twenty-seven sections of the Declaration of Rights of the Tennessee Constitution of 1796, hardly surprising since Sam Houston, a former governor of Tennessee, chaired the drafting committee at San Felipe. *See* 1 John Henry Brown, History of Texas From 1685 to 1892 at 229 (1892). The Tennessee free expression provision, of course, was closely modeled on Article IX, Section 7 of the Pennsylvania Constitution of 1790. *Compare* Tenn. Const. art. XI, § 19 (1796) *with* Pa. Const. art. IX, § 7 (1790).

**31.** As to the Constitution of 1845, the Court notes only a vote to reverse a preliminary decision to adopt the free expression provision of the Tennessee Constitution of 1790, 834 S.W.2d at 8, n. 7, *see* 1845 Journal at 74–75, 1845 Debates at 94–95, and a vote to reverse a preliminary provision requiring that "all publications injurious to female reputation" be "deemed false and libellous" without inquiry into the facts. *See* 1845 Journal at 74–75, 1835 Debates at 94, 303. As to the female reputation clause, the Court concludes: "Not even conventional limits on free speech curbed the sweeping scope of the free-speech guarantee." *See Davenport*, 834 S.W.2d at 8 n. 7. In fact, no other state, either then or now, has ever included such "conventional limits" in its constitution; at most, this rule was provided only by statute. *See* Tex.Penal Code arts. 750 & 751 (1895).

As to the Convention of 1875, the Court points to two similarly irrelevant occurrences. After the Convention voted to retain the 1845 lan-

guage in substantially unchanged form, Delegate William P. McLean of Titus County attempted to introduce at least the substance of the defeated language into the general provisions by resolving "that the truth of words spoken or published, and good motives in speaking or publishing, may be pled in case of libel suits." *See* Galveston Daily News, October 23, 1875, at 1. The action of the General Provisions Committee in failing to refer this language to the Convention, 1875 Journal at 553–61, is somehow trumpeted by the Court as a victory for "an expansive freedom of expression clause." 834 S.W.2d at 8. The first resolution of Delegate E.W. Brady of Grimes County, referred to the Bill of Rights Committee, also contained language which, at least to the framers, was surely more protective of free expression than that finally adopted:

No law shall ever be passed restraining the free expression of thought, opinions and ideas, or restricting the right to speak, write or print freely on any subject whatever; but, for the libelous abuse of that right, every person shall be responsible.

1875 Journal at 62. The Committee did not include the suggestion of confining abuse to defamatory conduct in its report to the Convention. *See id.* at 272.

Only if one accepts *Davenport's* apparent suggestion that the free expression clause applies to private conduct can Brady's proposed language be considered more narrow than the provision as adopted. If this issue was not actually presented in *Davenport*, *see* n. 1 above, then the Court erred in characterizing the Convention's action as a victory for greater expression rights. 834 S.W.2d at 8.

ful attention to [the provision's] language," the Court asserted, "indicates a desire in Texas to ensure broad liberty of speech." 834 S.W.2d at 8. There is, however, no evidence that the change was accomplished as a careful or even a conscious choice by the framers and ratifiers. From the surviving records of the Convention, it appears that the use of "person" was perhaps a printer's error or, at best, an editorial decision of the Committee on Style and Arrangement.[32]

Finally, the Court offered a broader "historical review to understand the origins of our liberties as Texans and the intentions of our forebears." 834 S.W.2d at 19. From this look to "our treasured state heritage, law and institutions," 834 S.W.2d at 22, the Court concluded that "[o]ur rich history demonstrates a long-standing commitment in Texas to freedom of expression," *id.* at 19, thus implying that "all that is unique to Texas" somehow encompasses an especial devotion to speech. *Id.* at 22.

The Court first concluded that "the authoritarianism and unresponsiveness of Mexico to [certain] attempts to exercise and establish protection of free speech" were "a contributing factor to Texas' revolution and independence," *id.* at 7, and that "[f]rom the outset of this state's history, freedom of expression was a priority." *Id.* While both statements may well be true,

the historical record recited in *Davenport* does not establish either position.

*Davenport's* proffered proof for these assertions is limited almost exclusively to the fact that Stephen F. Austin was imprisoned after sending his October 2, 1833, letter to the ayuntamiento of Bexar. Although Mexican officials "conclud[ed] that Austin was guilty of treason for plotting to withdraw Texas from Mexico," *see* ROBERT HALL, REMONSTRANCE–CITIZEN'S WEAPON AGAINST GOVERNMENT'S INTERFERENCE, 68 TEX.L.REV. 1409, 1417 (1990), Texans soon concluded that Mexico had "incarcerated in a dungeon, for a long time, one of our citizens, for no other cause but a zealous endeavor to procure the acceptance of our constitution, and the establishment of a state government." The Declaration of Independence of the Republic of Texas (1836), *reprinted in* 1 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897 at 1835 (1898). Austin himself, at least while still in Mexico, viewed the controversy as an example of "appearances" triumphing over reality. *See* STEPHEN F. AUSTIN, EXPOSICION AL PUBLICO SOBRE LOS ASUNTOS DE TEXAS (1835) [EXPLANATION TO THE PUBLIC CONCERNING THE AFFAIRS OF TEXAS], *translated in* 8 TEX. HIST.ASSN. Q. 232, 249 (1905) (Ethel Zivley Rather, trans.).

Today the plurality demonstrates Austin's longstanding concern for the right of free expression, beginning with his sugges-

---

**32.** The draft language of the Bill of Rights Committee retained, in its proposed Section 8, the word "citizen" as used in previous constitutions:

> Every citizen shall be at liberty to speak, write or publish his opinion on any subject, being responsible for the abuse of that privilege. And no law shall ever be passed curtailing the liberty of speech, or of the press. And in all civil or criminal actions for libel, the truth thereof may be given in evidence to the jury, and if it shall appear that the alleged libelous matter was published with good motives, and for justifiable ends, it shall be a sufficient defense.

1875 JOURNAL at 272.

As we have seen, the delegates rejected this new language and retained the text of the previous four constitutions, which differed as only to the final portion of the guarantee. Upon engrossment, however, the printer included only the changed language, omitting the unchanged first two sentences. Delegate E.L. Dohoney of Lamar County "drew attention to [this] omis-

sion" on the third reading of the Bill of Rights, and his substitute to restore the deleted language was adopted. *See* TEXAS DAILY GAZETTE, October 22, 1875, at 2. Although Dohoney's motion joined the two omitted sentences with a semicolon, it retained the word "citizen." 1875 JOURNAL at 434. Thus, the Bill of Rights passed its third reading with the traditional language intact. *See* GALVESTON DAILY NEWS, October 26, 1875, at 1. On the last day of the Convention, however, the entire document was read aloud and approved by the delegates. This was the first version in which the word "person" appeared. *See* GALVESTON DAILY NEWS, November 27, 1875, at 2; HOUSTON DAILY TELEGRAPH, November 28, 1875, at 2.

Although the plurality derides my suggestion that the word change might have been a "mere" printer's error, 859 S.W.2d at 11 n. 32, it offers absolutely no explanation for how this substitution was accomplished absent a vote of the delegates or, as far as the surviving record show, even their conscious acquiescence.

tions for electoral reform during Mexico's first empire, *see* EUGENE C. BARKER, THE LIFE OF STEPHEN F. AUSTIN 71–72 (1969), and continuing through his Circular from the Committee of Safety to the Jurisdiction of Austin, October 3, 1835. 2 PAPERS OF THE TEXAS REVOLUTION 1835–36 at 17, 19 (John H. Jenkins ed., 1973) ("The ... party ... now governing in Mexico ... [has] suppressed, by military influence, the expression of public opinion...."). But no other revolutionary document specifically references Mexico's deprivation of free expression rights—not the San Jacinto Resolutions of August 8, 1835, 1 THE PAPERS OF THE TEXAS REVOLUTION at 317–21; not the Nacogdoches Resolutions of August 15, 1935, *id.* at 343–45; not Austin's Brazoria speech of September 8, 1835, *id.* at 423–27; not the Declaration of the People of Texas in General Convention Assembled adopted by the Consultation on November 7, 1835, 1 GAMMEL at 522; not the Address of the General Council of the Provisional Government of Texas to the Mexican People of December 11, 1835, *id.* at 651–52; not the Resolution of the Provisional Government for Calling a Convention of December 10, 1836, *id.* at 980–82; not the Goliad Declaration of Independence on December 20, 1835, *id.* at 817–20; not even the Texas Declaration of Independence of March 2, 1836. *Id.* at 834–37. Texans repeatedly expressed their indignation over Mexico's deprivation of the right of trial by jury, the right to bear arms, and the right to religious freedom, but free expression was essentially unnoticed in all the literature promoting and explaining their cause.

Moreover, nothing in the historical record establishes that Texans, either then or now, have been singularly or uniquely devoted to free expression. No doubt, our earliest Anglo–American colonists cherished this right. As the Mexican Commissioner to Texas, Don Manuel de Mier y Teran, advised President Guadalupe Victoria in 1828: "Among these foreigners are fugitives from justice, honest laborers, vag-

abonds and criminals, but honorable and dishonorable alike travel with their political constitutions in their pockets, demanding the privileges ... which such a constitution guarantees." *See* BARKER, THE LIFE OF STEPHEN F. AUSTIN at 261. Such devotion did not always extend to tolerance for the exercise of free expression by others. Thus, the "widespread passion for freedom of speech" in the Republic of Texas "contributed to the frequency of fights and, to a lesser extent, of duels." William Ransom Hogan, *Rampant Individualism in the Republic of Texas*, 44 SW.HIST.Q. 454, 456–57 (1941), *reprinted in* WILLIAM RANSOM HOGAN, THE TEXAS REPUBLIC 267, 269 (1946). Intolerance prevented Sam Houston from speaking at the courthouse in Brenham during his unsuccessful race for Governor in 1857,[33] and after the Civil War the Union commander for Texas was moved to report:

Free speech and free press, as the terms are generally understood in other States, have never existed in Texas. In fact, the citizens of other states can not appreciate the state of affairs in Texas without actually experiencing it.

Official Report of General J.J. Reynolds, November 4, 1868, *reprinted in* JOURNAL OF THE RECONSTRUCTION CONVENTION, SECOND SESSION 111–12 (1870). Even in modern times, one observer believes:

In its zeal to maintain its own prosperous status quo, the ... Texas establishment tended to ignore, repress, or attack individuals and groups with different values.... This uncompromising stance on behalf of the Texas power structure may have created its own antithesis—a strong, colorful tradition of iconoclastic journalism. By stifling a reasonable range of dissent, the Texas establishment may have forced individualist writers to more radical stands and more flamboyant rhetoric.

JAMES MCENTEER, FIGHTING WORDS: INDEPENDENT JOURNALISTS IN TEXAS xii-xiii (1992).

---

33. Houston acquiesced in the rebuff, but invited anyone "who desires to hear Sam Houston speak and will follow me hence to yonder hillside under the shade of yon spreading live oak on the soil of Texas[.] I have a right to speak there because I have watered it with my blood!" MARQUIS JAMES, THE RAVEN 390 (1929).

Surely most Texans believe in free speech, at least most of the time. But I submit that the "unique values, customs, and traditions of our citizens," *Davenport*, 834 S.W.2d at 20, are, with regard to free expression, in fact the shared legacy of the American heritage, if not of the entire modern constitutional tradition. *See, e.g.*, FRANKLIN D. ROOSEVELT, STATE OF THE UNION MESSAGE, JANUARY 6, 1941 ("In the future days, which we seek to make secure, we look forward to a world founded upon four essential freedoms. The first is freedom of speech and expression—everywhere in the world.")

### 3.

Finally, *Davenport* raises the notion of a living constitution, stating:

> [H]istorical analysis is only a starting point. The constitution of our state is an organic document. [citation omitted] In no way must our understanding of its guarantees be frozen in the past. Rather, our concept of freedom of expression continues to evolve over time.

834 S.W.2d at 19. Contrary to the charges of the plurality, I have not "forgotten" that our constitutional understanding can change, or that the framers and ratifiers would not have us apply one of our great freedoms in the same way to modern circumstances as they might have applied it to their own problems a century ago. *Davenport*, for example, correctly referenced new "forms of expression" and "new methods of infringing on speech" as examples of new circumstances requiring new protection. *See id.* But today's plurality eschews all specifics, saying only that "we as jurists are summoned to give effect to [the Constitution's] terms whenever liberty is threatened." 859 S.W.2d at 14. Thus, to find fault with the plurality's case authority, historical development, or intent analysis becomes not merely irrelevant, but proof positive of the critic's constitutional naivete. Surely our fundamental freedoms are "evolved" or "unfrozen" for some better reason than five justices' ephemeral notion of the greater good. Our summons to case-by-case activism is a poor substitute for a principled articulation of the means by which our understanding of fundamental liberties can change with time.

### D.

I conclude that nothing in the language or purpose of the Texas Free Expression Clause authorizes us to abandon the notion of accommodating competing interests, as the plurality has done, or even to afford greater weight in the balancing of interests to free expression than we would under the First Amendment, as Justice Gonzalez proposes. Under the first clause, with its explicit reference to abuse, I would be inclined to give even less weight to expression interests than the expansive wording of the First Amendment provides. One could argue that the second clause, which so closely parallels the First Amendment, *cf. Ex parte Tucker*, 220 S.W. at 76, mandates a more similar balance. We are not required, however, to use past or present First Amendment doctrine as a minimum "floor" which our independent guarantee must be interpreted to meet or exceed. Previous intimations to the contrary in some of our opinions are, in my view, simply wrong. *See LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tex.1986); *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983); *see also Heitman v. State*, 815 S.W.2d 681 (Tex. Crim.App.1991); *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Crim.App.1983).[34]

---

**34.** This position was again apparently asserted by the Court in *Davenport*, which suggested that, in interpreting their own constitutions, state courts "may not deny individuals the minimum level of protection mandated by the Federal Constitution." *Id.* at 15. Literally read, this position makes no logical sense. If our text was written at a different time by different people with different concerns, then the protection it affords may be greater, lesser, or the same as that provided by a different provision in the United States Constitution. As *Davenport* itself notes, " '[o]ur Texas Forbears surely never contemplated that the fundamental state charter, crafted after years of rugged experience on the frontier and molded after reflection on the constitutions of other states, would itself veer in meaning each time the United States Supreme Court issued a new decision.' " *Id.* at 16 (quoting JAMES C. HARRINGTON, THE TEXAS BILL OF RIGHTS 41 (1987)).

The suggestion that state bills of rights cannot afford less liberty protection than their federal

Given the many difficulties with our guarantee, it would be difficult to articulate its precise meaning with confidence. I decline to make the attempt for a simple, but to me compelling reason: the trial court's orders fail to meet constitutional muster under the more familiar contours of the First Amendment.

## IV.

In turning to the First Amendment to resolve this case, I am by no means avoiding the issue before us. In fact, while Relators request relief under both the federal and state constitutions, they devote barely 15 percent of their briefs before this Court to the latter claims; the rest pertains solely to their First Amendment arguments. Respondents undertake no independent discussion of Article I, Section 8 jurisprudence at all, simply distinguishing such cases as *Davenport* and *Tucker*, along with First Amendment prior restraint cases, from the place and manner regulations at issue here. Only because of the false construct of considering state constitutional issues first, pronounced by this Court in *Davenport*, has it been necessary for seven justices who join in the judgment to write three separate, time-consuming opinions.[35]

Relators assert that the 100–foot bans on demonstrating violate their rights under the United States Constitution in three respects: (1) the restrictions impermissibly infringe upon their freedom of speech; (2) the restrictions constitute an invalid prior

counterparts confuses independent state constitutionalism with the mandate of the Supremacy Clause, U.S. Const. art. VI, cl. 2, that federal rights, if asserted, not be ignored. Thus, in this case, our Court could not deny relief to the relators on state constitutional grounds without also considering all properly pled federal constitutional claims. But the "federal safety net" is a false construct, now rejected by an increasing number of courts and scholars. *See, e.g., State v. Smith*, 301 Or. 681, 725 P.2d 894 (1986) (Oregon Constitution does not require Miranda warnings); *Black v. Employment Div.*, 301 Or. 221, 721 P.2d 451 (1986) (freedom of religion narrower under Oregon Constitution), *vacated and remanded sub nom., Employment Division v. Smith*, 485 U.S. 660, 108 S.Ct. 1444, 99 L.Ed.2d 753 (1988); *Serna v. Superior Court*, 40 Cal.3d 239, 219 Cal.Rptr. 420, 707 P.2d 793 (1985) (California Constitution requires less stringent speedy trial standards than federal counterpart); Jeffrey Amestoy & Julie Brill, *State Constitutions from the Attorney General's Perspective: An Institutional Schizophrenia*, 1 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 229, 236 (1988); Ronald K.L. Collins & Peter J. Galie, *Models of Post–Incorporation Judicial Review: 1985 Survey of State Constitutional Individual Rights Decisions*, 55 U.CIN.L.REV. 317, 327 (1986); John M. Devlin, *State Constitutional Autonomy Rights in an Age of Federal Retrenchment: Some Thoughts on the Interpretation of State Rights Derived from Federal Sources*, 3 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 195, 243 (1990); Peter J. Galie, *Modes of Constitutional Interpretation: The New York Court of Appeals' Search for a Role*, 4 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 225, 227–28 (1991); Hans A. Linde, *Does the "New Federalism" Have a Future?*, 4 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 251, 258–59 (1991); Earl M. Maltz, *The Political Dynamic of the "New Judicial Federal-*

*ism,"* 2 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 233, 236–37 (1989); *Neil C. McCabe, The State and Federal Religion Clauses: Differences of Degree and Kind*, 5 St. Thomas L.Rev. 49 (1992); Steven J. Twist & Mark Edward Hessinger, *New Judicial·Federalism: Where Law Ends and Tyranny Begins*, 3 EMERGING ISSUES IN STATE CONSTITUTIONAL LAW 173, 185–87 (1990); Robert F. Williams, *Methodological Problems in Enforcing State Constitutional Rights*, 3 GA.ST.L.REV. 143, 151 (1986–87); *contra* Ann Althouse, *How to Build a Separate Sphere: Federal Courts and State Power*, 100 HARV.L.REV. 1485, 1491 (1987); William Brennan, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.REV. 535, 550 (1986); Charles G. Douglas, *Federalism and State Constitutions*, 13 VT.L.REV. 127, 143 (1988); Carol F. Peterkort, *The Conflict Between State and Federal Constitutionally Guaranteed Rights: A Problem of the Independent Interpretation of State Constitutions*, 32 CASE W.L.REV. 158, 161 (1981); William F. Swindler, *Minimum Standards of Constitutional Justice: Federal Floor and State Ceiling*, 49 MO.L.REV. 1, 15 (1984).

Fortunately, today's plurality opinion recognizes that "an independent state judiciary may interpret its fundamental law as affording less protection than our federal charter." 859 S.W.2d at 13. Regardless of what conclusions we reach in this or other cases, this recognition will enhance the possibility of principled state constitutional development.

**35.** In insisting that courts and litigants "rely on the state constitution in the first instance," *id.* at 18, the Court builds unnecessary rigidity into our decision-making process. Just as we do not insist that all contract claims be considered before accompanying tort claims, I see no need for the artificial construct in constitutional litigation.

restraint; and (3) the term "demonstrating" is unconstitutionally vague as it has been applied in this case.

It is undisputed that the expressive activities in which Relators were engaged, whether characterized as "praying," "preaching," or "demonstrating," are protected "speech" under the First Amendment, and thus are also federally protected against state infringement by virtue of the due process clause of the Fourteenth Amendment. Likewise, it is undisputed that the public streets and sidewalks where these activities occurred have long been deemed "public fora" for purposes of First Amendment analysis. *See Frisby v. Schultz*, 487 U.S. 474, 479–81, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420 (1988); *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). In a public forum:

> [T]he government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions [1] are content neutral, [2] are narrowly tailored to serve a significant government interest, and [3] leave open alternative channels of communication. Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling government interest.

*Id.* at 177, 103 S.Ct. at 1707 (internal citations and quotation marks omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 790–91, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

It is clear under federal law that the restrictions imposed in this case were an attempt at a "time, place, and manner" restriction rather than an "absolute prohibition on a particular type of expression" or prior restraint. *See, e.g., Northeast*

*Women's Center, Inc. v. McMonagle*, 939 F.2d 57 (3rd Cir.1991); *Portland Feminist Women's Health Center v. Advocates for Life*, 859 F.2d 681 (9th Cir.1988); *Pro-Choice Network of Western New York v. Project Rescue*, 799 F.Supp. 1417 (W.D.N.Y.1992); *Hirsh v. City of Atlanta*, 261 Ga. 22, 401 S.E.2d 530 (1991); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Project Jericho*, 52 Ohio St.3d 56, 556 N.E.2d 157 (1990); *Bering v. SHARE*, 721 P.2d 918; *Thompson v. Police Dept. of New York*, 145 Misc.2d 417, 546 N.Y.S.2d 945 (N.Y.Sup.1989).

Under the first "prong" of the "time, place, and manner" analysis, courts have consistently held restrictions similar to the ones challenged here to be "content-neutral." *See McMonagle*, 939 F.2d at 63; *New York State NOW v. Terry*, 886 F.2d 1339, 1363–64 (2nd Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Portland Feminist Women's Health Center*, 859 F.2d at 686; *Pro-Choice Network*, 799 F.Supp. at 1432–33; *Fargo Women's Health Organization, Inc. v. Lambs of Christ*, 488 N.W.2d 401, 407–08 (N.D.1992); *Hirsh*, 401 S.E.2d at 533; *Project Jericho*, 556 N.E.2d at 162; *Bering*, 721 P.2d at 925; *Parkmed Co. v. Pro-Life Counselling, Inc.*, 91 A.D.2d 551, 457 N.Y.S.2d 27, 29 (1982). The orders here regulate only:

> [W]here, and how [the Relators] might speak, but not what [they] might say. The challenged sections ... make no mention whatsoever of abortion or any substantive issue.... In fact, the [restraining orders] could apply equally to protests which supported abortion as well as to protests which opposed abortion, or indeed, to protests supporting or opposing any other cause.

*McMonagle*, 939 F.2d at 63. Clearly, they are content-neutral.[36] Under the remaining

---

**36.** Relators argue, however, that because the restraining orders targeted only persons identified with the "pro-life" movement, the orders were, in context, aimed at the "pro-life" message, and are thus not "content-neutral." This argument has been explicitly rejected in a number of the cases cited above. *See McMonagle*, 939 F.2d at 63 (court order applying only to pro-life protesters not "content-based" because "only

those persons [were] proven [to] have created ... a threat of violence and intimidation"); *Terry*, 886 F.2d at 1363–64; *Hirsh*, 401 S.E.2d at 533; *Project Jericho*, 556 N.E.2d at 162; *Bering*, 721 P.2d at 926; *cf. Medlin v. Palmer*, 874 F.2d 1085, 1090 (5th Cir.1989) (ordinance prohibiting use of hand-held amplifiers within 150 feet of medical facilities was not content-based restriction of pro-life demonstrators' speech where

elements of the time, place, and manner test, we are required to balance carefully the interests the orders are intended to vindicate with the need to protect and preserve the "uninhibited, robust, and wide-open" debate that the First Amendment envisions. *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). This is true even when individuals, and their private affairs, are unwittingly or unwillingly pulled into the fray. *See, e.g., Frisby*, 487 U.S. at 479, 108 S.Ct. at 2499 (analyzing place restrictions on residential picketing); *cf. Mississippi Women's Medical Clinic v. McMillan*, 866 F.2d 788, 795–96 (5th Cir.1988) (refusing to hold trial court's refusal to issue anti-picketing injunction against pro-life forces an abuse of discretion). So long as clinic patients and staff are ensured access, the mere possibility that these unwilling listeners might find the protesters' message and presence distasteful, upsetting, or disturbing is not alone sufficient to justify a restriction on expression under the First Amendment. Ordinarily, "to avoid further bombardment of [their] sensibilities," unwilling listeners like the plaintiffs here are "simply [to] avert[ ] their eyes." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975). I would agree with Justice Gonzalez that the interests advanced in support of the challenged orders, the clinic patients' right to an abortion and the clinic owners' right to engage in lawful activities, are at least "significant" for purposes of the time, place, and manner analysis. While this Court in its 1948 decision *Ex parte Henry* struck down a 100–foot place restriction under the First Amendment, I might nonetheless be inclined to hold, on the strength of more recent federal precedent, that a 100–foot restriction on demonstrating is, all other things being equal, a sufficiently narrowly tailored means of advancing these interests that would leave open adequate alternative channels of communication.

*See McMonagle*, 939 F.2d at 72 (restriction allowing only 6–8 protesters within 500 feet of clinic property); *Bering*, 721 P.2d at 922–24, 931 (restriction barring demonstrations along front of clinic building); *see also Burson v. Freeman*, —— U.S. ——, —— – ——, 112 S.Ct. 1846, 1856–57, 119 L.Ed.2d 5 (1992) (upholding statute banning display or distribution of campaign literature and solicitation of votes within 100 feet of polling place; Court "d[id] not view the question whether the 100–foot boundary line could be tighter as a question of constitutional dimension. Reducing the boundary to 25 feet [was] a difference only in degree, not a least restrictive alternative in kind."); *Boos v. Barry*, 485 U.S. 312, 329, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333 (1985) (upholding portion of ordinance permitting no more than 3 picketers within 500 feet of embassy); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (upholding statute banning demonstrating "near" a courthouse applied to protest taking place 101 feet away); *but see Hirsh*, 401 S.E.2d at 533 (provision in order permitting small number of demonstrators within 50–foot demonstration-free zone was necessary to ensure that adequate alternative means of communication were available).

There are, however, two related difficulties in the challenged orders. First, particularly with respect to the order applicable to clinics other than Planned Parenthood, there is nothing in the record concerning the physical layouts of the numerous clinics in relation to their respective property lines, the property lines in relation to public sidewalks and roads, or the features of the areas in which the clinics were located. *Fargo Women's Health Clinic*, 488 N.W.2d at 409. As the plurality points out, clinics covered by this order were evidently located in such diverse surroundings as high-rise office buildings. In attempting to apply, in the name of administrative convenience, a blanket set of restrictions to such

---

language of ordinance said nothing about content of amplified speech); *but cf. Thomason v. Jernigan*, 770 F.Supp. 1195, 1199–1203 (E.D.Mich.1991) (city's vacation of cul de sac to abortion clinic in order to permit clinic to in-

voke trespass laws over areas not "content neutral" where pro-life protesters were sole source of traffic problems that precipitated city's action).

a wide variety of clinics, the trial court overlooks the careful, fact-specific balancing of interests required under the First Amendment. Further, by failing to provide any information concerning the surroundings and location of individual clinics, we have no way of judging the propriety of the 100–foot restriction in each location and whether such provisions ensure adequate alternative channels of communication. *See id.* Under the First Amendment, it is the responsibility of parties seeking state-imposed place restrictions on expressive activity to adduce evidence from which the trial court—and appellate courts, if necessary—can ascertain whether parties wishing to express themselves may adequately make themselves heard.

Second, as both the plurality and concurrence point out in the course of their respective analyses of Relators' Texas free speech clause claims, there are a number of other provisions in the orders, not challenged by Relators, designed to effectuate the interests that Plaintiffs assert. In addition to the 100–foot restriction, the orders prohibit:

■ "Trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from" the clinics or clinic parking lots;[37]

■ "Demonstrating within twenty-five (25) feet of any person seeking access to or leaving" the clinics or their parking lots "or in any way impeding such person's ... entrance to or exit from the clinics or parking lots;"

■ "Physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, or crowding persons entering or leaving, working at, or using any services" at the clinics;[38]

■ Making any sound or noise "that is so loud that it disturbs, injures, or endangers the health and safety of any patient or employee" of the clinics;

■ "Harassing, intimidating or physically abusing any doctor, health care professional, or other staff member, or employee or volunteer who assists in the provision of services" at any facility;

■ "Attempting to take, or in any manner inducing, encouraging, directing, aiding, or abetting others to take" any of the above actions.

Hence, even without the 100–foot restrictions, the orders guarantee physical access for clinic patients and staff free of harassment, violence, or intimidation. Further, each person seeking access to or leaving the clinics is afforded a 25–foot, demonstration-free bubble around them. To date, only one court has upheld such an expansive place restriction when included in an order, like the ones challenged today, containing a variety of other protections for clinic patients and staff. *See McMonagle,* 939 F.2d at 71–73 (restriction allowing 6–8 protesters within 500 feet of clinic property); *compare Pro-Choice Network,* 799 F.Supp. at 1434–35, 1440–41 (upholding 15–foot place restriction in context of order with structure virtually identical to those of this case).[39]

I would accordingly hold that Plaintiffs have failed to demonstrate that the challenged 100–foot restrictions are sufficiently narrowly tailored and leave open adequate alternative channels of communication to pass muster under the First Amendment.

## V.

Before closing, I pause briefly to respond to the dissenting opinion's arguments that Relators' claims should properly be dispensed with under some version of the so-called "collateral bar" rule like that propounded by the United States Supreme Court in *Walker v. City of Birmingham,*

---

37. The Planned Parenthood order additionally prohibited "physically invading, entering without consent, [and] damaging" of that facility or its parking lots. Further, it prohibited "[o]bstructing or interfering in any way with the entrance or exit of pedestrian or vehicle traffic" to or from the street in front of the clinic.

38. The Planned Parenthood order also extended the protections described under this provision and the one preceding it to persons entering and exiting the intervening businesses.

39. In *Burson* and *Cox,* for example, the 100–foot bans were the sole provision in the challenged restrictions. *See also Boos v. Barry,* 485 U.S. at 329, 108 S.Ct. at 1168.

388 U.S. 307, 315–21, 87 S.Ct. 1824, 1829–32, 18 L.Ed.2d 1210 (1967). I cannot ignore the long-established Texas practice of permitting litigants imprisoned for the violation of court orders restricting speech to challenge the constitutionality of those orders through habeas proceedings. *See, e.g., Ex parte Pierce,* 161 Tex. 524, 342 S.W.2d 424 (1961), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1650, 6 L.Ed.2d 388 *Ex parte Henry,* 215 S.W.2d 588; *Ex parte Tucker,* 220 S.W. 75; *see also Ex parte McCormick,* 88 S.W.2d 104; *Ex parte Foster,* 71 S.W. 593.

I do not agree, however, with the plurality's wholly unsupported suggestion that Texas' failure to follow the federal-style collateral bar rule is attributable to any supposedly greater "importance attached to freedom of expression in our state's jurisprudence." 859 S.W.2d at 2. A number of other states, like Texas, have permitted collateral attacks on court orders via habeas or similar proceedings. *None,* including some that deem their free speech clauses to be broader in at least some respects than the First Amendment, have linked the notion of a more expansive free speech clause with their refusal to follow the collateral bar rule. *See In re Berry,* 68 Cal.2d 137, 65 Cal.Rptr. 273, 279–82, 436 P.2d 273, 279–82 (Cal.1968); *see also Wood v. Goodson,* 253 Ark. 196, 485 S.W.2d 213, 217 (1972); *State ex. rel. Superior Court v. Sperry,* 79 Wash.2d 69, 483 P.2d 608, 611 (1971), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d 594, 596 (1966).

## VI.

The revitalized commitment to state constitutions has been one of the most important jurisprudential developments of our generation. Contrary to the repeated insinuations of the plurality, I question neither the power nor the obligation of our Court to apply state, as well as national, constitutional guarantees to the claims before us. Moreover, our application of the state constitution need not be controlled, or even informed, by how past or current federal courts have read corresponding guarantees of the United States Constitution.

Unfortunately, however, the manner in which some state courts have exercised this authority has led some commentators to view state constitutional guarantees as merely a convenient vehicle for result-oriented pronouncements. *See* authorities cited at *Davenport,* 834 S.W.2d at 38 n. 10 (Hecht, J., concurring). Our recent writings in the free expression area have also done little to dispel this notion. From the unseemly chauvinism of *Davenport* to the blatantly partisan factual recitation of today's plurality opinion, it would appear that some see our Texas Constitution as little more than "a handy grab bag filled with a bevy of clauses that may be exploited" to achieve "some particular social goal." Ronald R.K. Collins, *Reliance on State Constitutions—Away From a Reactionary Approach,* 9 HASTINGS CONST. L.Q. 1, 2 (1981). If I have authored an "expansive writing ... to dissent from each and every underpinning of" *Davenport,* 6 S.W.2d at ——, it is only because that opinion is so perforated with error, constructs so flawed a foundation for a methodological framework for future decisions. I do, indeed, "fret" over such a writing by this Court, 859 S.W.2d at 8, n. 14, and I fervently hope that our subsequent efforts in this area will prove more substantial. For this case, as the guarantees of the First Amendment to the United States Constitution provide all the relief sought by Relators, I rely solely on that authority to concur in the judgment that Relators remain discharged.

CORNYN, J., joins in this opinion.

## APPENDIX

### COMPENDIUM OF STATE FREE SPEECH CLAUSES

ALABAMA

*1819*

(effective Dec. 14, 1819)

Art. I, § 8: Every citizen may freely speak, write, and publish his sentiments on

all subjects, being responsible for the abuse of that liberty.

Art. VI, § 14: In prosecutions for the publishing of papers investigating the official conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the courts.

*1861*

(effective Mar. 21, 1861)

Same as 1819 provisions.

*1865*

(effective Sept. 30, 1865)

Art. I, § 5: That every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 13: That in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and that in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court.

*1867*

(effective July 13, 1868)

Art. I, § 6: That any citizen may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 14: That in prosecution for the publication of papers investigating the official conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and that in all indictments for libel, the jury shall have the right to determine the law and the facts under the direction of the court.

*1875*

(effective Dec. 6, 1875)

Art. I, § 5: Same as Art. I, § 6 (1867).

Art. I, § 13: That in prosecutions for the publication of papers investigating the official conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and that in all indictments for libel the jury shall have the right to determine the law and the facts under the direction of the court.

*1901*

(effective Nov. 28, 1901) (present)

Art. I, § 4: That no law shall ever be passed to curtail or restrain the liberty of speech or of the press; and any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 12: That in all prosecutions for libel or for the publication of papers investigating the official conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and that in all indictments for libel, the jury shall have the right to determine the law and the facts under the direction of the court.

## ALASKA

*1956*

(effective Jan. 3, 1959) (present)

Art. I, § 5: Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

## ARIZONA

*1910*

(effective Feb. 14, 1912) (present)

Art. II, § 6: Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

## ARKANSAS

*1836*

(effective June 15, 1836)

Art. II, § 7: That printing-presses shall be free to every person; and no law shall ever be made to restrain the rights thereof.

The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject—being responsible for the abuse of that liberty.

Art. II, § 8: In prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have the right to determine the law and the facts.

*1861*

(effective June 1, 1861)

Same as 1836 provisions.

*1864*

(effective Apr. 11, 1864)

Art. II, § 7: That printing-presses shall be free to every person; and no law shall ever be made to restrain the rights thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print, on any subject—being responsible for the abuse of that liberty.

Art. II, § 8: In prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence, and in all indictments for libels, the jury shall have the right to determine the law and the facts.

*1868*

(effective June 22, 1868)

Art. I, § 2: The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libellous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted.

*1874*

(effective Oct. 13, 1874) (present)

Art. II, § 6: The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and, if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party charged shall be acquitted.

## CALIFORNIA

*1849*

(effective Sept. 9, 1850)

Art. I, § 9: Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1879*

(effective May 7, 1879)

Art. I, § 9: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact. Indictments found, or information laid, for publications in newspapers, shall

be tried in the county where such newspapers have their publication office, or in the county where the party alleged to be libeled resided at the time of the alleged publication, unless the place of trial shall be changed for good cause.

*Present*

(1879 as amended June 3, 1980)

Art. I, § 2(a): Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.

Art. I, § 2(b): A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

As used in this subdivision, "unpublished information" includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated.

## COLORADO

*1876*

(effective Aug. 1, 1876) (present)

Art. II, § 10: That no law shall be passed impairing the freedom of speech; that every person shall be free to speak, write, or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.

## CONNECTICUT

*1776*

(effective Aug. 1776)

Para. 2: And be it further enacted and declared, That no Man's Life shall be taken away: No Man's Honor or good Name shall be stained....

*1818*

(effective Nov. 1818)

Art. I, § 5: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 6: No law shall ever be passed to curtail or restrain the liberty of speech or of the press.

Art. I, § 7: In all prosecutions or indictments for libels the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court.

*1955*

(effective Jan. 1, 1955)

Art. I, § 5: Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 6: No law shall ever be passed to curtail or restrain the liberty of speech or of the press.

Art. I, § 7: In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court.

*1965*

(effective Dec. 30, 1965) (present)

Art. I, §§ 4, 5, and 6 same as Art. I, §§ 5, 6, and 7 (1955).

## DELAWARE

*1776*

(effective Sept. 20, 1776)

Declaration of Rights and Fundamental Rules, § 23: That the Liberty of the Press ought to be inviolably preserved.

*1792*

(effective June 12, 1792)

Art. I, § 5: The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty. In prosecutions for publications investigating the proceedings of officers, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury may determine the facts and the law, as in other cases.

*1831*

(effective Dec. 2, 1831)

Art. I, § 5: The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity, and any citizen may print on any such subject, being responsible for the abuse of that liberty. In prosecutions for publications investigating the proceedings of officers, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury may determine the facts and the law, as in other cases.

*1897*

(effective June 10, 1897)(present)

Art. I, § 5: The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty. In prosecutions for publications, investigating the proceedings of officers, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury may determine the facts and the law, as in other cases.

## FLORIDA

*1838*

(effective Mar. 3, 1845)

Art. I, § 5: That every citizen may freely speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty; and no law shall ever be passed to curtail, abridge, or restrain the liberty of speech or of the press.

Art. I, § 15: That in all prosecutions and indictments for libel the truth may be given in evidence; and, if it shall appear to the jury that the libel is true, and published with good motives, and for justifiable ends, the truth shall be a justification; and the jury shall be the judges of the law and facts.

*1861*

(effective Apr. 27, 1861)

Same as 1838 provisions.

*1865*

(effective Nov. 7, 1865)

Art. I, § 5: That every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty; and no law shall be passed to curtail, abridge, or restrain the liberty of speech or of the press.

Art. I, § 15: That in all prosecutions and indictments for libel, the truth may be given in evidence; and, if it shall appear to the jury that the libel is true, and published with good motives, and for justifiable ends,

the truth shall be a justification; and the jury shall be the judges of the law and facts.

*1868*

(effective July 4, 1868)

Art. I, § 10: Every citizen may fully speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or abridge the liberty of speech or the press. In all criminal prosecutions and civil actions for libel the truth may be given in evidence to the jury, and if it shall appear that the matter charged as libellous is true, but was published from good motives, the party shall be acquitted or exonerated.

*1885*

(effective June 1, 1887)

Art. I, § 13: Every person may fully speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for libel the truth may be given in evidence to the jury, and if it shall appear that the matter charged as libellous is true, but was published for good motives, the party shall be acquitted or exonerated.

*1969*

(effective Jan. 1, 1969) (present)

Art. I, § 4: Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.

## GEORGIA

*1777*

(effective Feb. 5, 1777)

Art. LXI: Freedom of the press and trial by jury to remain inviolate forever.

*1789*

(effective May 6, 1789)

Art. IV, § 3: Freedom of the press and trial by jury shall remain inviolate.

*1798*

(effective May 30, 1798)

Art. IV, § 5: Freedom of the press, and trial by jury, as heretofore used in this State, shall remain inviolate; and no *ex post facto* laws shall be passed.

*1861*

(effective Aug. 1861)

Art. I, § 8: Freedom of thought and opinion, freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may freely speak, write and print, on any subject, he shall be responsible for the abuse of that liberty.

*1865*

(effective Dec. 1865)

Art. I, § 6: Freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may freely speak or write or print on any subject, he shall be responsible for the abuse of the liberty.

*1868*

(effective June 25, 1868)

Art. I, § 9: Freedom of speech and freedom of the press are inherent elements of political liberty. But while every citizen may freely speak, or write, or print on any subject, he shall be responsible for the abuse of the liberty.

Art. I, § 19: In all prosecutions or indictments for libel the truth may be given in evidence, and the jury shall have the right to determine the law and the facts.

*1877*

(effective Dec. 1877)

Art. I, § 1, para. 15: No law shall ever be passed to curtail, or restrain, the liberty of speech, or of the press; any person may speak, write, and publish his sentiments, on

all subjects, being responsible for the abuse of that liberty.

Art. I, § 2, para. 1: In all prosecutions or indictments for libel the truth may be given in evidence; and the jury in all criminal cases, shall be the judges of the law and the facts. The power of the Judges to grant new trials in cases of conviction, is preserved.

*1945*

(effective Dec. 1945)

Art. I, § 1, para. 15: No law shall ever be passed to curtail, or restrain the liberty of speech, or of the press; any person may speak, write and publish his sentiments, on all subjects, being responsible for the abuse of that liberty.

Art. I, § 2, para. 1: In all prosecutions or indictments for libel the truth may be given in evidence; and the jury in all criminal cases, shall be the judges of the law and the facts. The power of the judges to grant new trials, in cases of conviction, is preserved.

*1976*

(effective Jan. 1, 1977)

Art. I, § 1, para. 4: Same as Art. I, § 1, para. 15 (1945).

Art. I, § 1, para. 8: In all prosecutions or indictments for libel the truth may be given in evidence; and the jury in all criminal cases, shall be the judges of the law and the facts. The power of the judges to grant new trials in case of conviction is preserved.

*1983*

(effective July 1, 1983) (present)

Art. I, § 1, para. 5: No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty.

Art. I, § 1, para. 6: In all civil or criminal actions for libel, the truth may be given in evidence; and, if it shall appear to the trier of fact that the matter charged as libelous is true, the party shall be discharged.

## HAWAII

*1840***

(effective Oct. 8, 1840) (constitutional monarchy)

Contains a rudimentary bill of rights, but no specific free speech provisions.

*1852***

(effective June 14, 1852) (constitutional monarchy)

Art. III: All men may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press.

*1864***

(effective Aug. 20, 1864)(constitutional monarchy)

Art. III: All men may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of that right, and no law shall be enacted to restrain the liberty of speech, or of the press, except such laws as may be necessary for the protection of His Majesty the King and the Royal Family.

*1887***

(effective July 7, 1887)(constitutional monarchy)

Art. III: All men may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of that right, and no law shall be enacted to restrain the liberty of speech, or of the press.

*1894***

(effective July 4, 1894)(Republic)

Art. III: All men may freely speak, write and publish their sentiments on all subjects; and no law shall be enacted to restrain the liberty of speech or of the press; but all persons shall be responsible for the abuse of such right. Provided, however, that the Legislature may enact such laws as may be necessary, to restrain and prevent the publication or public utterance of indecent or seditious language.

*1959*

(effective Aug. 21, 1959)

Art. I, § 3: No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

*Present*

(1959 as amended Nov. 7, 1978)

Art. I, § 4: No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

## IDAHO

*1889*

(effective July 3, 1890)(present)

Art. I, § 9: Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty.

## ILLINOIS

*1818*

(effective Dec. 3, 1818)

Art. VIII, § 22: That the printing-presses shall be free to every person who undertakes to examine the proceedings of the general assembly or of any branch of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. VIII, § 23: In prosecutions for the publication of papers investigating the official conduct of officers, or of men acting in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right of determining both the law and the fact, under the direction of the court, as in other cases.

*1848*

(effective Apr. 1, 1848)

Art. XIII, § 23: The printing-presses shall be free to every person who undertakes to examine the proceedings of the general assembly, or any branch of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. XIII, § 24: In prosecutions for the publication of papers investigating the official conduct of officers, or of men acting in a public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have the right of determining both the law and the fact, under the direction of the court, as in other cases.

*1870*

(effective Aug. 8, 1870)

Art. II, § 4: Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.

*1971*

(effective July 1, 1971)(present)

Art. I, § 4: All persons may speak, write and publish freely, being responsible for the abuse of that liberty. In trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.

## INDIANA

*1816*

(effective Dec. 11, 1816)

Art. I, § 9: That the printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of government;

and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. I, § 10: In prosecution for the publication of papers investigating the official conduct of officers, or men in a public capacity, or where the matter published is proper for the public information, the truth thereof may be given in evidence; and, in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1851*

(effective Nov. 1, 1851)(present)

Art. I, § 9: No law shall be passed restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print freely on any subject whatever; but for the abuse of that right every person shall be responsible.

Art. I, § 10: In all prosecutions for libel, the truth of the matters alleged to be libellous may be given in justification.

## IOWA

*1846*

(effective Dec. 28, 1846)

Art. I, § 7: Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech, or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury, and if it appear to the jury that the matter charged as libellous was true, and was published with good motives and justifiable ends, the party shall be acquitted.

*1857*

(effective Sept. 1857)(present)

Same as 1846 provision.

## KANSAS

*1859*

(effective Jan. 29, 1861)(present)

Bill of Rights, § 11: The liberty of the press shall be inviolate; and all persons may freely speak, write, or publish their sentiments on all subjects, being responsible for the abuse of such right; and in all civil or criminal actions for libel, the truth may be given in evidence to the jury, and if it shall appear that the alleged libellous matter was published for justifiable ends, the accused party shall be acquitted.

## KENTUCKY

*1792*

(effective June 1, 1792)

Art. XII, (para. 7): That the printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communications of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. XII, (para. 8): In prosecutions for publications of papers, investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1799*

(effective Jan. 1, 1800)

Art. X, § 7: That printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. X, § 8: In prosecutions for the publication of papers investigating the official conduct of officers or men in a public ca-

pacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1850*

(effective Jan. 1, 1851)

Art. XIII, § 9: That printing-presses shall be free to every person who undertakes to examine the proceedings of the general assembly, or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

Art. XIII, § 10: In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1890*

(effective Jan. 1, 1892)(present)

Bill of Rights, § 1: All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:

.    .    .    .    .

Fourth: The right of freely communicating their thoughts and opinions.

Bill of Rights, § 8: Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof. Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty.

Bill of Rights, § 9: In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libel the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

## LOUISIANA

*1812*

(effective Apr. 30, 1812)

Art. VI, § 21: Printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of the government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

*1845*

(effective Jan. 25, 1846)

Title VI, Art. 110: The press shall be free. Every citizen may freely speak, write, and publish his sentiments on all subjects; being responsible for an abuse of this liberty.

*1852*

(effective Jan. 15, 1853)

Title VI, Art. 106: Same as Title VI, Art. 110 (1845).

*1861*

(effective Mar. 15, 1861)

Same as 1852 provision.

*1868*

(effective July 16, 1868)

Title I, Art. 4: The press shall be free; every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of this liberty.

*1879*

(effective Jan. 8, 1880)

Bill of Rights, Art. 1: No laws shall be passed respecting an establishment of reli-

gion or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and petition the government for a redress of grievances.

General Provisions, Art. 168: In all proceedings of indictments for libel, the truth thereof may be given in evidence. The jury in all criminal cases shall be judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge.

*1898*

(effective May 12, 1898)

Bill of Rights, Art. 3: No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

General Provisions, Art. 179: In all proceedings or indictments for libel, the truth thereof may be given in evidence. The jury in all criminal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge.

*1913*

(effective Nov. 22, 1913)

Same as 1898 provisions.

*1921*

(effective July 1, 1921)

Art. I, § 3: Same as Bill of Rights, Art. 3 (1898).

Art. XIX, § 9: Same as General Provisions, Art. 179 (1898).

*1974*

(effective Dec. 31, 1974)(present)

Art. I, § 7: No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.

**MAINE**

*1820*

(effective Mar. 15, 1820)(present)

Art. I, § 4: Every citizen may freely speak, write, and publish his sentiments on any subject, being responsible for the abuse of this liberty. No laws shall be passed regulating or restraining the freedom of the press; and, in prosecutions for any publication respecting the official conduct of men in public capacity, or the qualifications of those who are candidates for the suffrages of the people, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels, the jury, after having received the direction of the court, shall have a right to determine, at their discretion, the law and the fact.

**MARYLAND**

*1776\**

(effective Nov. 8, 1776)

Declaration of Rights, VIII: That freedom of speech and debates, or proceedings in the Legislature, ought not to be impeached in any other court or judicature.

Declaration of Rights, XXXVIII: That the liberty of the press ought to be inviolably preserved.

*1851*

(effective July 4, 1851)

Declaration of Rights, Art. 8: That freedom of speech and debate, or proceedings in the legislature, ought not to be impeached in any court of judicature.

Declaration of Rights, Art. 38: Same as Declaration of Rights, XXXVIII (1776).

*1864*

(effective Nov. 1, 1864)

Declaration of Rights, Art. 10: Same as Declaration of Rights, Art. 8 (1851).

Declaration of Rights, Art. 40: That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

*1867*

(effective Oct. 5, 1867)(present)

Declaration of Rights, Art. 10: Same as 1864 provision.

Declaration of Rights, Art. 40: That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that privilege.

## MASSACHUSETTS

### 1780*

(effective Oct. 25, 1780)

Declaration of Rights, Art. XVI: The liberty of the press is essential to the security of freedom in a State: it ought not, therefore, to be restrained in this commonwealth.

Declaration of Rights, Art. XXI: The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever.

### Present

(1780 as amended Nov. 2, 1948)

Declaration of Rights, Art. XVI: The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged.

Declaration of Rights, Art. XXI: Unchanged.

## MICHIGAN

### 1835

(effective Jan. 26, 1837)

Art. I, § 7: Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the

party shall be acquitted; and the jury shall have the right to determine the law and the fact.

### 1850

(effective Jan. 1, 1851)

Art. IV, § 42: No law shall ever be passed to restrain or abridge the liberty of speech or of the press; but every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of such right.

Art. VI, § 25: In all prosecutions for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. The jury shall have the right to determine the law and the fact.

### 1908

(effective Jan. 1, 1909)

Art. I, § 4: Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of such right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

Art. I, § 18: In all prosecutions for libels the truth may be given in evidence to the jury; and, if it shall appear to the jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, the accused shall be acquitted.

### 1963

(effective Jan. 1, 1964)(present)

Art. I, § 5: Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

Art. I, § 19: In all prosecutions for libels the truth may be given in evidence to the jury; and, if it appears to the jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, the accused shall be acquitted.

## MINNESOTA

*1857*

(effective May 11, 1858)

Art. I, § 3: The liberty of the press shall forever remain inviolate, and all persons may freely speak, write, and publish their sentiments on all subjects, being responsible for the abuse of such right.

*1974*

(effective Nov. 5, 1974)(present)

Same as 1857 provision.

## MISSISSIPPI

*1817*

(effective Dec. 10, 1817)

Art. I, § 6: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 7: No law shall ever be passed to curtail or restrain the liberty of speech or of the press.

Art. I, § 8: In all prosecutions or indictments for libels, the truth may be given in evidence; and the jury shall have the right to determine the law and the facts, under the direction of the court.

*1832*

(effective Jan. 1, 1833)

Art. I, § 6: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

Art. I, § 7: No law shall ever be passed to curtail or restrain the liberty of speech, or of the press.

Art. I, § 8: In all prosecutions or indictments for libel, the truth may be given in evidence; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the facts.

*1869*

(effective Feb. 18, 1869)

Art. I, § 4: The freedom of speech and of the press shall be held sacred, and in all indictments for libel the jury shall determine the law and the facts, under the direction of the court.

*1890*

(effective Nov. 1, 1890)(present)

Art. III, § 13: The freedom of speech and of the press shall be held sacred, and in all prosecutions for libel the truth may be given in evidence, and the jury shall determine the law and the facts under the direction of the court; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted.

## MISSOURI

*1820*

(effective Aug. 10, 1821)

Art. XIII, § 16: That the free communication of thoughts and opinions is one of the invaluable rights of man, and that every person may freely speak, write, and print on any subject, being responsible for the abuse of that liberty; that in all prosecutions for libels the truth thereof may be given in evidence, and the jury may determine the law and the facts, under the direction of the court.

*1865*

(effective July 4, 1865)

Art. I, § 27: That the free communication of thoughts and opinions is one of the invaluable rights of man, and that every person may freely speak, write, and print on any subject, being responsible for the abuse of that liberty; that in all prosecutions for libel, the truth thereof may be given in evidence, and the jury may determine the law and the facts, under the direction of the court.

*1875*

(effective Nov. 30, 1875)

Art. II, § 14: That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write, or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the

direction of the court, shall determine the law and the fact.

*1945*

(effective Mar. 30, 1945)(present)

Art. I, § 8: That no law shall be passed impairing the freedom of speech, no matter by what means communicated; that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty; and that in all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and in suits and prosecutions for libel the jury, under the direction of the court, shall determine. the law and the facts.

**MONTANA**

*1889*

(effective Nov. 8, 1889)

Art. III, § 10: No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

*1972*

(effective July 1, 1972)(present)

Art. II, § 7: No law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty. In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

**NEBRASKA**

*1866*

(effective Mar. 1, 1867)

Art. I, § 3: Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be

passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel the truth may be given in evidence; and if it shall appear to the jury that the matter charged as libellous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1875*

(effective Nov. 1, 1875)(present)

Art. I, § 5: Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.

**NEVADA**

*1864*

(effective Oct. 31, 1864)(present)

Art. I, § 9: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted or exonerated.

**NEW HAMPSHIRE**

*1776\**

(effective Jan. 5, 1776)

There is no specific provision.

*1784\**

(effective June 2, 1784)

Art. I, § 22: The Liberty of the Press is essential to the security of freedom in a state; it ought, therefore, to be inviolably preserved.

Art. I, § 30: The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation

of any action, complaint, or prosecution, in any other court or place whatsoever.

*Present*

(1784 as amended 1968)

Art. I, § 22: Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved.

Art. I, § 30: Unchanged.

## NEW JERSEY

*1776\**

(effective July 3, 1776)

There is no specific provision.

*1844*

(effective Sept. 2, 1844)

Art. I, § 5: Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1947*

(effective Jan. 1, 1948)(present)

Art. I, § 6: Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

## NEW MEXICO

*1910*

(effective Jan. 6, 1912)(present)

Art. II, § 17: Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true and was published with the good motives and for justifiable ends, the party shall be acquitted.

## NEW YORK

*1777\**

(effective Apr. 20, 1777)

There is no specific provision.

*1822*

(effective Dec. 31, 1822)

Art. VII, § 8: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1846*

(effective Jan. 1, 1847)

Art. I, § 8: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1895*

(effective Jan. 1, 1895)

Art. I, § 8: Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with the good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

*1938*

(effective Jan. 1, 1939)(present)

Same as 1895 provision.

### NORTH CAROLINA

*1776\**

(effective Dec. 18, 1776)

Declaration of Rights, XV: That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained.

*1862*

(effective May 20, 1862)

Same as 1776 provision.

*1868*

(effective July 1, 1868)

Art. I, § 20: The freedom of the press is one of the great bulwarks of liberty, and, therefore, ought never to be restrained, but every individual shall be held responsible for the abuse of the same.

*1876*

(effective Dec. 31, 1876)

Art. I, § 20: The freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained, but every individual should be held responsible for the abuse of the same.

*1970*

(effective July 1, 1971)(present)

Art. I, § 14: Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be re-

strained, but every person shall be held responsible for their abuse.

### NORTH DAKOTA

*1889*

(effective Nov. 2, 1889)

Art. I, § 9: Every man may freely write, speak and publish his opinions on all subjects, being responsible for the abuse of that privilege. In all civil and criminal trials for libel the truth may be given in evidence, and shall be a sufficient defense when the matter is published with good motives and for justifiable ends; and the jury shall have the same power of giving a general verdict as in other cases; and in all indictments or informations for libels the jury shall have the right to determine the law and the facts under the direction of the court as in other cases.

*1980*

(effective 1980)(present)

Art. I, § 4: Same as Art. I, § 9 (1889).

### OHIO

*1802*

(effective Mar. 1, 1803)

Art. VIII, § 6: That the printing-presses shall be open and free to every citizen who wishes to examine the proceedings of any branch of government, or the conduct of any public officer; and no law shall ever restrain the right thereof. Every citizen has an indisputable right to speak, write, or print upon any subject as he thinks proper, being liable for the abuse of that liberty. In prosecutions for any publication respecting the official conduct of men in a public capacity, or where the matter published is proper for public information, the truth thereof may always be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1851*

(effective Jan. 8, 1852)(present)

Art. I, § 11: Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge liberty of

speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted.

## OKLAHOMA

*1907*

(effective Nov. 16, 1907)(present)

Art. II, § 22: Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous, be true and was written or published with good motives and for justifiable ends, the party shall be acquitted.

## OREGON

*1859*

(effective Feb. 14, 1859)(present)

Art. I, § 8: No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever, but every person shall be responsible for the abuse of this right.

## PENNSYLVANIA

*1776\**

(effective Sept. 28, 1776)

Declaration of Rights, XII: That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained.

Plan or Frame of Government, § 35: The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government.

*1790*

(effective Sept. 2, 1790)

Art. IX, § 7: That the printing-press shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1838*

(effective Jan. 1, 1839)

Art. IX, § 7: That the printing-press shall be free to every person who undertakes to examine the proceedings of the legislature or any branch of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. In prosecution for the publication of papers investigating the official conduct of officers, or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1873*

(effective Jan. 1, 1874)

Art. I, § 7: The printing-presses shall be free to every person who may undertake to examine the proceedings of the legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may

freely speak, write, and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

*1968*

(effective Apr. 23, 1968) (present)

Art. I, § 7: The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

### RHODE ISLAND

*1842*

(effective May 1843)

Art. I, § 20: The liberty of the press being essential to the security of freedom in a State, any person may publish his sentiments on any subject, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, unless published from malicious motives, shall be sufficient defence to the person charged.

*1986*

(effective Dec. 4, 1986) (present)

Art. I, § 20: The liberty of the press being essential to the security of freedom in a state, any person may publish sentiments on any subject, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, unless published from malicious motives, shall be sufficient defense to the person charged.

### SOUTH CAROLINA

*1776\**

(effective Mar. 26, 1776)

There is no specific provision.

*1778\**

(effective Nov. 30, 1778)

XLIII: That the liberty of the press be inviolably preserved.

*1790*

(effective June 3, 1790)

Art. IX, § 6: The trial by jury, as heretofore used in this State, and the liberty of the press, shall be forever inviolably preserved.

*1865*

(effective Sept. 27, 1865)

Art. IX, § 7: The trial by jury as heretofore used in this State, and the liberty of the press, shall be forever inviolably preserved. But the general assembly shall have power to determine the number of persons who shall constitute the jury in the inferior and district courts.

*1868*

(effective Apr. 16, 1868)

Art. I, § 7: All persons may freely speak, write, and publish their sentiments on any subject, being responsible for the abuse of that right; and no laws shall be enacted to restrain or abridge the liberty of speech or of the press.

Art. I, § 8: In prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and in all indict-

ments for libel, the jury shall be the judges of the law and the facts.

*1895*

(effective Dec. 31, 1895)

Art. I, § 4: The General Assembly shall make no law respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble and to petition the Government or any department thereof for redress of grievances.

Art. I, § 21: In all indictments or prosecutions for libel, the truth of the alleged libel may be given in evidence, and the jury shall be the judges of the law and the facts.

*1971*

(effective May 13, 1971) (present)

Art. I, § 2: Same as Art. 1, § 4 (1895).

Art. I, § 16: In all indictments or prosecutions for libel, the truth of the alleged libel may be given in evidence, and the jury shall be the judges of the law and facts.

## SOUTH DAKOTA

*1889*

(effective Nov. 2, 1889) (present)

Art. VI, § 5: Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. In all trials for libel, both civil and criminal, the truth, when published, with good motives and for justifiable ends, shall be a sufficient defense. The jury shall have the right to determine the facts and the law under the direction of the court.

## TENNESSEE

*1785***

(Constitution of the State of Franklin)

Declaration of Rights, § 15: That the freedom of the press is one of the greatest bulwarks of liberty, and therefore ought never to be restrained.

*1796*

(effective June 1, 1796)

Art. XI, § 19: That the printing-press shall be free to every person who under-

takes to examine the proceedings of the legislature, or of any branch or officer of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

*1834*

(effective Mar. 6, 1835)

Art. I, § 19: That the printing-press shall be free to every person who undertakes to examine the proceedings of the legislature, or of any branch of office of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases.

*1870*

(effective Mar. 26, 1870) (present)

Art. I, § 19: That the printing-presses shall be free to every person to examine the proceedings of the legislature, or of any branch or officer of the government; and no law shall ever be made to restrain the right thereof.

The free communication of thoughts and opinions is one of the invaluable rights of men, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of

officers or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases.

**TEXAS**

*1836*\*\* (Constitution of the Republic of Texas)

Declaration of Rights, § 4: Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege. No law shall ever be passed to curtail the liberty of speech or of the press; and in all prosecutions for libels the truth may be given in evidence, and the jury shall have the right to determine the law and fact, under the direction of the court.

*1845*

Art. I, § 5: Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

Art. I, § 6: In prosecutions for the publication of papers investigating the official conduct of officers, or men in a public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and, in all indictments for libels, the jury shall have the right to determine the law and the facts under the direction of the court, as in other cases.

*1861*

(same)

*1866*

Art. I, § 5: (same)

Art. I, § 6: In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and, in all indictments for libels, the jury shall have the right to determine the law and the facts under the direction of the court, as in other cases.

*1869*

Art. I, § 5: (same)

Art. I, § 6: In prosecutions for the publication of papers investigating the official conduct of officers or of men in a public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and, in all prosecutions for libels, the jury shall have the right to determine the law and the facts, under the direction of the court as in other cases.

*1875* (present)

Art. I, § 8: Every person shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right to determine the law and the facts under the direction of the court, as in other cases.

**UTAH**

*1845*\*\*

(Constitution of the State of Deseret)

Art. VIII, § 5: Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to abridge the liberty of speech or of the press.

*1895*

(effective Jan. 4, 1896) (present)

Art. I, § 15: No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted, and the jury shall

have the right to determine the law and the fact.

**VERMONT**

*1777\*\**

(effective July 8, 1777)

Ch. 1, § XIV: That the people have a right to freedom of speech, and of writing and publishing their sentiments; therefore, the freedom of the press ought not be restrained.

Ch. 2, § XXXII: The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government.

*1786\*\**

(effective July 4, 1786)

Ch. 1, § XV: That the people have a right of freedom of speech and of writing and publishing their sentiments, concerning the transactions of government—and therefore the freedom of the press ought not to be restrained.

Ch. 1, § XVI: The freedom of deliberation, speech, and debate, in the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever.

*1796*

(effective Nov. 2, 1796) (present)

Ch. 1, § XIII: That the people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government, and therefore the freedom of the press ought not to be restrained.

Ch. 1, § XIV: The freedom of deliberation, speech, and debate, in the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation, or prosecution, action, or complaint in any other court or place whatsoever.

**VIRGINIA**

*1776\**

(effective June 12, 1776)

Bill of Rights, § 12: That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments.

*1830*

(effective July 1, 1830)

Art. I: Adopts the Bill of Rights from the 1776 constitution.

*1851*

(effective Jan. 12, 1852)

Bill of Rights, § XII: Same as Bill of Rights, § 12 (1776).

*1864*

(effective 1864)

Same as the 1851 provision.

*1870*

(effective Jan. 26, 1870)

Art. I, § 14: That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments; and any citizen may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

*1902*

(effective July 10, 1902)

Art. I, § 12: That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments; and any citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right.

*1970*

(effective July 1, 1971) (present)

Art. I, § 12: That the freedom of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

## WASHINGTON

*1889*

(effective Nov. 11, 1889) (present)

Art. I, § 5: Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

## WEST VIRGINIA

*1861*

(effective June 20, 1863)

Art. II, § 4: No law abridging freedom of speech or of the press shall be passed; but the legislature may provide for the restraint and punishment of the publishing and vending of obscene books, papers, and pictures, and of libel and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel or defamation. Attempts to justify and uphold an armed invasion of the State, or an organized insurrection therein, during the continuance of such invasion or insurrection, by publicly speaking, writing, or printing, or by publishing or circulating such writing or printing, may be, by law, declared a misdemeanor, and punished accordingly.

Art. II, § 5: In prosecutions and civil suits for libel the truth may be given in evidence; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the verdict shall be for the defendant.

*1872*

(effective 1872) (present)

Art. III, § 7: No law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may by suitable penalties, restrain the publication or sale of obscene books, papers or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

Art. III, § 8: In prosecutions, and civil suits for libel, the truth may be given in evidence; and if it shall appear to the jury that the matter charged as libellous, is true, and was published with good motives, and for justifiable ends, the verdict shall be for the defendant.

## WISCONSIN

*1848*

(effective May 29, 1848) (present)

Art. I, § 3: Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions, or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury, that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

## WYOMING

*1889*

(effective July 10, 1890) (present)

Art. I, § 20: Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in trials for libel, both civil and criminal, the truth, when published with good intent and justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court.

\* Constitutions of the original thirteen states that were in effect prior to the Constitution of the United States of America.

\*\* Constitutions of states, not among the original thirteen states, that existed prior to the State's admission to the United States of America.

GONZALEZ, Justice, concurring.

In *Davenport v. Garcia*, 834 S.W.2d 4, 12–13 (Tex.1992), this Court stated that "we can benefit from the insights of well-reasoned and developed federal jurisprudence" in analyzing our state constitution. However, in today's opinion, the plurality ignores years of federal and state jurisprudence without offering any reasoning for

its departure from the well-known "time, place, and manner" standard and adopts an overly restrictive test for analyzing restrictions on speech. I would instead utilize a modified version of the time, place, and manner test to hold that the creation of the one-hundred (100) foot free speech zone around the entrances, exits, and parking lots of various Houston abortion clinics during the Republican National Convention was unconstitutional. Therefore, although I concur in the judgment of the Court, I do not join the plurality opinion.

## I.

I commence my analysis by examining the traditional and fundamental dichotomy between direct and indirect speech regulation that has been utilized by the courts of this state and the courts of this nation for generations.[1] I believe that such an analysis is necessary to remain faithful to *Davenport* and its directive that this Court should "borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful...." *Davenport,* 834 S.W.2d at 20. In order to determine whether the course of our sister states and the federal judiciary is helpful, we must at some point examine the rationale developed by these other courts. This Court should not develop constitutional law in a complete vacuum, but instead we should examine the development of the law in the other states and the federal system and benefit from their experiences. The federal courts, and especially the United States Supreme Court, have developed a two-track model for examining speech regulations that has been followed to some extent by the vast majority of other jurisdictions in this nation. Before we reject such a well-accepted model, we should at least examine it.

The First Amendment cases of the United States Supreme Court have created two tracks for free speech analysis: 1) a track for direct speech regulation aimed at communicative impact, and 2) a track for indirect speech regulation aimed at noncommunicative impact that possesses adverse effects on communicative opportunity. Lawrence H. Tribe, American Constitutional Law § 12-2 (2d ed. 1988); *see also Konigsberg v. State Bar of California,* 366 U.S. 36, 49–51, 81 S.Ct. 997, 1005–07, 6 L.Ed.2d 105 (1961). The difference between direct speech regulation and indirect speech regulation has been a fundamental part of federal First Amendment jurisprudence for at least fifty years. *See, e.g., Hague v. C.I.O.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939) (plurality opinion of Roberts, J.); *Cox v. New Hampshire,* 312 U.S. 569, 574–76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63 & n. 18, 78–79, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976); *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 536–37, 107 S.Ct. 2971, 2981, 97 L.Ed.2d 427 (1987). Direct speech regulation prevents the dissemination of a certain idea because of the potential effect of the idea; in other words, an individual is prohibited from expressing a particular idea because the government has determined that idea is in some way harmful to society. In contrast, indirect speech regulation does not prevent the dissemination of an idea; it instead regulates either the timing of the speech, the place of the speech, or the manner of the speech. It is obvious that a direct speech regulation that prevents an idea from ever reaching the marketplace of ideas is more offensive than an indirect speech regulation that incidentally effects either the manner, the timing, or the placement of the expressive activity.

The United States Supreme Court has recognized consistently the dichotomy between direct speech regulations and indi-

---

1. *See, e.g., Hague v. C.I.O.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939) (plurality opinion of Roberts, J.); *Cox v. New Hampshire,* 312 U.S. 569, 574–76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Planned Parenthood v. Operation Rescue,* 406 Mass. 701, 550 N.E.2d 1361, 1370 (1990); *Iranian Muslim Organization v. City of San Antonio,* 615 S.W.2d 202, 205–06 (Tex.1981); *Olvera v. State,* 806 S.W.2d 546, 548–50 (Tex.Crim.App.1991); *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918, 931 (1986), *cert. dism'd,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).

rect speech regulations. The Court closely scrutinizes direct speech regulations, holding that such regulations are unconstitutional unless the government establishes, for example, that the message being suppressed poses a "clear and present danger," or constitutes a defamatory falsehood. LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–2 (2d ed. 1988); *see also Konigsberg*, 366 U.S. at 50, 81 S.Ct. at 1006. In contrast, the Court engages in a balancing test for indirect speech regulations. TRIBE § 12–2; *see also Konigsberg*, 366 U.S. at 51, 81 S.Ct. at 1007. An indirect speech regulation is constitutional if it is content neutral, narrowly tailored to serve a significant state interest, and it leaves open ample alternative communicative channels. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). Thus, the Court is much less likely to find a regulation unconstitutional when it just regulates the time, place, and manner of expression rather than wholly precluding the dissemination of a thought in the marketplace of ideas.

Although this dichotomy between direct speech regulation and indirect speech regulation is not without its critics,[2] the United States Supreme Court and the lower federal courts have utilized this dichotomy for over fifty years. *See Hague v. C.I.O.*, 307 U.S. at 515–16, 59 S.Ct. at 963–64 (1939); *Cox v. New Hampshire*, 312 U.S. at 574, 61 S.Ct. at 765 (1941). Moreover, the courts of every other state likewise utilize this same distinction. *See, e.g., Planned Parenthood v. Operation Rescue*, 406 Mass. 701, 550 N.E.2d 1361, 1370 (1990); *Bering v. SHARE*, 106 Wash.2d 212, 721 P.2d 918

(1986), *cert. dism'd,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). Even this state has recognized this dichotomy in previous decisions. *Iranian Muslim Organization v. City of San Antonio*, 615 S.W.2d 202, 205–06 (Tex.1981); *Olvera v. State*, 806 S.W.2d 546, 548–50 (Tex.Crim.App. 1991). Furthermore, not only do most jurisdictions in the nation recognize the dichotomy between direct and indirect speech regulations, such a distinction just makes sense. Why should indirect restrictions attempting to balance competing rights be subject to the same high degree of scrutiny as direct restrictions that completely ban a type of expression? However, in today's opinion, without analysis or discussion, the plurality fails to recognize this dichotomy under the Texas Constitution. I instead would utilize the experiences of this state and other jurisdictions and recognize the traditional distinction between indirect speech regulation and direct speech regulation; therefore, I would subject indirect speech regulations to a less onerous test than direct speech regulations.

## II.

Without even mentioning the law of other jurisdictions, the plurality in today's opinion just applies the *Davenport* test for direct speech regulations to an indirect speech regulation. In *Davenport v. Garcia*, this Court addressed the ability of a trial court judge to suppress speech with a "gag order." The gag order at issue in *Davenport* prohibited an attorney from making any public comment or discussion of a case outside the courtroom. 834 S.W.2d at 6. After analyzing the history

---

**2.** *See, e.g., Konigsberg v. State Bar of California,* 366 U.S. 36, 61–71, 81 S.Ct. 997, 1012–17, 6 L.Ed.2d 105 (1961) (Black, J., dissenting); Baker, *Unreasoned Reasonableness: Mandatory Parade Permits and Time, Place, and Manner Restrictions,* 78 Nw.U.L.Rev. 937 (1983). However, it is interesting to note that Justice Black, recognized as the chief proponent of the absolutist view that all regulations on speech are unconstitutional, possessed a very limited view of what actually constituted "speech." For example, Justice Black wrote in *Street v. New York,* 394 U.S. 576, 610, 89 S.Ct. 1354, 1374, 22 L.Ed.2d 572 (1969) (Black, J., dissenting), that flag burning was in no way protected speech, a position

that has been rejected by the Court. Similarly, Justice Black did not believe that the right of free speech broadly granted "a constitutional right to engage in the conduct of picketing or patrolling, whether on publicly owned streets or on privately owned property." *Cox v. Louisiana,* 379 U.S. 559, 578, 85 S.Ct. 476, 468, 13 L.Ed.2d 487 (1965) (Black, J., dissenting). His opinion in these cases and other similar cases has led commentators to believe that the absolutist view requires a preliminary balancing test on what actually constitutes protected "speech." *See, e.g.,* TRIBE § 12–2; ROTUNDA, NOWAK & YOUNG, CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 20.7 (1st ed. 1986).

of the free speech provision contained in article I, section 8 of the Texas Constitution, the Court concluded that our free speech guarantee provides greater rights than the First Amendment. *Id.* at 10. Our Court then devised a test for gag orders in civil judicial proceedings, holding that such orders withstand constitutional scrutiny "only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm." *Id.* The Court went on to add that it was "fully aware that a prior restraint will withstand scrutiny under this test only under the most extraordinary circumstances." *Id.* (emphasis added). The Court then held that the gag order violated the free speech guarantees of article I, section 8 of the Texas Constitution. *Id.* at 11.

The gag order at issue in *Davenport* was obviously a direct regulation on speech. It prevented the attorney from making any comment on her case, except in the narrow confines of the courtroom. In other words, the order prohibited the attorney from ever expounding her thoughts in the public marketplace for ideas. Such a restrictive, direct regulation on speech must be subject to the highest degree of judicial scrutiny. The Court in *Davenport* correctly analyzed this order as constitutional only if it prohibited an imminent and irreparable harm and it provided the least restrictive means to preclude this harm. The type of direct speech restraint analyzed in *Davenport* can and should survive constitutional scrutiny "only under the most extraordinary circumstances."

In contrast, the injunction at issue in this case just regulated the location and manner of expression, rather than precluding wholly the dissemination of the relators' anti-abortion message. The relators were free to express their views anywhere except within a limited area around various abortion clinics in Houston. Consistent with well-reasoned and developed federal and state jurisprudence, this type of indirect regulation of speech is not as egregious as

a direct regulation of speech. It should thus be subject to less onerous scrutiny than the gag order test from *Davenport v. Garcia.*

An indirect time, place, and manner regulation is not as egregious as a direct regulation on the content of speech for several reasons. As mentioned previously, a time, place, and manner regulation does not preclude the dissemination of a thought in the same manner as a direct, content-based regulation. Furthermore, time, place, and manner regulations fundamentally arise from the balancing of two competing interests. For example, in this case, the trial court created this zone in an attempt to balance the free expression rights of the protestors against two rights: the right of women to be free from undue harassment in securing an abortion and the right of the clinic owners to engage in lawful activities without obstruction and intimidation. *See also Frisby v. Schultz,* 487 U.S. 474, 484–88, 108 S.Ct. 2495, 2502–04, 101 L.Ed.2d 420 (1988) (balancing right of privacy in home against First Amendment right to engage in residential picketing); *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50–52, 106 S.Ct. 925, 930–31, 89 L.Ed.2d 29 (1986) (balancing freedom of expression against attempt to preserve quality of life by zoning adult theaters); *Grayned v. City of Rockford,* 408 U.S. 104, 115–20, 92 S.Ct. 2294, 2302–05, 33 L.Ed.2d 222 (1972) (balancing right of individuals to demonstrate against interest of educating children without interference from noisy demonstrations); *Kovacs v. Cooper,* 336 U.S. 77, 86–87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949) (restricting sound amplification in residential neighborhood); *Valenzuela v. Aquino,* 853 S.W.2d 512, 518 (Tex.1993) (Gonzalez, J., dissenting) (balancing right of privacy in home against right of free expression). This requisite balancing of competing rights necessitates some discretion on the part of trial courts and legislatures in attempting to resolve these difficult issues. Therefore, I would not require that an indirect restriction on speech be subjected to scrutiny under a "least restrictive means"

analysis; I instead would require only that the restriction be narrowly tailored.[3]

As this Court stated in *Davenport*, a speech restriction will meet the exacting "least restrictive means" test in only the "most extraordinary circumstances." Why should restrictions attempting to balance such delicate, competing rights be subject to such exacting scrutiny? I agree that the right of free speech is the most important right in our free society, but I also believe that the enjoyment of this right cannot always trample on the rights of others. I see no reason to create such a limited "least restrictive means" test for an indirect speech regulation.[4] Our research has failed to locate any other jurisdiction in this nation that utilizes such a stringent test.[5] In fact, previous Texas cases, including cases decided under article I, section 8 of the Texas Constitution, have utilized the time, place, and manner test.[6] But these cases, along with all the other state and federal jurisprudence on this matter, are conspicuously absent from the plurality's opinion today.

However, I am a vigorous proponent of the right of free expression, and I have on many occasions expressed my belief that the free speech guarantees of the Texas Constitution are greater than the guarantees provided by the First Amendment. *See, e.g., Casso v. Brand,* 776 S.W.2d 551, 564 (Tex.1989) (Gonzalez, J., concurring and dissenting); *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 944 (Tex.1988) (Gonzalez, J., concurring). This is now also the opinion of this Court. *Davenport,* 834

---

**3.** I do not disagree with the plurality that the **consideration** of less restrictive alternatives is **relevant** to the determination of whether a certain restriction is narrowly tailored to serve the government's interest. *See* 859 S.W.2d at 7. However, considering other alternatives is not the same as utilizing a **least restrictive alternative test.** When utilizing a least restrictive alternative test, this Court could potentially strike down any restriction on speech. This was recognized in *Davenport* by the Court's statement that a restriction survives scrutiny under this test only in the "most extraordinary circumstances." Could an ordinance that prohibited residential picketing in a neighborhood between 9 p.m. and 7 a.m. be unconstitutional because this Court determines that the least restrictive alternative is to disallow picketing only between 10 p.m. and 6 a.m.? I just cannot agree that in every case the least restrictive alternative must be used to regulate speech when competing interests are involved.

**4.** As an indication of how onerous the "least restrictive means" test is, the counsel for the state basically conceded at oral argument that the restraining orders in this case could not survive scrutiny under *Davenport*.

**5.** The case cited by the plurality, *West Virginia Citizens Action Group, Inc. v. Daley,* 174 W.Va. 299, 324 S.E.2d 713 (1984), is not a "least restrictive means" case. The case uses the traditional time, place, and manner test requiring that the restriction is narrowly tailored to serve the government's interest. The West Virginia court considered the availability of less restrictive alternatives in determining whether the restriction was narrowly tailored to achieve the governmental interest, but the court did not require that the restriction constitute the "least restrictive means" of achieving that objective.

**6.** Many cases from this state have applied the time, place, and manner test to regulations challenged under the First Amendment in accordance with federal law. *See, e.g., Iranian Muslim Organization v. City of San Antonio,* 615 S.W.2d 202, 205–06 (Tex.1981); *Olvera v. State,* 806 S.W.2d 546, 548–50 (Tex.Crim.App.1991); *Houston Chronicle Pub. Co. v. City of Houston,* 620 S.W.2d 833, 837 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). Even more importantly, however, several cases from this state have applied versions of the time, place, and manner test to free speech claims specifically alleged under article I, section 8 of the Texas Constitution. *State v. Garcia,* 823 S.W.2d 793, 797–98 (Tex.App.—San Antonio 1992, pet. ref'd); *Lindsay v. Papageorgiou,* 751 S.W.2d 544, 549–50 (Tex.App.—Houston [1st Dist.] 1988, writ denied). *See generally Valenzuela v. Aquino,* 800 S.W.2d 301, 304–05 (Tex.App.—Corpus Christi 1990), *rev'd in part on other grounds,* 853 S.W.2d 512 (Tex.1993); *Lauderback v. State,* 789 S.W.2d 343, 347–48 (Tex.App.—Fort Worth 1990, pet. ref'd). Furthermore, in *Maloy v. City of Lewisville,* 848 S.W.2d 380, 385 (Tex.App.—Fort Worth 1993, no writ), the Fort Worth Court of Appeals upheld an injunction based on a content-neutral zoning ordinance as a permissible time, place, and manner restriction under the Texas Free Expression Clause while recognizing that *Davenport* mandated that the Texas Constitution provided broader rights of free expression than the First Amendment. Thus, nothing in the case law of this state prior to today's plurality opinion even hinted that some version of the time, place, and manner test would not apply to indirect speech regulations under the Texas Constitution.

S.W.2d at 10. Consistent with "Texas' strong and longstanding commitment to free speech," *id.* at 7, I would modify the time, place, and manner test to reflect the greater free speech guarantee contained in article I, section 8. Rather than utilizing the normal standard requiring that the restriction be narrowly tailored to serve an significant government interest, I would require that the restriction be narrowly tailored to serve a compelling government interest.[7]

Thus, under the Texas Constitution, I would hold that a time, place, and manner restriction is valid if it is content neutral, narrowly tailored to serve a compelling government interest, and it leaves open ample alternative communicative channels. Such a modified time, place, and manner test would allow courts and legislative bodies to adequately balance competing interests in indirectly regulating speech. Furthermore, this test would still maintain our proper commitment under the Texas Constitution to our broad freedom of expression guarantee since balancing would occur only if the government's interest was "compelling."[8]

---

7. Chief Justice Phillips' concurring opinion objects to my opinion on the ground that "nothing in the language or purpose of the Texas Free Expression Clause authorizes us ... to afford greater weight in the balancing of interests to free expression than we would under the First Amendment." 859 S.W.2d at 32 (Phillips, C.J., concurring). Similarly, the Chief Justice commences his opinion by stating: "The decisions of five justices in two opinions are based on the fundamentally flawed premise that the Free Expression Clause of the Texas Constitution, TEX. CONST. art. I, § 8, is in some relevant way 'broader' or more protective of free expression than the First Amendment to the United States Constitution." *Id.* at 16. I will not engage in a lengthy response to his historical conclusions because the Court in *Davenport v. Garcia*, 834 S.W.2d at 7–10, 13–21, already has rejected such arguments. However, I feel that a brief response is appropriate.

Chief Justice Phillips' concurrence utilizes *Edgewood Ind. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex.1989), as the test for interpreting provisions of the Texas Constitution. 859 S.W.2d at 18. However, he pays mere lip service to a good portion of this test. His opinion does not recognize "the difficulties inherent in determining the intent of voters over a century ago," and he therefore does not rely "heavily on the literal text" of the constitution, a text that has been expressly recognized by this Court as "more broadly worded" in *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988). Furthermore, his opinion does not discuss that we seek the constitution's meaning "with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time." *Edgewood*, 777 S.W.2d at 394. Rather than recognize these other portions of the *Edgewood* formulation, the concurrence relies almost exclusively on his own interpretation of the history of the Texas Free Exercise Clause, an interpretation that was rejected by this Court in *Davenport*.

Moreover, while criticizing the *Davenport* decision for its failure to note that other jurisdictions possess similar free expression clauses, the concurrence can be criticized for not recognizing expressly that many of these other jurisdictions with similar free expression guarantees have determined that their constitutions provide greater expressive rights than the First Amendment. *See, e.g., Robins v. PruneYard Shopping Center*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 859–61, 592 P.2d 341, 346–48 (1979), *aff'd*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Bock v. Westminster Mall Co.*, 819 P.2d 55, 60 (Colo. 1991); *State v. Schmid*, 84 N.J. 535, 423 A.2d 615, 626, 630 (1980), *dism'd*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). *See also Bering v. SHARE*, 106 Wash.2d 212, 721 P.2d 918, 931 (1986), *cert. dism'd*, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).

As a final point, I would like to address the practical effect of the concurrence's views. If this Court were to adopt these views, it would mean either that the meaning of the Texas Constitution could not evolve from its meaning in 1875 or that the meaning of the Texas Constitution would change every time the United States Supreme Court issued a decision that cut back on fundamental constitutional guarantees. I cannot accept either of these two alternatives. To state that the Texas Constitution cannot evolve from its intended meaning in 1875 ignores countless decisions of this Court and other courts regarding the evolution of organic constitutional guarantees over time. *See, e.g., Davenport*, 834 S.W.2d at 10; *Edgewood*, 777 S.W.2d at 374. To state that the Texas Constitution changes with every subsequent decision of the United States Supreme Court is equally problematic and denies the citizens of Texas an opportunity to have their rights adequately protected.

8. Such an approach has been utilized by at least one other state court in interpreting the scope of its free speech guarantee for time, place, and manner restrictions. *See Bering v. SHARE*, 106 Wash.2d 212, 721 P.2d 918, 931 (1986), *cert.*

### III.

Although I differ from the plurality opinion in the method by which I analyze the constitutionality of these temporary restraining orders, I reach the same result. As stated in the plurality opinion, the temporary restraining orders the relators violated in this case contained numerous restrictions, such as prohibitions on trespassing on clinic property, blockading or impeding access to a clinic, invading clinic property, harassing or intimidating clinic staff or patients, and demonstrating in a twenty-five foot arc of any person seeking access to the clinic. However, the relators were charged with violating only the one-hundred foot distance limitation of the order. *See* 859 S.W.2d at 3. Thus, I must only determine whether the one-hundred foot distance limitation survives constitutional scrutiny under the modified time, place, and manner test of the Texas Constitution.

I commence this analysis by determining whether the temporary restraining orders in this case are content neutral. I believe that the orders are indeed content neutral. The restraining orders apply equally to all protests; no differentiation is made based upon the particular message conveyed by the relators. It is true that the restraining orders only applied to the relators, but that is because they are the only defendants the clinics have established create the requisite threat of harm to support injunctive relief. *See generally Northeast Women's Center v. McMonagle,* 939 F.2d 57, 67 (3d Cir. 1991); *New York NOW v. Terry,* 886 F.2d 1339, 1363 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Medlin v. Palmer,* 874 F.2d 1085, 1090 (5th Cir.1989); *Portland Feminist Women's Health Center v. Advocates for Life,* 859 F.2d 681, 686 (9th Cir.1988); *Hirsh v. City of Atlanta,* 261 Ga. 22, 401 S.E.2d 530, 533 (1991), *cert. denied,* — U.S. —, 112 S.Ct. 75, 116 L.Ed.2d 49 (1991); *Planned Parenthood v. Project Jericho,* 52 Ohio St.3d 56, 556 N.E.2d 157, 162 (1990); *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918, 926 (1986), *cert. dism'd,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).

The second prong of this modified time, place, and manner test is whether the restraining order is narrowly tailored to serve a compelling government interest. The clinics identified two interests for the restraining order: the right of women to be free from undue harassment in securing their right to an abortion and the right of the clinic owners to engage in lawful activities without obstruction and intimidation. However, these interests, while indeed compelling, are adequately served by the remaining portions of the orders that were not violated. The orders prohibited trespassing on clinic property, blockading or impeding access to a clinic, invading clinic property, harassing or intimidating clinic staff or patients, and demonstrating in a twenty-five foot arc of any person seeking access to the clinic. These prohibitions adequately serve the two compelling government interests involved in this case. Thus, there is no compelling interest in keeping the relators one-hundred feet from all clinic entrances, exits, and parking lots when access to the clinic has been guaranteed by the other, more narrowly drawn prohibitions of the temporary restraining orders. In other words, the one-hundred foot free speech zones in this case are not narrowly tailored to serve any compelling interest not already served by the other restrictions in the temporary restraining orders.

Therefore, under the modified time, place, and manner test, the one-hundred foot distance limitation in the temporary restraining orders violates article I, section 8 of the Texas Constitution. I thus concur in the judgment of the Court that relators be discharged.

HECHT, Justice, dissenting.

I agree that the district court's temporary restraining orders impermissibly infringed upon relators' First Amendment rights for the reasons explained by CHIEF JUSTICE PHILLIPS in his concurring opinion. I do not agree, however, that relators were entitled to violate those orders with impuni-

ty without first exhausting all available efforts to have them set aside. Relators chose a course of action which they expected would land them in jail. I would not disappoint them; I would remand them into the custody of the Sheriff of Harris County until they served their full punishment. Accordingly, I dissent.

Relators hardly deny that they intentionally violated the district court's orders. Their sole, and very feeble, disclaimer is that they could not be completely sure that their public protests in the vicinity of abortion clinics were "demonstrations" restricted by the orders. This belated disclaimer is belied by the fact that five of the seven relators were videotaped in front of clinics tearing up copies of court orders and proclaiming their intention to violate them. The record proves, in my view, that they were successful in accomplishing their stated intent.

Although the district court's orders limiting relators' freedom to protest are more restrictive than the First Amendment allows, they are not transparently invalid. Far to the contrary, as every Member of this Court recognizes, if the facts were slightly different, or even perhaps if the actual circumstances were more fully described in the record, the restrictions the district court imposed would be justified. Relators made no attempt to obtain review of the orders before they violated them, either by asking the trial court to dissolve them or by seeking relief from an appellate court. Relators do not contend that such attempts were impossible, futile, or frustrated. Indeed, there is ample evidence to the contrary. Plaintiffs and the district court were prepared to proceed on whatever schedule defendants elected. Relators, on the other hand, appeared more anxious to violate the district court's orders than to contest them.

Despite relators' flagrant disregard of arguably valid orders issued to preserve peace while allowing relators an opportunity to express their views in a public forum, the Court excuses their conduct entirely for the reason that the orders, after careful analysis, should have been narrower. The Court thus adopts a blanket exception to the rule—often referred to as the collateral bar rule—which ordinarily requires that judicial orders be obeyed until set aside. This exception allows a person to violate a court order and yet escape all punishment whenever it can be shown that the order excessively restricted the person's constitutional free speech rights. This broad exception to the collateral bar rule presents too great an impediment to the orderly administration of justice which the rule is meant to protect, as this case illustrates.

The record before us reflects that on August 5, 1992, the district court conducted a hearing on applications for injunctive relief in three lawsuits to restrict relators' public protests of abortion clinics in Houston planned to occur at the time of the Republican National Convention.[1] The convention was to begin thirteen days later, on August 17, although some of the participants were meeting prior to that date. At the time of the hearing, plaintiffs had already notified several of the defendants of the suits, including Rescue America, Operation Rescue (through its California and Houston offices), and three of the relators (Tucci, Terry and Jewitt). An attorney appeared on behalf of Rescue America at the hearing.[2] The hearing was devoted to argument of counsel representing plaintiffs and some of the defendants concerning whether any relief should be granted, and it lasted the entire day. The district court inquired of the parties how soon the temporary injunction should be heard if a temporary restraining order issued. Plaintiffs indicated that they were willing to proceed promptly with a hearing on their request for a temporary or permanent injunction, if

---

1. The three lawsuits were *Planned Parenthood of Houston, et al., v. Operation Rescue—National, et al.*, Cause No. 92–34008, *Houston Women's Clinic, Inc., et al., v. Operation Rescue—National, et al.*, Cause No. 92–34123, and *Jerry Edwards, M.D., et al. v. Operation Rescue—Nation-*

*al, et al.*, Cause No. 92–34158, consolidated in the 190th District Court of Harris County, Texas.

2. Other defendants, not parties to this habeas proceeding, appeared at the hearing by counsel or pro se.

defendants were ready. Plaintiffs suggested August 12, a week later, as a possible date for a hearing that would give defendants time to prepare. Defendants' counsel indicated that because of deadlines in other cases, he would prefer to delay the hearing until August 13. On August 6, the district court issued a temporary restraining order in each case and set the hearing on the applications for temporary injunction for August 12.[3]

Our record contains only two of the court's orders.[4] Both prohibited demonstrating within 100 feet of plaintiffs' property. One of the orders also prohibited demonstrating within a defined area.[5] Each of the relators was found to have knowingly violated at least one of the orders by demonstrating within a restricted area. There is no doubt that relators were aware of the orders. Tucci, Benham, Mahoney, Jewitt, and Wright were videotaped tearing up copies of the orders and announcing their intention to violate them. A constable actually read the order on the street, twice, in the presence of defendants Benham, Mahoney, Jewitt and Wright. The district court held each relator in contempt and as punishment ordered them each to pay a $500 fine and to be jailed for up to six months or until they purged themselves of contempt by paying the fine and swearing that they would abide with the court's orders.[6] Relators refused to pay their fines and were incarcerated. They petitioned the court of appeals for relief by habeas corpus, which that court denied. They then filed their petitions in this Court.

Habeas corpus is a collateral attack on a contempt judgment.[7] It is used to review whether the relator has been unlawfully imprisoned. *Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex.1979); *Ex parte Ellis*, 37 Tex.Crim. 539, 40 S.W. 275, 276 (1897). Habeas corpus has also been used to challenge the enforceability of the order, the violation of which is the basis for contempt.[8] The cases have not been entirely

---

**3.** The August 12 hearing was delayed in part because by then plaintiffs had already moved to hold certain relators in contempt based on events of August 10, and in part at the request of defendants' counsel. The hearing was never conducted.

**4.** We have the temporary restraining orders issued in Cause No. 92–34008 and Cause No. 92–34123.

**5.** The restricted area was described as bounded by the west side of that part of Fannin street which is west of Planned Parenthood's facility and construction side and one intervenor's property; the east side of that part of San Jacinto Street that is east of Planned Parenthood's Berry Street parking lot and a second intervenor's property; and any portion of the sidewalks or the street along this one block of Berry Street. The boundaries were shown in an attached exhibit.

**6.** The trial court required that the fines either be paid or "served out" at the rate of $5.00 per day as one condition for purging the contempt. The other conditions varied somewhat. Tucci was to swear that he would obey the court's lawful orders; Terry and Slovenic were to swear to obey the temporary restraining order; and Benham, Mahoney, Jewitt, and Wright were to announce in court their intentions to abide by the temporary restraining order. But while the conditions for purging contempt were similar, the consequences varied: Tucci, Terry, and Slovenic were ordered jailed until they purged themselves of contempt, but "in no event" for more than six months; the sheriff was to release them when they served their "punishment period" *or* when they purged themselves of contempt. In contrast, the sheriff was ordered to jail Benham, Mahoney, Jewitt and Wright until they served their punishment periods *and* they purged themselves of contempt.

**7.** As a collateral attack on a contempt judgment, habeas corpus permits only a limited scope of review. Limited as it is, habeas corpus has been held to be the only remedy available to review an individual's incarceration for contempt. *Ex parte Cardwell*, 416 S.W.2d 382, 384 (Tex.1967) (habeas corpus allowed because no remedy by appeal); *Wagner v. Warnasch*, 156 Tex. 334, 295 S.W.2d 890, 893 (Tex.1956) (challenge to incarceration for contempt must be by habeas corpus). The rule that no appeal will lie from a judgment of contempt is dubious at best, but firmly entrenched and seldom challenged. This limitation has undoubtedly served to shape the Court's development of the law of contempt in habeas cases.

**8.** *See, e.g., Ex parte Lesher*, 651 S.W.2d 734 (Tex. 1983) (temporary restraining order without required bond unenforceable); *Ex parte Edmonds*, 383 S.W.2d 579 (Tex.1964) (no jurisdiction to enjoin entry on condemned land); *Ex parte George*, 364 S.W.2d 189 (Tex.1963) (injunction preempted by federal labor law); *Ex parte Rhodes*, 163 Tex. 31, 352 S.W.2d 249 (1962) (court had power to order that child remain in county); *Ex parte Pierce*, 161 Tex. 524, 342

consistent as to when this broader relief by habeas corpus is permitted. Some have taken an expansive view, allowing a collateral attack of any injunction which violates constitutional free speech rights. *See, e.g., Tucker,* 220 S.W. at 76; *Henry,* 215 S.W.2d at 596. Other cases have espoused a stricter view, limited to determining the trial court's jurisdiction. *See, e.g., George,* 364 S.W.2d 189; *Rhodes,* 352 S.W.2d 249, 250–51; *Lipscomb,* 239 S.W. 1101, 1103–04. Some cases restrict their consideration of the lower court's jurisdiction to subject matter and personal jurisdiction. *See, e.g., Ex parte Kimberlin,* 126 Tex. 60, 86 S.W.2d 717, 720 (1935) (injunction against enforcement of allegedly unconstitutional tax law, even if in error on the law and the facts, was within the trial court's jurisdiction). Others, however, rely upon a broader concept of "jurisdiction," using a three-prong test to determine whether contempt was justified, inquiring into: (1) jurisdiction of the subject-matter; (2) jurisdiction of the person; and (3) authority of the court to render the particular judgment. *Ex parte Duncan,* 127 Tex. 507, 95 S.W.2d 675, 679 (1936), *citing Ex parte Britton,* 127 Tex. 85, 92 S.W.2d 224 (1936); *Tinsley,* 40 S.W. at 307 (if court is without jurisdiction of the subject-matter, or of the parties, or lacks power to make the order in the particular case, it cannot punish for contempt or dis-

obedience of such order). Still other cases have concluded that the touchstone is whether relator was afforded due process. *See, e.g., Ex parte Genecov,* 143 Tex. 476, 186 S.W.2d 225 (Tex.1945), *cert. denied,* 326 U.S. 733, 66 S.Ct. 41, 90 L.Ed. 436 (1945) (principles of due process "included" the question of the trial court's jurisdiction to issue the order); *Lipscomb,* 239 S.W. at 1104 (issue is whether a citizen is restrained of his liberty without due process, "by which is meant his restraint is the result of a hearing before a competent tribunal, having jurisdiction of the subject matter, after notice, and an opportunity to be heard"). One case pragmatically combined the standards, concluding that a judgment may be attacked because of a "lack of jurisdiction in the court to render it, or because the contemner was deprived of his liberty without due process of law". *Ex parte Helms,* 152 Tex. 480, 259 S.W.2d 184, 186 (1963).

Although various standards have been used to judge the enforceability of the order relator violated, the cases consistently recognize that the review afforded by habeas corpus is a collateral attack upon a judgment which should not be permitted in every instance. This is the basic premise of the collateral bar rule. *See, e.g.,* Richard E. Labunski, *The "Collateral Bar"*

S.W.2d 424 (1961), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961) (order barring blocking street upheld); *Ex parte Dilley,* 160 Tex. 522, 334 S.W.2d 425 (1960) (injunction preempted by federal labor law); *Ex parte Twedell,* 158 Tex. 214, 309 S.W.2d 834 (1958) (injunction preempted by federal labor law); *Ex parte Lillard,* 159 Tex. 18, 314 S.W.2d 800 (1958) (custody order issued without jurisdiction); *Ex parte Henry,* 147 Tex. 315, 215 S.W.2d 588 (1948) (injunction against constitutionally-protected picketing); *Ex parte Thomas,* 141 Tex. 591, 174 S.W.2d 958 (1943), *reversed sub nom. Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (statute and injunction barring union organizer from soliciting union members without registering); *Ex parte Barrett,* 120 Tex. 311, 37 S.W.2d 741 (1931) (injunction against holding an election was outside the general scope of judicial power); *Ex parte Castro,* 115 Tex. 77, 273 S.W. 795 (1925) (order prohibiting remarriage within one year of divorce was without authority); *Ex parte Lipscomb,* 111 Tex. 409, 239 S.W. 1101 (1922) (witness jailed over his claim of attorney-client privilege was not enti-

tled to review on the merits); *Ex parte Tucker,* 110 Tex. 335, 220 S.W. 75 (1920) (injunction attempting to control free speech was beyond the power of the court to issue). *See also Ex parte McCormick,* 129 Tex.Crim. 457, 88 S.W.2d 104 (1935) ("gag" orders); *Ex parte Foster,* 44 Tex.Crim. 423, 71 S.W. 593 (1903) (same); *Ex parte Warfield,* 40 Tex.Crim. 413, 50 S.W. 933, 934 (Tex.Crim.App.1899) (equitable jurisdiction to issue injunction); *Ex parte Tinsley,* 37 Tex. Crim. 517, 40 S.W. 306, 307 (1897), *aff'd sub nom. Tinsley v. Anderson,* 171 U.S. 101, 18 S.Ct. 805, 43 L.Ed. 91 (1898) (where the court is without jurisdiction of the subject-matter, or of the parties, or lacks power to make the order in the particular case, it cannot punish for contempt or disobedience of such order); *Ex parte Ellis,* 37 Tex.Crim. 539, 40 S.W. 275, 276 (1897) (questioning authority to issue alimony and child support order, but discharging relator on other grounds). *Cf. Ex parte Hall,* 854 S.W.2d 656 (Tex.1993) (underlying temporary order based upon a premarital contract, not interlocutory support criteria, was unenforceable by con-

*Rule and the First Amendment: The Constitutionality of Enforcing Unconstitutional Orders*, 37 AM.U.L.REV. 323 (1988); Joel L. Selig, *Regulation of Street Demonstrations by Injunction: Constitutional Limitations on the Collateral Bar Rule in Prosecutions for Contempt*, 4 HARV.CIV. RIGHTS-CIV.LIB.L.REV. 135, 141 (1968); *see also Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). The rule, in its most general terms, was expressed by the United States Supreme Court in *Howat v. Kansas*, 258 U.S. 181, 189–90, 42 S.Ct. 277, 280–81, 66 L.Ed. 550 (1926): "An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be." Essentially the same rule was articulated in *Ex parte Warfield*, 40 Tex.Crim. 413, 50 S.W. 933, 934 (1899):

> [w]herever the court has authority to grant the writ of injunction, no matter what irregularities may attend the granting thereof, or however erroneously the court may have acted in granting the same, as long as the injunction exists, undissolved, it must be obeyed, and for a violation thereof the party will be held in contempt. If, however, the court has no jurisdiction over the subject-matter involved, or if it has exceeded its power, by granting an injunction in a matter beyond its jurisdiction, the injunction will be treated as absolutely void, and defendants in such case cannot be punished for contempt for its alleged violation.

The rule has been used to bar collateral attacks even when the challenge is to the court's jurisdiction and the constitutionality of its order. *See* Wright, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2ND § 702. *See also Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Sev-

eral Texas contempt cases, however, do not address the principles of the collateral bar rule—only the merits of relators' free speech claims. *See Henry, Tucker, McCormick*, and *Foster* (discharging relators), and *Pierce* and *Thomas* (refusing to discharge relators).

The collateral bar doctrine is based on:

> a belief that in the fair administration of justice no man can be a judge in his own case, however exalted his station, however righteous his motives, irrespective of his race, color, politics, or religion.... One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedoms.

*Walker v. City of Birmingham*, 388 U.S. 307, 320–21, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967).

*Walker* upheld a contempt citation for violation of an ex parte temporary restraining order which ordered a group of civil rights protesters to obey an ordinance which required that a permit be obtained in advance of any parade or march. Contemnors argued that the temporary restraining order violated the First Amendment, and the Supreme Court acknowledged that there were "substantial constitutional questions" about the validity of the order. *Id.* Even the ordinance which the order enforced was later determined to be unconstitutional. Nevertheless, the Court held that in appeal from a judgment of contempt, the collateral bar rule precluded contemnors from challenging the constitutionality of the order they had violated.

The collateral bar rule cannot be applied without exception. For example, the rule is generally deemed to apply only in "criminal" or "punitive" contempt actions, as opposed to "civil" actions. "Civil" contempt is used to procure future compliance with an order. If the order is improper, it would be purposeless to insist upon continued compliance. Thus, review of the propriety of the order should not be barred.[9] "Crimi-

---

tempt due to constitutional prohibition against imprisonment for debt).

**9.** *See* Wright, at § 702. "Civil" contempt, instead of imposing a fixed sentence for past con-

nal" contempt punishes a violation of an order. When violation of an order justifies punishment even if the order was improper in some respect, the collateral bar rule precludes review of the order.

Other exceptions may be constitutionally required. A collateral challenge may be allowed, for example, in a case where there was no opportunity for effective review of the order before it was violated. *See Walker*, 388 U.S. at 315 n. 6, 87 S.Ct. at 1829 n. 6 (distinguishing *In re Green*, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962)); Wright, at § 702. As *Walker* suggests, a case may be in a "different constitutional posture" if petitioners attempted to challenge the injunction in state courts before violating it, but were met with delay or frustration of their constitutional claims. 388 U.S. at 318, 87 S.Ct. at 1830. See also *United States v. Ryan*, 402 U.S. 530, 532, n. 4, 91 S.Ct. 1580, 1582, n. 4, 29 L.Ed.2d 85 (1971) (proceedings to enforce a burdensome or otherwise objectionable jury subpoena). Another exception may apply if an order is "transparently invalid." See *Martin v. Wilks*, 490 U.S. 755, 790 n. 28, 109 S.Ct. 2180, 2199, 104 L.Ed.2d 835 (1989) (Stevens, J., dissenting); *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986), *cert. dism'd*, 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 Wright § 702 n. 19. This rule may account for several of the Texas free speech cases. *Walker* also implies, to some extent, that too sudden a turn on the procedural highway might run afoul of additional constitutional guarantees, if, *e.g.*, a rule in contravention of earlier practice is suddenly adopted without notice.[10] Other exceptions might arise from state law. There may be cases in which the order sought to be enforced is so

patently outside the court's authority to act, under any set of facts, that a collateral attack is permitted. *See, e.g., Ex parte Castro*, 115 Tex. 77, 273 S.W. 795 (1925) (order prohibiting remarriage within one year of original divorce was without authority, and therefore void); *Warfield*, 50 S.W. at 936–37 (indicating that collateral attack is appropriate only if it may at once be perceived that no condition of facts could confer jurisdiction).

The reasons for the collateral bar rule, however, are as compelling as the reasons for the exceptions. As *Walker* eloquently expresses, the idea that a person may intentionally violate a court order without consequence, even if there are grounds for reversing that order, strikes at fundamental notions of order in a free society. This is no less true when constitutional rights are in issue. A blanket exception to the rule whenever free speech rights are claimed to be infringed makes it very difficult for trial courts to enforce order in volatile situations, such as the one which is the setting for the present proceedings.

The circumstances of this case do not fall within any warranted exception to the collateral bar rule. It is true that relators were afforded only a short time in which to present their defense to plaintiffs' suits and, if necessary, to seek relief from the court of appeals. The temporary restraining orders were issued less than a week before the first planned protests. The timing of the protests—to coincide with the Republican National Convention—was integrally linked to their content. In some cases, the delay occasioned by undertaking a direct attack on an order could potentially deprive the party of his opportunity to speak without any effective remedy.[11]

---

tempt, seeks to procure compliance by, for example, imposing indefinite confinement until the contemnor purges the contempt. *Ex parte Werblud*, 536 S.W.2d 542, 545 (Tex.1976); Wright, § 704.

**10.** The Court observed: "We do not deal here, therefore, with a situation where a state court has followed a regular past practice of entertaining claims in a given procedural mode, and without notice has abandoned that practice to the detriment of a litigant who finds his claim foreclosed by a novel procedural bar. This is

not a case where a procedural requirement has been sprung upon an unwary litigant when prior practice did not give him fair notice of its existence." *Walker*, 388 U.S. at 319, 87 S.Ct. at 1831 (citations omitted).

**11.** *See* Joel L. Selig, *Regulation of Street Demonstrations by Injunction: Constitutional Limitations on the Collateral Bar Rule in Prosecutions for Contempt*, 4 Harv.Civ.Rights-Civ.Lib.L.Rev. 135, 141 (1968); Note, *Defiance of Unlawful Authority*, 83 Harv.L.Rev. 626, 635 (1970); *see also Walker*, 388 U.S. at 349, 87 S.Ct. at 1847

This is not such a case. Relators could have requested a full evidentiary hearing; they did not. After relators received notice that the orders had issued, they made no serious attempt to have them dissolved or modified. They made no attempt to seek review by appeal.[12] Relators, in fact, were uninterested in seeking review of the orders, as evidenced by their declared intent to violate the orders without regard to legal process.

Relators' circumstances are similar to those we described in a habeas corpus case arising over a half century ago:

> [I]nstead of moving to modify or dissolve the [order], and instead of seeking to have a hearing on same, relator appears to have fully acquiesced in the action of the court until [the time at which he violated the order]. If the restraining order was too broad and included matters of doubtful validity, it was clearly the duty of relator to obey same and to seek a modification or dissolution.

*Ex parte Kimberlin*, 86 S.W.2d at 721. Relators' free speech claims in this proceeding should be precluded by the collateral bar rule.[13]

\*　　\*　　\*　　\*　　\*　　\*

The cases before the district court required it to balance conflicting claims of right. To protect the rights of one group, the court was constrained to limit the rights of the other. The district court may not have struck the precise balance required by the First Amendment, but it attempted to do so, it afforded relators every opportunity to challenge its decision, and that decision was flawed only because it was too restrictive and not because no restrictions were justified. In these circumstances, relators should not be allowed to publicly spurn the court's orders and escape all punishment.

I would deny relators relief and remand them to the custody of the sheriff.

ENOCH, J., joins in this Dissenting Opinion.

---

(Brennan, J., dissenting) ("[t]he ability to exercise protected protest at a time when such exercise would be effective must be as protected as the beliefs themselves").

**12.** *See generally* William Frank Carroll, *Review of Temporary Restraining Orders in Texas—An Appealing Prospect*, 46 Tex.Bar Journal 1406 (1983). *See also Walker*, 388 U.S. at 318–19, 87 S.Ct. at 1830–31; *see also* Richard E. Labunski, *The "Collateral Bar" Rule and the First Amendment: The Constitutionality of Enforcing Unconstitutional Orders*, 37 Am.U.L.Rev. 323, 374–77 (1988). *Cf. In re Providence Journal Co.*, 820 F.2d 1354, 1355 (1st Cir.1987) (en banc) (parties wishing to challenge "transparently invalid" court orders collaterally were required to first make a good faith effort to seek emergency relief from appellate court, if available), *modifying* 820 F.2d 1342 (1st Cir.1986), *cert. dism'd*,

485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988).

**13.** Some federal cases suggest that even if a contempt citation is not set aside by a reviewing court because the order violated is invalid, the court issuing the contempt judgment should have the opportunity to reassess whether punishment should still be imposed, given the invalidity of the order. *See United States v. Dickinson*, 465 F.2d 496, 513–14 (1972) (vacating and remanding to the trial court to allow it to decide whether the contempt judgment or punishment would still be deemed appropriate), *citing Donovan v. City of Dallas*, 377 U.S. 408, 414, 84 S.Ct. 1579, 1583, 12 L.Ed.2d 409 (1964), and *Dunn v. United States*, 388 F.2d 511, 513 (10th Cir.1968). This practice allows greater flexibility in applying the collateral bar rule. Our habeas corpus procedure does not permit this practice, however.